```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3    United States of America,

 4                    Plaintiff,

 5    -v-                                  Case No. 19-20259

 6    Gemar Morgan,

 7                    Defendant.
      _____/
 8

 9                     JURY TRIAL - VOLUME 1
               (EXCLUDING VOIR DIRE AND JURY SELECTION)
10
                  BEFORE THE HONORABLE DAVID M. LAWSON
11                   United States District Judge
                 Theodore Levin United States Courthouse
12                   231 West Lafayette Boulevard
                          Detroit, Michigan
13                        November 5, 2019

14    APPEARANCES:

15    FOR THE PLAINTIFF:    DAWN ISON
                            ROBERT VAN WERT
16                          United States Attorney's Office
                            211 West Fort Street, Suite 2001
17                          Detroit, Michigan  48226

18    IN PRO PER:           GEMAR MORGAN

19    FOR THE DEFENDANT     MARGARET S. RABEN
      AS STANDBY COUNSEL:   Gurewitz & Raben, PLC
20                          333 West Fort Street, Suite 1400
                            Detroit, Michigan  48226

21

22

23

24            To Obtain a Certified Transcript Contact:
              Rene L. Twedt, CSR-2907, RDR, CRR, CRC
25                   www.transcriptorders.com
```

1    TABLE OF CONTENTS

2    MATTER                                                              PAGE

3    GOVERNMENT'S OBJECTION TO DEFENDANT'S EXHIBITS
     Argument By Mr. Van Wert..................................   5
4    Argument By Defendant Morgan.............................   7
     Ruling By the Court......................................   9
5    Further Argument By Mr. Van Wert.........................  10
     Further Argument by Defendant Morgan.....................  13
6    Ruling By the Court......................................  21

7    MOTION TO BAR EVIDENCE OF PRIOR CONVICTION
     Argument By Defendant Morgan.............................  22
8    Argument By Mr. Van Wert ................................  23
     Further Argument by Defendant Morgan.....................  25
9    Ruling By the Court......................................  27

10   MOTION TO DISMISS
     Argument By Defendant Morgan.............................  28
11   Ruling By the Court......................................  30

12   OBJECTION TO GOVERNMENT EXHIBITS 2 AND 5
     Argument By Defendant Morgan.............................  31
13   Argument By Mr. Van Wert.................................  32
     Ruling By the Court......................................  33
14   Further Argument By Defendant Morgan.....................  34
     Further Argument By Mr. Van Wert ........................  34
15   Ruling By the Court......................................  36

16   **(JURY VOIR DIRE AND SELECTION HELD UNDER SEPARATE VOLUME)**

17   Jury Sworn...............................................  38

18   PRELIMINARY JURY INSTRUCTIONS............................  38

19   OPENING STATEMENTS
     For the Government By Ms. Ison...........................  59
20   For the Defendant By Defendant Morgan....................  62

21   GOVERNMENT'S CASE-IN-CHIEF

22   WITNESSES:

23   BRIAN KROSS
     Direct Examination By Mr. Van Wert.......................  68
24   Cross Examination By Defendant Morgan....................  85

25

1   WITNESSES:

2   DARREN LONG

    Direct Examination By Mr. Van Wert........................ 102
3   Cross Examination By Defendant Morgan..................... 109

4   JONATHAN COMER
    Direct Examination By Mr. Van Wert........................ 113
5   Cross Examination By Defendant Morgan..................... 118
    Redirect Examination By Mr. Van Wert..................... 120
6   Recross Examination By Defendant Morgan................... 121
    Examination By the Court................................. 124

7   DAVID SALAZAR
8   Direct Examination By Mr. Van Wert........................ 126
    Cross Examination By Defendant Morgan..................... 134

9   KENTON WESTON
10  Direct Examination By Ms. Ison........................... 138
    Cross Examination By Defendant Morgan..................... 155
11  Redirect Examination By Ms. Ison......................... 165
    Recross Examination By Defendant Morgan................... 170
12  Further Redirect Examination By Ms. Ison................. 175
    Further Recross Examination By Defendant Morgan.......... 177
13  Further Redirect Examination By Ms. Ison................. 177
    Further Recross Examination By Defendant Morgan.......... 178

14

15  EXHIBITS RECEIVED:

16  Exhibit Number 1.........................................  81
    Exhibit Number 3......................................... 151
17  Exhibit Number 5......................................... 147
    Exhibit Number 6......................................... 148

18

19  CERTIFICATE OF COURT REPORTER............................ 183

20

21

22

23

24

25

1    Detroit, Michigan

2    November 5, 2019

3    9:22 a.m.

4                              *      *      *

5            THE CLERK:  All rise.  The United States District

6    Court for the Eastern District of Michigan is now in session,

7    the Honorable David M. Lawson presiding.

8            THE COURT:  You may be seated.

9            THE CLERK:  Now calling the case of the United States

10   against Gemar Morgan, Case Number 19-20259.

11           THE COURT:  Good morning, counsel.  Would the

12   Government attorneys put their appearances on the record,

13   please?

14           MR. VAN WERT:  Good morning, your Honor.  Rob

15   Van Wert for the United States.

16           MS. ISON:  Good morning, your Honor.  Dawn Ison on

17   behalf of the United States.

18           THE COURT:  And Mr. Morgan, good morning, sir.

19           THE DEFENDANT:  Good morning.

20           THE COURT:  Ms. Raben, you're appearing as standby

21   counsel for Mr. Morgan?

22           DEFENDANT MORGAN:  Margaret Raben as standby counsel

23   to Mr. Morgan.  Yes, sir.

24           THE COURT:  Thank you.  You may be seated.

25           The case is here for trial; however, I had some

1    motions that were filed at the last minute that have not been

2    addressed.

3            The Government has filed two motions objecting to the

4    Defendant's exhibits and theory of the case, and the Defendant

5    filed a motion to bar evidence of prior convictions under

6    Rule 609 and also renewed a motion to dismiss on a

7    jurisdictional basis.

8        (Pause in the proceedings at 9:23 a.m.)

9            THE COURT:  I guess I misspoke.  The Government

10    didn't file motions, but the Government did file objections.

11    They are not characterized as motions.

12            Ms. Ison, do you want to address the Government's

13    objection to Number 74, please?

14            MS. ISON:  Your Honor, Mr. Van Wert will do that.

15            THE COURT:  Mr. Van Wert, go ahead.

16            MS. ISON:  Thank you.

17            MR. VAN WERT:  Which objection was that, your Honor?

18            THE COURT:  74.  Docket Number 74.

19            MR. VAN WERT:  Yes, your Honor.

20            THE COURT:  That's the objection to the exhibits.

21            MR. VAN WERT:  Yes, your Honor.

22            Your Honor, quite frankly, we did object to all three

23    exhibits.

24            THE COURT:  If you're not by a microphone, you're

25    going to have to speak up.

1          MR. VAN WERT:  We did object, your Honor, to all

2    Exhibits A, B, and C, proposed Defense exhibits.  Quite

3    frankly, the Defendant is seeking to admit what appear to be

4    printouts of no longer valid law and also irrelevant and no

5    longer legally valid case law.

6          The Defendant is attempting to -- quite frankly, if

7    these exhibits are put in front of the jury, instead of the

8    jurors being instructed by the law properly by the Court with

9    the jury instructions, they may be misled with this irrelevant

10   law that's put forth by the Defendant in Exhibits A, B, and C,

11   your Honor.  He cites to an improper statute.

12         THE COURT:  You mean he cites an improper statute?

13         MR. VAN WERT:  He does, your Honor.  I believe he has

14   cited to a --

15         THE COURT:  No, he doesn't cite to anything.

16         MR. VAN WERT:  You're correct.  I apologize.  He

17   included a -- what appears to be a printout of some form of

18   922 that's not the current valid version of 922 which is

19   relevant in this case.

20         THE COURT:  Oh, I'm not sure.  I think it's the

21   current version, it's just not the one that applies here.

22         MR. VAN WERT:  Correct.  Correct.  He also cites a

23   portion of the case of United States v. Bass, which does not

24   apply to 922(g) cases.

25         And he also attaches portions of the United States

1   Constitution, various amendments to that Constitution.

2           THE COURT:  You're not suggesting that's expired, are

3   you?

4           MR. VAN WERT:  No, your Honor, absolutely not, your

5   Honor, that is still valid law.  However -- however, the

6   Defendant's concerns or what is proper to be put in front of

7   the jury for the sake of law will come from the Court in the

8   form of the jury instructions.

9           THE COURT:  Well, that's the core argument; correct?

10          MR. VAN WERT:  Yes, your Honor.

11          THE COURT:  That this is not something for the jury

12  to consider.

13          MR. VAN WERT:  Correct, your Honor.  Thank you.

14          THE COURT:  Mr. Morgan, do you want to respond to

15  that?

16          DEFENDANT MORGAN:  Yes, your Honor.

17          Actually, the exhibits that I provided and submitted

18  to the courts, the 922(g) is the new version of 922(g).

19  Title 18 is from LexisNexis, the redefined definition, the

20  922(g).

21          And also, I also got, like, you know, definition of

22  Supreme Court's ruling on the proper commerce clause.

23          And I got case law from Garcia, 143 F.Supp 2d 791,

24  describing the use of a gun manufactured in another state

25  which do apply to this situation.

1          And also I have another page from the Garcia case

2     that defines the proper commerce clause.

3          THE COURT:  Well, the argument, Mr. Morgan, is that

4     these are not proper exhibits to submit to the jury because

5     they are statements of the law.  They don't address any of the

6     facts that are at issue in the case.

7          The Government argues, and I believe correctly, that

8     the jury must take their law that they are to apply from my

9     instructions, not from exhibits or from argument by you.  The

10    sole source of law in a trial that the jury applies comes from

11    the Judge, not from the parties, and your exhibits don't

12    address any of the factual issues in the case.

13         The elements in the case are whether you possessed a

14    firearm; secondly, whether at the time you possessed the

15    firearm you had previously been convicted of a felony; and

16    then finally, whether the gun was -- had traveled in

17    interstate commerce.  Those are factual issues, and your

18    exhibits don't address any of those.  So the Government

19    objects to them.  Do you have any response to that?

20         DEFENDANT MORGAN:  Yes.  Actually, the commerce

21    clause definitions that I have, it do properly define the

22    interstate commerce definition which do apply to this current

23    situation.

24         THE COURT:  Well, maybe as a matter of law, and

25    you can argue that when it comes time to discuss the jury

```
 1    instructions, but those are not exhibits that the jury will
 2    see, because the jury takes its law from me, not from you.
 3              DEFENDANT MORGAN:  Right.  What about up under the
 4    Federal Rules of Evidence 402, United States statute, federal
 5    statute?
 6              THE COURT:  I'm sorry, what are you asking about?
 7              DEFENDANT MORGAN:  Up under Federal Rules of Evidence
 8    402, it states that I can submit United States federal
 9    statutes.
10              THE COURT:  No, it doesn't.  Rule 402 deals with
11    relevant evidence, and the evidence in the case has to do with
12    whether the relevant evidence in the case is evidence that
13    might have a tendency to establish a fact; that is, a fact of
14    consequence to the determination of the action, whether it's
15    more likely or less likely than it would be without the
16    evidence.  That has nothing to do with statements of the law.
17    Do you understand that?
18              DEFENDANT MORGAN:  Yes.
19              THE COURT:  All right.  Do you have any further
20    response?
21              DEFENDANT MORGAN:  Just a second.
22       (Discussion held off the record at 9:32 a.m.)
23              DEFENDANT MORGAN:  No.
24              THE COURT:  All right.  Thank you.
25              The Government's objection will be sustained.  The
```

1    Court will not receive Exhibits A, B, or C of the Defendant.

2    The jury will not see those and they will not be submitted to

3    the jury.

4           The next objection is Objection Number 75, and that's

5    the objection to the defense theory.  I'm not sure that that

6    plays much of a role here, but Mr. Van Wert, are you taking

7    that one too?

8           MR. VAN WERT:  Yes, your Honor.

9           THE COURT:  Let me hear your argument, what your

10   concern is.

11          MR. VAN WERT:  Well, your Honor, regarding

12   Mr. Morgan's theory of defense that he has submitted, a

13   Defendant's only entitled to have his defense theory put

14   before the jury as long as there is basis for it in the law

15   and the facts that will come out at trial.

16          Judge, Mr. Morgan's theory of defense --

17          THE COURT:  Are you anticipating a jury instruction

18   argument here?

19          MR. VAN WERT:  But I think -- well, essentially, what

20   Mr. Morgan is attempting to do is have his theory of defense

21   included in the jury instructions or to have the Court

22   instruct the jury as to his theory of defense.  I believe it's

23   Jury Instruction 6.1 which allows for the theory of defense to

24   be given to the jurors by the Court and that's what Mr. Morgan

25   has submitted.

1          Our objection to that is that it's Mr. Morgan's --

2     the body of his theory of defense is rife with incorrect

3     statements of the law, incorrect arguments regarding his

4     status as a derivative person under the statute.

5          He starts out by including an incorrect definition of

6     the term "felon" as opposed to the correct version that's

7     listed in 921(a)(20) which defines it as a person convicted of

8     a crime punishable by imprisonment for more than one year.

9          Mr. Morgan puts -- vaguely puts forth an entrapment

10    defense, and then Mr. Morgan argues that his -- his -- that he

11    is not prohibited from possessing a firearm because more than

12    three years has passed since his felony convictions; however,

13    Mr. Morgan applies the wrong portion of the Michigan Code,

14    Section 750.224f.

15         Mr. Morgan attempts to apply subprovision (1) which

16    pertains to individuals who are convicted of felonies that are

17    not specified offenses.  However, in dealing with Mr. Morgan's

18    State of Michigan conviction for armed robbery, armed robbery

19    is a specified offense in the State of Michigan; therefore,

20    Section 224f, subsection (2) applies, which imposes an

21    additional requirement in order to have your rights restored,

22    meaning that Mr. Morgan would have to petition the Circuit

23    Court in the county where he resides for an order restoring

24    those rights.

25         Mr. Morgan has not put forth any evidence that he has

1    done so.  He has not provided an order from any Circuit Court

2    in Michigan restoring those rights.

3              THE COURT:  Well, even if he did, would that have any

4    effect on Section 922(g)?

5              MR. VAN WERT:  It would not in Mr. Morgan's case,

6    because --

7              THE COURT:  Well, in any case?

8              MR. VAN WERT:  It does.  In certain situations, if an

9    individual is successful in petitioning the Circuit Court,

10   technically under the law a Circuit Court can restore an

11   individual's rights.

12             THE COURT:  Not the right to possess a firearm as

13   under federal law.

14             MR. VAN WERT:  Not under federal law, no.  And

15   especially in Mr. Morgan's case, because he does have a --

16             THE COURT:  We are in a federal court.

17             MR. VAN WERT:  Absolutely.  Well, and in addition,

18   in Mr. Morgan's case he does have another federal felony

19   conviction for felon in possession of a firearm, and

20   Mr. Morgan does not address that conviction either.

21             So his theory of defense misstates the law, misstates

22   the law's application to his situation, and again, would do

23   nothing but confuse the jury as to the correct law and the

24   issues that are relevant in this case.

25             THE COURT:  All right.  Mr. Morgan, do you have a

1    response?

2          DEFENDANT MORGAN:  Yes, your Honor.  My theory of

3    defense asserts the rights that, you know, I was given up

4    under the United States Constitution amendments.  The

5    definition of "felon" that I did, you know, define up under

6    my theory of defense was from Case Maker law library and it

7    is up to date.

8          THE COURT:  Well, I appreciate that, Mr. Morgan.

9    Here's my concern:  You're not correct.  You misunderstand the

10   law.  And your definition of "felon" is not the definition

11   that governs this case.  The statute, 924 -- 922(g) of

12   Title 18 says that if a person had been convicted of a felony,

13   that is, a crime punishable by more than a year in prison,

14   then the person is prohibited from possessing a firearm.

15         Now, my concern is that you might be attempting to go

16   to trial here based on your understanding of what you believe

17   the law is, but it's not correct, so that you would be trying

18   to put forth a defense that is irrelevant, that the jury

19   cannot even consider.

20         So I know you're challenging whether you have been

21   convicted of a felony or not.  The Government will be offering

22   proofs to show that you were convicted of armed robbery and

23   that you also were convicted of being a felon in possession of

24   a firearm.  Both of those are qualifying felonies that would

25   disqualify you from possessing a firearm.

1      The second defense you're attempting to put forth has

2  to do with whether the gun was in or affecting commerce, but

3  the law from the Supreme Court and from the Circuit clearly

4  state -- states that if the -- if you possessed a gun in a

5  state other than the weapon's state of manufacture, then that

6  satisfies that element of the crime.

7      Now, you can try to defend that if you want, but the

8  jury will not be instructed on that theory because it's not a

9  correct statement of the law.  Do you understand that?

10      DEFENDANT MORGAN:  Yes.

11      THE COURT:  Okay.  Go ahead.

12      DEFENDANT MORGAN:  May I speak on that behalf?

13      THE COURT:  Yes, you may.  Go ahead.

14      DEFENDANT MORGAN:  According to case law that I have,

15  it say:  "The use of a gun manufactured in another state,

16  neither does the use of a gun manufactured in another state

17  constitute engaging in interstate commerce.  Because there are

18  no gun manufacturers in Michigan, virtually every gun comes

19  from another state; thus, any gun used in a state that does

20  not manufacture guns necessarily involves the accusation" --

21  "acquisition of a product that moved in interstate commerce.

22      "If the use of a gun manufactured in another state

23  supplied the jurisdictional hook for whether an action

24  constitutes engaging in interstate commerce, then every crime

25  committed in Michigan with a gun or any other weapon not

1    manufactured here would potentially be subject to federal

2    criminal jurisdiction.  This is not the law.

3         "If it were, then whether or not federal criminal

4    jurisdiction attaches would depend upon where weapons are

5    manufactured.  The gun used here were the implement by which

6    members carried out alleged criminal activity.  The gun may

7    have been involved in interstate commerce, but not the

8    enterprise, as the statute required.

9         "The Supreme Court made clear in American Building

10   Maintenance that the purchase from a local supplier of goods

11   which traveled at one time in interstate commerce does not

12   constitute engaging in the acquisition of goods in interstate

13   commerce.  The Court found that the janitorial services

14   suppliers could not be said to have engaged in commerce based

15   on the allegations that the company made local purchases of

16   equipment and supplies that were" -- "that were manufactured

17   in another state.

18        "Although the Benton companies used janitorial

19   equipment and supplies manufactured in a large part outside

20   of California, they did not purchase them directly from

21   suppliers located in other states; rather, those products were

22   purchased in intrastate transactions from a local distributor.

23   Once again, therefore, the Benton companies were separated

24   from direct participation in interstate commerce by the

25   pricing and other marketing decisions of independent

 1    intermediaries.  By the time the Benton companies purchased

 2    their janitorial supplies the flow of commerce had ceased."

 3            And I also have another one.

 4            THE COURT:  Well, wait.  Before you do put that down,

 5    you were reading from a case, weren't you?

 6            DEFENDANT MORGAN:  Yeah.  A case that the --

 7            THE COURT:  What's the name of that case?

 8            DEFENDANT MORGAN:  That's Garcia versus United

 9    States.

10            THE COURT:  Is that the one that Judge Edmunds

11    decided?

12            DEFENDANT MORGAN:  I really -- the case I got is --

13    it came from the United -- I mean, the U.S. Supreme Court.

14            THE COURT:  The case that you were reading from is a

15    District Court case, I believe, and the statement of the law

16    there is correct, but it doesn't apply to the crime that

17    you're charged with.

18            DEFENDANT MORGAN:  I have another one from the

19    Supreme Court.

20            THE COURT:  Well, you know, you're charged with being

21    a felon in possession of a firearm.  You're not charged with

22    engaging in a racketeer influenced and corrupt organization

23    activity, you're not charged with selling firearms, and you're

24    not charged with using a firearm in connection with another

25    felony.  You're simply charged with possessing a gun that has

```
 1    some connection with interstate commerce.
 2           And the law is quite clear that if you are in
 3    Michigan and you possess a gun that was manufactured in a
 4    state other than Michigan, I believe the state of manufacture
 5    here is either Nevada or California, then that satisfies
 6    that element of the crime.  And that's what the jury will be
 7    instructed on, and you will not be permitted to argue
 8    something else, because that's not what the law is.
 9           DEFENDANT MORGAN:  Could I read from this section?
10           THE COURT:  Yes.  Tell me what you're reading from
11    first.
12           DEFENDANT MORGAN:  It's from the Garcia case, too.
13           THE COURT:  Okay.  And do you have a citation for the
14    Garcia case there?
15           DEFENDANT MORGAN:  Yes.  143 F.Supp. 2d 791.
16           THE COURT:  Yes.  Decided what year?
17           DEFENDANT MORGAN:  2000.
18           THE COURT:  2000.  Okay.  Go ahead.
19           DEFENDANT MORGAN:  "The Court rejected the
20    Government's submission concerning purported ties to the
21    interstate commerce emphasizing that the term used, in and
22    affecting commerce, is most sensibly read to mean active
23    employment for commercial purposes and not merely a passive
24    passing or past connection to commerce."
25           And that came from the same citing.
```

1        THE COURT:  Right.  Which -- in which the defendants

2   were not charged with being felons in possession of a firearm.

3   It's a different crime.  The case does not apply here.

4        DEFENDANT MORGAN:  I understand that, but it actually

5   clarified interstate commerce, that the current case I'm

6   facing is adopting for this charge.

7        THE COURT:  Let me just suggest to you this:  There

8   is a case called Scarborough versus the United States.  It's a

9   United States Supreme Court case that was decided in 1977.  In

10  that case the interstate nexus element, the Supreme Court

11  says, is satisfied if there is proof that the firearm

12  previously traveled in interstate commerce.

13       And then in 1989, the Sixth Circuit decided a case

14  called United States versus Pedigo.  And in that case the

15  Court said that the element is met if the defendant possessed

16  the firearm outside of its state of manufacture.  That's

17  the -- that's the law, Mr. Morgan, and that's the law that

18  the jury will be instructed on.

19       Now, the reason I take pains to tell you about this

20  is because I'm concerned that based upon your misunderstanding

21  you might be going to trial to assert a defense that is

22  inapplicable.  In other words, based upon what you're trying

23  to say, your position is indefensible.

24       Now, many times people go to trial on felon in

25  possession cases because they dispute whether or not they

1    actually possessed the gun.  Now, I don't know what the facts

2    are behind that element here in this case, but if you have a

3    defense, a factual defense that you were not in possession of

4    that gun, then we can hear proofs on that and the jury will

5    decide based upon the evidence.

6            But if you're arguing about whether the gun was --

7    traveled in interstate commerce based upon your theory, that's

8    a non-starter.  And if you're arguing that you are not a felon

9    because you're not currently serving a sentence, that's a

10   non-starter, too.  That's simply an incorrect statement of

11   the law.

12           DEFENDANT MORGAN:  (Gesturing.)

13           THE COURT:  Yes.

14           DEFENDANT MORGAN:  Well, I had my rights restored

15   through the State of Michigan and through the transportation

16   TSA and the Department of Homeland Security.

17           THE COURT:  I respectfully disagree that you did not

18   have your rights restored and the jury will not be instructed

19   on that either.

20           Now, if you want to take that position, as you had in

21   your motions to dismiss, then you can ask an appellate court

22   whether or not I have correctly ruled on that issue, but at

23   this point the issue is settled, that you have not had your

24   rights restored, that you are a convicted felon, and you are

25   a prohibited person.  So if the Government proves that you

Jury Trial - Volume 1 - November 5, 2019

1    possessed this Raven Arms handgun, then the jury will have

2    sufficient evidence to base a conviction, if they choose to

3    do that.

4              DEFENDANT MORGAN:  (Gesturing.)

5              THE COURT:  Go ahead.

6              DEFENDANT MORGAN:  In 2014 I was -- I had to apply

7    for a hazmat endorsement that was, you know, part of my CDLs

8    and through that I had to --

9              THE COURT:  When you say "CDL" you mean commercial

10   driver's license?

11             DEFENDANT MORGAN:  Yes.

12             THE COURT:  Okay.

13             DEFENDANT MORGAN:  As part of that I had to petition

14   for the Circuit Court for background clearance in order to

15   submit a background clearance to the TSA and Homeland

16   Security.  And I got the background clearance from the

17   Circuit Court and I submitted it to the TSA for the background

18   clearance through they requirement.  So I met the requirements

19   of having the background clearance.

20             THE COURT:  And tell me how that restores your

21   rights.

22             DEFENDANT MORGAN:  Due to the fact that I went -- I

23   went with -- first of all, back in 2000 and -- what, I think

24   it was like '11 and '12 when I applied, they told me I didn't

25   meet the credentials because I haven't, you know, had enough

1    time, you know, off of papers and stuff like that.  So in 2014

2    when I applied they said that I met the credentials.  So I put

3    in the application to get the clearance from the Circuit

4    Court, and then I had to pay $89 to TSA to do a background

5    check with the result, the clearance from the Circuit Court,

6    and in March of 2014 they approved me for the background

7    clearance to have the hazmat endorsement.

8              THE COURT:  All right.  So you added a hazmat

9    endorsement, hazardous materials endorsement to your

10   commercial driver's license.

11             DEFENDANT MORGAN:  Yes.

12             THE COURT:  That didn't have anything to do with a

13   gun.

14             DEFENDANT MORGAN:  Could I ask a question?

15             THE COURT:  Go ahead.

16             DEFENDANT MORGAN:  And part of the statute states

17   that you can't ship, receive, transport, up under the

18   credentials of a felon.  When they cleared me to -- when

19   they cleared me in 2014, I was endorsed to transport

20   everything from explosives, which falls up under the terms of

21   firearms, all the way to marine pollutants, you know, just

22   about everything up under the hazmat table.

23             THE COURT:  Well, maybe you did.  Doesn't change

24   things, though, about whether you were a prohibited person

25   from possessing a firearm.

1           Now, that being the case, I will sustain the

2      Government's objection to your proposed theory of the case.

3           Now, you have a motion to bar evidence of a prior

4      conviction under Rule 609?

5           DEFENDANT MORGAN:  Yes.

6           THE COURT:  Do you want to address that?

7           DEFENDANT MORGAN:  Yes.

8           Defense notes that Federal Rules of Evidence Rule 609

9      bars the Government from entering into evidence any of his

10     prior conviction on the grounds of certificate of rehab,

11     governed in Federal Rules of Evidence Rule 609(b)(2) and

12     (c)(1).

13          Defense would like to assert for the record Federal

14     Rules of Evidence Rule 609, impeachment by evidence of a

15     criminal conviction, (b), limits on using the evidence of a

16     criminal conviction after ten years.  The subdivision (b)

17     applies if more than ten years have passed since the

18     conviction or release from confinement; whereas, the

19     Government Exhibit 5 conviction 98-10382 has passed the ten

20     years that Rule 609(b) bars as evidence, as well in (c)(1) of

21     this rule promises that has been the subject of certificate of

22     rehabilitation or other equivalent procedures based on a

23     finding that the person has been rehabilitated.

24          Defense asserts Rule 609(b)(2) and (c)(1) as the

25     authority to exclude the Government Exhibit 3 and 4,

```
 1    06-CR-00190, and Exhibit Number 5, 98-10382.  Both convictions
 2    are a conviction of (c)(1), certificate of rehabilitation, and
 3    number -- and Number 5 of the Government exhibit meets (b)(2)
 4    and (c)(1) of Rule 609 which exclude the Government from using
 5    the past conviction as evidence.
 6             Due to the rule -- due to Rule 609(b)(2) ten-year
 7    limit and (c)(1) certificate of rehabilitation, the Defense
 8    requests that the Court honor Rule 609(b)(2) and (c)(1) in
 9    this matter as the Fourteenth Amendment of the United States
10    Constitution promises equal protection of the law with
11    granting this motion Rule 609(b)(2) and (c)(1) motion to bar
12    the Government from entering past conviction that Rule 609
13    authorized from the Government -- authorized from the
14    Government inflicting harm, error, abuse, and prejudice.
15             Respectfully, Gemar Morgan.
16             THE COURT:  Thank you, Mr. Morgan.
17             Who is responding to that?  Mr. Van Wert?
18             MR. VAN WERT:  Yes, your Honor.
19             THE COURT:  All right.  Go ahead.
20             MR. VAN WERT:  Just very briefly, Judge.
21             We're not seeking to admit the prior convictions
22    under Rule 609.  609 only applies if the Government were to
23    attack Mr. Morgan's character if he were to testify.  We're
24    not using the convictions to impeach his character.  We're
25    using it to satisfy an element of the 922(g) offense.  So
```

1    609 does not apply to the Government's use of Mr. Morgan's

2    prior convictions.

3            THE COURT:  Mr. Morgan, do you understand what

4    that -- what the Government is saying there?

5            DEFENDANT MORGAN:  Not really.

6            THE COURT:  All right.  Rule 609 is a rule of

7    evidence.  Under the Rules of Evidence when a witness

8    testifies the opposite side can challenge the witness's

9    credibility in a number of ways.  One way of challenging

10   credibility is to attack the witness's character for

11   truthfulness, and one way to attack character for truthfulness

12   is to show that the witness had previously been convicted of a

13   felony.

14           The idea being that if a witness is not inclined to

15   honor the rules of society, and therefore, commits a crime,

16   that witness also is less likely to honor the oath to tell the

17   truth.  Do you follow me so far?

18           DEFENDANT MORGAN:  Yes.

19           THE COURT:  Okay.  Now, if a witness has been

20   previously convicted of a felony and testifies, then the

21   Government can use that previous conviction --

22           DEFENDANT MORGAN:  (Gesturing.)

23           THE COURT:  Just let me finish.

24           The Government can use that previous conviction to

25   attack the witness's credibility.  But the limits are that the

1    conviction can't be stale.  So if the conviction is more than

2    ten years old, the Government cannot offer that conviction

3    into evidence for that purpose to attack the witness's

4    credibility, but it may be offered in evidence for another

5    purpose.  And the purpose the Government claims here is to

6    show that one of the elements of the crime is satisfied; that

7    is, that you were previously convicted of a felony, because

8    there is no time limitation under the felon in possession

9    statute.  The evidence is offered for a different purpose.

10           Do you understand that?

11           DEFENDANT MORGAN:  No.  Because the 609 up under the

12   Federal Rules of Evidence that I cited --

13           THE COURT:  Yes.

14           DEFENDANT MORGAN:  -- it didn't mention anything

15   about witness testimony.

16           THE COURT:  It does.  It says, "The following rules

17   apply to attacking a witness's character for truthfulness by

18   evidence of a criminal conviction."

19           So if the Government were to attack your character

20   for truthfulness by using that conviction, then the

21   limitations in Rule 609 would apply.  But the Government

22   is not offering the evidence for that purpose.

23           Now, if you look at Rule 105, Rule 105 says that

24   evidence can be offered for multiple purposes, and if it's

25   offered for multiple purposes, one a proper one and the other

```
 1    an improper one, then you're entitled to a limiting
 2    instruction.
 3            So if you were to testify in this case I would
 4    instruct the jury that it should not consider your prior
 5    convictions on your character for truthfulness, but the jury
 6    can consider your prior convictions on whether you are a
 7    prohibited person because you were a felon when you possessed
 8    the firearm.  That would be my instruction.
 9            Do you understand that?
10            DEFENDANT MORGAN:  I would have to say no, because
11    like I said, the --
12            THE COURT:  Well, I'm not asking if you agree with
13    me, I'm just asking if you understand.
14            DEFENDANT MORGAN:  No.
15            THE COURT:  You don't understand?
16            DEFENDANT MORGAN:  No.
17            THE COURT:  All right.  Let me try to put it this
18    way:  The ten-year limit does not apply if the Government
19    offers your conviction to show that you are a felon.
20            DEFENDANT MORGAN:  Could you repeat that?
21            THE COURT:  Yes.
22            The ten-year limitation in Rule 609 does not apply if
23    the Government offers your prior conviction for the purpose of
24    proving that you're a felon, and therefore, a prohibited
25    person under the firearm statute.
```

 1          DEFENDANT MORGAN:  I respect what you saying, your

 2     Honor, but like I say, the rule that I, you know, citated, it

 3     doesn't mention anything about a witness or the credibility

 4     of -- it talks about a person's prior conviction.  It don't

 5     mention anything about a witness or they credibility to

 6     testify.

 7          THE COURT:  It does.  Do you have the rule there?

 8          DEFENDANT MORGAN:  Yeah.  I got the --

 9          THE COURT:  Do you see 609(a), "In general," do you

10     see that?

11          DEFENDANT MORGAN:  I can read it out this book.

12          THE COURT:  Go ahead.

13          DEFENDANT MORGAN:  Okay.  "Impeachment by evidence of

14     a criminal conviction.  In general, the following rules apply

15     to attacking a witness character for truthfulness or evidence

16     of a criminal conviction."

17          THE COURT:  There, that's what it says.

18          DEFENDANT MORGAN:  Oh, okay.  The law library that I

19     go off of, it didn't have this part, but I see now.

20          THE COURT:  See what I'm talking about now?

21          DEFENDANT MORGAN:  Yeah.

22          THE COURT:  Okay.  So that motion is denied.

23          DEFENDANT MORGAN:  Okay.

24          THE COURT:  Your next motion is another motion to

25     dismiss under Rule 12(b)(2) arguing that there is no nexus to

1    interstate commerce, but we have already discussed that.

2              Do you understand the position of the Court that your

3    argument does not have merit?

4              DEFENDANT MORGAN:  No, because I got case laws that

5    defines interstate commerce as, you know, for example --

6              THE COURT:  I know you read to me from the Garcia

7    case.

8              DEFENDANT MORGAN:  Yeah.  It defines it in a

9    different manner than the Court is stressing.

10             THE COURT:  Right.  But I'm telling you that the way

11   I read it, the case law that you cited does not apply to this

12   situation, and it does not govern the rules that we will go

13   forward with in this trial.

14             DEFENDANT MORGAN:  So the question I have for the

15   Court is, I'm charged with being -- part of that because it

16   say possessing in interstate commerce.  Am I being charged

17   with being regulated up under the commerce clause?

18             THE COURT:  No.  You're regulated under the criminal

19   code.

20             DEFENDANT MORGAN:  Because my understanding of the

21   commerce clause is that Congress had the power to regulate

22   commerce and that's transportation.  So I don't understand how

23   the -- according to the laws that I, you know, recited and

24   researched, I don't understand how I can fall up under a

25   federal jurisdiction when it don't allege that I transported

1    the firearm.

2            THE COURT:  It doesn't allege that you transported

3    anything.  It alleges that the gun had been transported.  It

4    doesn't have to be by you.  If the gun was transported in

5    interstate commerce, that satisfies the element of that crime.

6            DEFENDANT MORGAN:  Yeah, but the Congress got the

7    power to regulate commerce, not manufacturing.  According to

8    Garcia, the use of a gun in Michigan, according to that --

9            THE COURT:  Well, okay, Mr. Morgan.  I appreciate

10   your viewpoint.  I'm not going to debate the point with you,

11   though.

12           DEFENDANT MORGAN:  Okay.

13           THE COURT:  I'm going to tell you, though, that the

14   law that I will apply in this case is this:  If the Government

15   proves that the gun was possessed by you and that gun had been

16   manufactured in a state other than Michigan, then the jury

17   will be free to conclude that that element has been satisfied

18   and that the gun traveled in interstate commerce.  Do you

19   understand?

20           DEFENDANT MORGAN:  No.

21           THE COURT:  All right.

22           DEFENDANT MORGAN:  I mean, unless it's proven.

23           THE COURT:  Unless what's proven?

24           DEFENDANT MORGAN:  That it traveled in interstate

25   commerce.

1          THE COURT:  Right.  If the gun was not manufactured

2    in Michigan, it was manufactured in another state and the gun

3    was found in Michigan, then I suggest to you that the law

4    says that that is sufficient proof that the gun traveled in

5    interstate commerce.

6          Now, you may not like that, but that's what the cases

7    say.

8          DEFENDANT MORGAN:  It ain't about what I like, your

9    Honor.  It's about the case laws that I recited and the

10   definition that came from the case law.

11         THE COURT:  I agree with you, it's not about what you

12   like.

13         DEFENDANT MORGAN:  Yeah.

14         THE COURT:  It is about what the law is.  And I'm

15   telling you what I believe to be the law and the law that will

16   be applied in this case.  Do you understand?

17         DEFENDANT MORGAN:  Yes, your Honor.

18         THE COURT:  All right.  So that's my ruling.  Your

19   motion to dismiss, the renewed motion to dismiss Docket

20   Number 77 is denied.

21         DEFENDANT MORGAN:  Okay.

22         THE COURT:  Now, I don't think that -- I think that

23   takes care of all the motions.

24         DEFENDANT MORGAN:  No.

25         THE COURT:  Mr. Morgan, did you have something else?

 1          DEFENDANT MORGAN:  Yes.  I got an objection to the

 2   Government proposed -- oh, on Docket Number 70.

 3          THE COURT:  Number 70?

 4          DEFENDANT MORGAN:  Yes.

 5          THE COURT:  Okay.  I'm not sure that I know what that

 6   one is.

 7          Oh, that's objecting to the admission of the

 8   ammunition?

 9          DEFENDANT MORGAN:  2 and 5.

10          THE COURT:  Exhibits 2 and 5?

11          DEFENDANT MORGAN:  Yes.

12          THE COURT:  2 is the ammunition.  5 is a certified

13   copy of your -- of a conviction.  I'm not sure what that

14   conviction means.

15          But let's talk about Number 2 first.

16          DEFENDANT MORGAN:  Okay.  Accused's objection to

17   Government Proposed Exhibit 2.  The Government proposed to

18   admit ammunition as its Exhibit 2.  Defendant objects to the

19   exhibit because possession of ammunition is a separate crime

20   and Defendant is not charged with the crime of possession of

21   ammunition, and because under Federal Rules of Evidence 403,

22   this evidence is more prejudicial than probative and will

23   confuse the jury.

24          THE COURT:  Okay.  I understand your argument.

25          Mr. Van Wert?

1          MR. VAN WERT:  Just very briefly, Judge.  We can

2    probably make this pretty simple.  Initially the Government

3    was going to admit the ammunition or a photograph of the

4    ammunition.  At this point in time we're not planning on doing

5    so; however, at the same time -- however, depending on how the

6    proofs come out and depending on how Mr. Morgan may or may not

7    cross examine the witnesses, that may be relevant at some

8    point in time.

9          It's our standpoint that the ammunition is still

10   relevant and we -- because, quite frankly, a firearm is

11   defined as a weapon which will or is designed or may readily

12   be converted to expel a projectile by an action, so the fact

13   that the gun is actually loaded with ammunition or is capable

14   of being loaded with ammunition goes to whether or not that

15   weapon at issue is a firearm by statute.

16         THE COURT:  Will the proofs show that the weapon,

17   when it was seized, was loaded?

18         MR. VAN WERT:  Yes, they will, your Honor.

19         THE COURT:  And is the ammunition that you intend to

20   offer ammunition that fits the weapon?

21         MR. VAN WERT:  It was taken from that weapon and it

22   does fit that weapon, yes, your Honor.

23         THE COURT:  Okay.  All right.  So at this point in

24   time you don't intend to offer it?

25         MR. VAN WERT:  We do not, your Honor.  Partially,

Jury Trial - Volume 1 - November 5, 2019

1   quite frankly, based upon the Court's order not allowing the
2   ammunition into court.  We do have photographs of it, but at
3   this point in time we're going to forgo admitting that as an
4   exhibit; however, again, depending on how the proofs come
5   out and how the Defendant may or may not cross examine the
6   witnesses, we would like to reserve the right to admit it at
7   trial if it becomes an issue.
8           THE COURT:  All right.  This is what I'm going to do,
9   Mr. Morgan:  I'm going to deny your motion as moot because
10  the Government does not intend to offer the ammunition into
11  evidence.
12          If the Government changes its mind, I'll direct the
13  Government to take that up outside the presence of the jury
14  before you mention the ammunition or offer it into evidence.
15          MR. VAN WERT:  Yes, your Honor.  We will.  Thank you.
16          THE COURT:  And we can argue it at that time.
17          DEFENDANT MORGAN:  Okay.
18          THE COURT:  Now, what is Exhibit Number 5?
19          I'm not sure what certified conviction that refers
20  to.
21          Oh, wait a minute.  I might have that here.
22          DEFENDANT MORGAN:  Oh, it's the --
23          THE COURT:  That's the armed robbery conviction?
24          DEFENDANT MORGAN:  Yes.
25          THE COURT:  And what's the problem with that?

1          DEFENDANT MORGAN:  The Government proposed to admit

2    a certified copy of conviction in Case Number 98-10382.  I

3    object under Federal Rules of Evidence 403.  The Government

4    only has to prove a prior felony conviction which the

5    Government intends to do with the record from Case Number

6    06-00190.  Federal Rules of Evidence 403 says evidence should

7    be excluded if it is more prejudicial than probative evidence.

8          More conviction is more prejudicial than probative

9    because the only purpose is to make me look bad in the eyes

10   of jury and a 1998 conviction is not relevant to any issue

11   the Government needs to prove if the evidence of the 2'06

12   conviction is admitted.  I ask the Court to exclude the

13   Government's Proposed Exhibit 5.

14          THE COURT:  Okay.

15          MR. VAN WERT:  Thank you, your Honor.

16          Judge, based upon the recent Supreme Court decision

17   in Rehaif the Government now needs to prove the Defendant's

18   knowledge of his status as a person who was convicted of a

19   crime punishable by more than one year in prison.  That's

20   what we're seeking to do with the admission of both the

21   certified copy of the 1998 armed robbery conviction and the

22   2006 felon in possession conviction as well, your Honor.

23          The Defendant makes an argument under 403, however,

24   he is applying the wrong standard.  403 says that it's

25   excludable only if the -- only if the relevant nature of the

1    evidence is substantially outweighed by the danger of unfair

2    prejudice.

3            In this case, your Honor, the Government has offered

4    to stipulate, essentially stipulate away this evidence by

5    allowing Mr. Morgan to agree that he is a felon, that he is

6    a prohibited person.  Mr. Morgan has decided not to do that.

7    Mr. Morgan has essentially forced us to prove up his knowledge

8    that he has been -- that he has been convicted of a crime

9    punishable by more than one year in prison.

10           And, in fact, Mr. Morgan is even contesting those

11   convictions.  So Mr. Morgan is not only forcing us to prove --

12   to prove this issue, but he is contesting our proofs on this

13   issue.  That makes these documents of not one but both

14   convictions extremely relevant, your Honor.

15           Again, Mr. Morgan, quite frankly, holds the keys to

16   whether or not this evidence is admissible or not because we

17   have offered to stipulate it away.  Mr. Morgan has chosen not

18   to do that, and that's fair, that's his right; however, at the

19   same time, Mr. Morgan can't not agree to the stipulation and

20   then contest the evidence we're going to put forth, but then

21   limit us in the evidence we're going to put forth on this

22   issue when it's a direct element based upon the recent

23   Supreme Court cases.

24           THE COURT:  Okay.

25           MR. VAN WERT:  Thank you.

1        THE COURT:  Do you have any response to that?

2        DEFENDANT MORGAN:  No.

3        THE COURT:  All right.  The one element of the crime,

4   Mr. Morgan, is that you had been convicted of a felony

5   previously and that you knew that you were a convicted felon

6   at the time you allegedly possessed the firearm.  And so in

7   order to prove that the Government has to show that you have

8   a prior felony conviction, which would be the armed robbery

9   conviction.

10        And to prove that you knew that you had a prior

11   felony conviction, the Government wants to show that you had

12   previously been convicted of the same crime you're charged

13   with here; that is, being a prohibited person in possession

14   of a firearm.  And so both of those are highly probative.

15        Now, it is true that the jury could consider multiple

16   felony convictions to show that you simply have a bad

17   character or that you have a propensity to commit a crime.

18   That is a danger.  But it does not substantially outweigh the

19   probative value.  And so Rule 403, in my view, would not

20   prohibit that evidence.  And so your objection to Exhibits --

21   to Exhibit 5 is overruled.

22        I don't think we have any further motions; is that

23   correct?

24        DEFENDANT MORGAN:  Yes.

25        THE COURT:  All right.  Ms. Raben, in light of my

 1    rulings, would you like a few minutes to talk to Mr. Morgan?

 2             MS. RABEN:  Yes.

 3             THE COURT:  All right.  We will take a recess.  And

 4    let me know when you're ready and then we will call for the

 5    jury.

 6             Recess court.

 7             THE CLERK:  All rise.  Court is now in recess.

 8        (Recess taken from 10:10 a.m.  to 10:50 a.m.)

 9

10                          *      *      *

11        (Jury Voir Dire and Selection Held Under Separate Volume.)

12                          *      *      *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE CLERK:  All rise.  Court is back in session.

 2            THE COURT:  You may be seated.

 3            Are we ready for the jury?

 4            MR. VAN WERT:  Yes, your Honor.  Thank you.

 5            THE COURT:  Mr. Morgan?

 6            DEFENDANT MORGAN:  Yes.

 7            THE COURT:  Thank you.

 8            Bring in the jury, please.

 9            THE CLERK:  All rise for the jury.

10       (Jury entered courtroom at 1:03 p.m.)

11            THE COURT:  You may be seated.

12            Members of the jury, when we began the selection

13   process you took an oath to answer the questions truthfully.

14   We have another oath to administer to you right now with

15   respect to your function as jurors on this trial.

16            So I'm going to ask if you will all please stand,

17   raise your right hands, listen to Ms. Pinkowski's oath, and

18   answer out loud when she has finished.

19       (Jury sworn at 1:04 p.m.)

20            THE COURT:  Thank you.  You may be seated.

21            Members of the jury, I want to speak to you briefly

22   about the function of a judge in a criminal trial and your

23   function as jurors.

24            You have just been sworn as a jury to try this case,

25   and by your verdict you will decide the disputed issues of
```

1   fact that exist between the parties.

2          The Court, that is I, will decide questions of

3   law that arise during the trial, and before you retire to

4   deliberate at the conclusion of the trial I will give you

5   instructions on the law that you are to follow in deciding the

6   case and in reaching your verdict.

7          I do that verbally, but I also give them to you in

8   writing so that each of you will have a copy of those written

9   instructions at the end of the case.

10          It is my responsibility to conduct the trial of this

11   case in an orderly, fair, and efficient manner, to rule upon

12   the questions of law that arise during the course of the

13   trial, and to instruct you on the law that you are to apply to

14   the case.

15          You can look on my function, that is, the function

16   of the Court, as that of a referee or an umpire.  I have no

17   personal or professional interest in how this case comes out.

18   The outcome of the case will be entirely up to you as the jury

19   in returning your verdict.

20          My job is to see to it that only legally admissible

21   evidence is received in court, in this court, and to tell you

22   what the law is during and at the end of the trial and to

23   settle any disputes that might arise between the parties

24   during the course of the trial.

25          Now, a few housekeeping matters.  As I mentioned

1    before, the seats that you are in now are the seats that you

2    will occupy whenever you're in the courtroom.

3           I see all of you are wearing your juror pages.  It's

4    very important that you keep those badges on and visible at

5    all times when you're in the building and also during breaks,

6    if there is an occasion for you to leave the building during

7    the day.  The reason is that there are several people in the

8    building and in the vicinity of the courthouse who may be

9    attorneys or witnesses, and they know that they should not

10   have any contact with jurors.  But you have to put them on

11   notice that you are a juror and that's why you wear the

12   badges.  The badges also put the public on notice that you are

13   jurors, so no one will try to talk to you about what you're

14   doing or to discuss anything about the case.

15          I would like to also tell you something about the

16   staff that's assigned to every federal judge, so you know what

17   they are doing during the trial.

18          As I mentioned, Ms.  Twedt is a certified court

19   reporter and she takes down everything that is said in the

20   courtroom by making the court record.  It's a verbatim record,

21   and she does that on a stenotype machine that is connected to

22   a computer, but it also emits strips of paper that have court

23   reporter's notes on them.

24          Now, the court reporter's notes are not normally

25   legible by or readable by people that are untrained.  It takes

1    quite a bit of skill to be able to read the notes.  But if

2    becomes necessary to determine what's been said, either an

3    exact question or exact answer of a witness, Ms.  Twedt can

4    read that back with her court reporter notes.  And if it

5    becomes important later on to find out what happened during

6    the entire trial, she can produce a transcript by using those

7    notes.

8           Now, the technology is not available to produce an

9    immediate, clear, and accurate transcript.  We can produce

10   rough transcripts pretty quickly.  But sometimes jurors ask

11   if they can have the transcript of the testimony of a witness

12   when they are deliberating and that takes time.

13          We don't send transcripts back into the jury room.

14   If you have questions about what a witness says or said, then

15   there is an opportunity to come back into the courtroom and

16   have that testimony read back to you, but we don't like to do

17   that because it's somewhat time consuming, although we can, if

18   need be.

19          But the point is that you should pay attention to

20   what the witnesses say and be attentive at the time that the

21   testimony comes in so that we don't have to try to repeat that

22   later on.

23          Also, you met Ms.  Susan Pinkowski, our courtroom

24   deputy clerk.  She also holds the title of case manager.  Now,

25   her job is to see to it that the ongoing business of this

1    court goes forward even while I'm occupied by this trial.

2            Now, this is one of many cases that are on my list,

3    which we call the docket, and those cases are in various

4    stages of development, and Ms.  Pinkowski monitors those and

5    helps move them along through the process.

6            She will do that sometimes while she is in the

7    courtroom.  Sometimes she won't be in the courtroom, she will

8    be back in her office.  Other times she will come and go and

9    may hand me papers to sign, which usually don't have anything

10   to do with this case.  And the only reason I bring it up is

11   because it is part of the normal give and take and activity of

12   the courtroom and it should not be a distraction for you to

13   your primary job, which is to pay attention to the testimony

14   of the witnesses.

15           In addition, I have two law clerks that are assigned

16   to me.  Michael Shaffer is our senior law clerk, who is giving

17   his Thanksgiving Day parade wave to you over there, and Amir

18   El-Aswad is our junior law clerk.  He is sitting right over

19   here.

20           When I say that they are law clerks, that's really

21   somewhat of a misnomer.  They are both attorneys.  They have

22   both taken and passed bar examinations.  They stay with me for

23   a finite period of time and their job is to assist me in doing

24   legal research primarily.

25           When I instruct you on the law, I want to be sure

1   that it's accurate and current.  And the law is in a state of

2   flux; sometimes it changes daily.  So one of their jobs is to

3   assist me in making sure that the law that I give you is

4   current, updated, and accurate.

5         They also are working on other cases and they may be

6   coming and going and handing me papers to sign, and once

7   again, that should not serve as a distraction for you.

8         Now, the building we are in was completed in 1933 at

9   the end of the Hoover administration, beginning of the

10  Roosevelt administration, for those of you who are fans of

11  American presidents.  Actually, if you have the opportunity

12  after the trial is over to look around the building and see

13  some of the architectural features, it really is quite a very

14  impressive monument in the city here and take advantage of

15  that.

16        One thing that you will notice is that we are in a

17  construction phase, as well, which is a renovation within the

18  building itself, and one of the things that the contractors

19  have done is to redo all the plumbing, electrical, and HVAC

20  systems.

21        Now, I saw some of you fanning yourselves a little

22  earlier today, which means that it's either not working or

23  working too well, so we will try to keep it a little cooler in

24  here, especially in the afternoon hours.  But if it gets too

25  cool, attend to your own comfort.  If you want to bring a

1   sweater so you can doff it or don it as your comfort dictates,
2   feel free to do that.
3         The hours of court are 8:00 in the morning to 5:00 in
4   the afternoon.  We will conduct this trial during the hours
5   of 8:30.  We will begin tomorrow morning at 8:30.  We will
6   continue until about 3:00 or 3:30.  We will not take a lunch
7   break.  We will take breaks during the day.
8         If you would like to snack during the breaks, feel
9   free to bring something and keep it in the refrigerator in the
10  jury room.  If you need water it is in the refrigerator in the
11  jury room as well and you can bring water into the courtroom
12  if you like as well.
13        When we take our breaks we will try to time them for
14  a logical break point, which means after a witness testifies
15  or between the direct and cross examination of a witness.
16        Plan on arriving early, maybe ten after 8:00 or 8:15
17  to assemble on the fifth floor in the jury room so we can
18  be -- have you up here and in the box in the courtroom by 8:30
19  so we can get moving on the case.  The sooner we start, the
20  sooner we finish.
21        If there is anything else that you need other than
22  water or anything else, please let us know.  For example, if
23  you need to take a break to use the facilities or for any
24  reason, just either raise your hand, or if I don't notice you
25  or somebody doesn't notice you, speak up.

1        As happens from time to time, you get drowsy see and

2    it's a little tough to pay attention and you want to just take

3    a stretch break, just stand in place.  You don't have to ask

4    permission to do that.

5        If you need more than that and you need to just walk

6    to clear your head, tell us.  We will do that.  This is not a

7    marathon contest.  The point is, we want to keep you attentive

8    and fresh so that you can receive the evidence and make your

9    decision based on it.

10        Now, you will notice we have thirteen of you.  Twelve

11    jurors are the requisite number to decide a criminal case.  We

12    have an extra juror that we call an alternate juror because we

13    know that in the ordinary experiences of life people sometimes

14    become sick or have accidents or emergencies and if that

15    should happen we want to be sure that there is the legally

16    required number of jurors to decide the case.

17        Now, none of you is identified right now as an

18    alternate juror.  We will make that choice at the conclusion

19    of the case.  And so all of you should pay attention, because

20    potentially every one of you might be called upon, likely will

21    be called upon to deliberate and decide the case.

22        Now, with respect to note taking, I see all of you or

23    most of you, I think all of you, have brought your notebooks

24    into the courtroom.  You're not obliged to take notes.  And if

25    you do take notes you shouldn't be influenced by the notes of

1    another juror, but rather, you should rely on your own

2    recollection of what the evidence is.

3              Also, don't let note taking distract you from paying

4    attention to the testimony of the witnesses or looking at the

5    exhibits as they are displayed.  Notes are not evidence in the

6    case.  They are only an aid to recollection and they are not

7    entitled to any greater weight than the actual recollection or

8    impression of each juror as to what the testimony is.

9              Notes taken by a juror should not be disclosed to

10   anyone other than a fellow juror during the deliberation

11   process.  The notebooks also must remain in the jury room at

12   the conclusion of the day.  Don't take them home with you.

13             At the conclusion of the trial you can take your

14   notes with you, I mean, when the case is all over with, or

15   you can leave them in your notebooks and we will destroy them.

16   Nobody is going to read your notes.  They will be private.  I

17   think the notebooks are probably identified by juror number,

18   but if you like, write your name on the first page so that you

19   can identify them.

20             Now, I want to explain briefly the general order of

21   the procedures in a trial so that you know what's coming next.

22             The first thing that will happen when I'm done with

23   these preliminary instructions is that the attorney for the

24   Government will make an opening statement.

25             The purpose of the opening statement is for counsel

1    to outline to you the Government's theory of the case and

2    what she thinks the evidence will show.  Opening statements

3    are not evidence.  They are only intended to assist you

4    in understanding the viewpoints of the parties.

5         At the conclusion of the Government's opening

6    statement Mr. Morgan will have an opportunity to make an

7    opening statement or he may elect to reserve it until later in

8    the trial.

9         After opening statements we will begin taking the

10   actual evidence.  As I said, the statements of the attorneys

11   are not evidence.  Mr. Morgan's opening statement is not

12   evidence in the case.

13        Evidence consists of the testimony of witnesses and

14   exhibits, which can be documents or physical objects, that you

15   can consider in deciding the case.

16        The testimony of witnesses is taken by the -- first

17   of all, the Government calling a witness to come forward to

18   testify.  The witness is sworn to tell the truth, will take a

19   seat over here in the witness box, and then evidence will

20   proceed by question and answer.

21        The Government's attorney will ask the witnesses --

22   the witness questions; the witness will respond.  We call that

23   direct examination.

24        When the Government has asked all the questions it

25   chooses to of the witness, then Mr. Morgan will have an

 1    opportunity to question that witness.  We call that cross

 2    examination.  Cross examination is allowed because sometimes

 3    it illuminates the testimony or challenges the testimony or

 4    sometimes it might be useful to elicit testimony that could be

 5    favorable to the Defense.

 6         After the direct and cross examination and sometimes

 7    redirect and recross examination the witness will be excused,

 8    the Government will call its next witness, and we will repeat

 9    the process until all the witnesses have testified, and at

10    that point the Government will rest its case.

11         After the Government rests, then the Defendant has

12    an opportunity to present evidence.  Now, you should clearly

13    understand that a defendant in a criminal case is not obliged

14    to produce any evidence whatsoever.  The law does not require

15    a defendant in a criminal case to prove his innocence or

16    produce any evidence.

17         Also, however, if the Defendant does call witnesses

18    the attorney for the Government will have a right to cross

19    examine the witnesses called by the Defendant.

20         After all the evidence has been presented I will give

21    preliminary final instructions on the law that you are to

22    apply in the case.  As I said, I'll give them verbally in

23    court and also in writing so you can follow along.

24         After I have given those preliminary instructions

25    both sides will have an opportunity to present closing

1   arguments in support of their case.  Those statements, the

2   statements by the attorneys and the statements of Mr. Morgan

3   during closing arguments, are not evidence, just like opening

4   statements are not evidence.  But they are only intended to

5   assist you in understanding the evidence and the theory of

6   each party.  You must base your decision only on the evidence

7   in the case.

8           Following the closing arguments of the attorneys and

9   Mr. Morgan I will give you an instruction on the manner of

10  your deliberations and the possible verdicts that you may

11  return and then you will retire to the jury room and

12  deliberate on your verdict.  You will do that by applying the

13  law as I give it to you to the facts as you find them to be.

14          The function of the jury is to determine the facts

15  and you are the sole and exclusive judges of the facts and you

16  alone will determine the weight, the effect, and the value of

17  the evidence as well as the credibility of the witnesses.  You

18  must consider and weigh all of the testimony of each witness

19  who appears before you and you alone are to determine whether

20  to believe any witness and the extent to which you think any

21  witness should be believed.

22          It is your responsibility to consider any conflicts

23  in the testimony that might be presented by the witnesses or

24  the evidence or that might arise during the course of the

25  trial.  Your decision as to any fact in the case is final.

1          On the other hand, it is your duty to accept the law

2    as I give it to you and apply that law.

3          Your determination of the facts of the case must be

4    based only on the evidence that is offered and received in

5    this courtroom.  As I said before, evidence consists of the

6    testimony of the witnesses and the exhibits, which as I

7    mentioned could be documents or other physical objects.  It

8    also may include some things that I simply instruct you to

9    consider as evidence.

10         And as to evidence, the questions that the attorneys

11   and Mr. Morgan ask the witnesses are not evidence themselves.

12   It is the answers of the witnesses that consist of the

13   evidence in the case.

14         Now, some of you may have heard the terms, direct

15   evidence and circumstantial evidence.  Direct evidence is

16   simply evidence like the testimony of an eyewitness which, if

17   you believe it, directly proves a fact.

18         So as an example, if a witness testified that he saw

19   it raining outside and you believed that witness, that would

20   be direct evidence that it was raining.

21         Circumstantial evidence is simply a chain of

22   circumstances that indirectly prove a fact.  If someone, for

23   example, continuing our analogy, walked into the courtroom

24   carrying a wet umbrella and wearing a raincoat that was

25   covered with drops of water, that would be circumstantial

1    evidence from which you could conclude or infer that it was

2    raining outside.

3           It is your job to decide how much weight to give the

4    direct and circumstantial evidence.  The law does not make any

5    distinction between the two, nor does it say that one is any

6    better evidence than the other.  You should consider all the

7    evidence, both direct and circumstantial, and give it whatever

8    weight you believe it deserves.

9           Your function as the jury, of course, is equally

10   important as the function of the Court and the attorneys

11   and Mr. Morgan.  You should give careful attention to the

12   testimony as it is presented for your consideration.  You

13   should keep an open mind and not form or express any opinion

14   about the case until after you have heard all of the evidence,

15   the closing arguments of the attorneys and Mr. Morgan, and the

16   instructions as to the law, and until you have retired to the

17   jury room to consider your verdict.

18          From this point forward you must not discuss the case

19   with anyone, not even members of your own family, and not even

20   with each other as jurors in the case.  It would be unfair for

21   you to discuss the case among yourselves or with others like

22   family and friends until you have heard all the evidence and

23   retired to consider your verdict.

24          So you may tell your family and friends that you have

25   been selected as a juror on this case, but then you must tell

1    them that you are under instructions from the Court not to

2    discuss the case with them until I permit you to do so.

3            After the case is submitted to you for your

4    deliberations you still must not discuss it with anyone else

5    and only discuss it with each other when I instruct you to do

6    so, and only in the jury room and only in the presence of all

7    your fellow jurors.

8            When the trial is over and your verdict has been

9    received in open court, then you may discuss the case with

10   anyone you wish, but until that time comes we ask that you

11   control the natural desire to discuss the case both here and

12   at home.

13           The only information that you will receive about this

14   case will come to you while you are all together as a jury in

15   the presence of the Court and the attorneys and the parties

16   involved.  You must not consider any information that might

17   come to you from outside the courtroom.

18           This trial, like all federal trials, is governed by

19   rules that have to do with the admissibility of evidence.  The

20   rules include the Federal Rules of Evidence and the Federal

21   Rules of Criminal Procedure.

22           The rules have been debated and established by

23   Congress and the United States Supreme Court over many years.

24   Many of the rules have to do with the reliability or

25   unreliability of certain evidence.  Evidence that has been

1    determined to be unreliable may not be admissible and may

2    not be considered by you.

3            In many cases I rule on the admissibility of the

4    evidence before the trial even begins.  So it is extremely

5    important that you follow the instructions that you may only

6    consider the evidence which is admitted in this courtroom.

7    So you must not read any newspaper articles, if there are any,

8    about this case, or relating to this trial.  You must not

9    watch or listen to any television or radio accounts or

10   commentaries about the trial, if there are any during the

11   trial while it is in progress.  I find it unlikely that there

12   will be coverage, but I say that as a matter of caution.

13           You must not visit any scene that is mentioned in the

14   evidence in the case.  If it should be necessary that you must

15   visit a scene you will be taken there as a group under the

16   supervision of the Court.  That's unlikely to occur in this

17   case as well.

18           You must not consider as evidence any personal

19   knowledge that you might have about a place that's mentioned

20   in the evidence.  You may not make any investigation on your

21   own or conduct any experiments of any kind.

22           I know that many of you use smartphones, tablets,

23   the internet, and other tools of technology.  I imagine it's

24   ubiquitous, everybody seems to have one, but you must not use

25   those to check anything out about this case.

1            I think the natural desire these days, it's almost a

2    human reaction when something new comes up, one might want to

3    Google the person or the event or the law or the evidence or

4    the U.S. Attorneys or the Court.  You can't do that.  I mean,

5    you can when it's done, but you can't do it now.  So you

6    really should go radio silent at this point until the case

7    is finished.

8            So don't make any investigations on your own

9    or conduct any experiments.  You may not communicate

10   electronically with anyone about the case.  That includes your

11   family and friends.  You may not go on any social media sites

12   or any blogs or other social networking websites.  Don't post

13   on Facebook or Snapchat or YouTube.  All of these rules apply

14   while the case is underway.  As I said, after the case is over

15   and your verdict has been received in open court, that all

16   disappears, but until then, please honor that instruction.

17           You should not consult dictionaries or reference

18   materials or search the internet or blogs or use any other

19   electronic tools to obtain information about this case or to

20   help you decide the case.

21           Don't try to find any information from any source

22   outside the confines of this courtroom and don't permit anyone

23   to communicate with you or accept any communications that are

24   directed to you having anything whatsoever to do with this

25   trial.  If anyone does attempt to contact you about this case,

1   you must report it to me immediately, as soon as you return to

2   the jury room.

3        The story that I always tell has to do with a case

4   involving a colleague of mine, a District Judge in Missouri

5   who started a criminal case, was into it for a couple of

6   weeks, and it was a long trial, and one of the jurors ended

7   up going on line and finding something about a witness or

8   something like that.  Anyway, he used the internet to discover

9   information about the case.

10       And when that came to light, the Judge had to declare

11  a mistrial, and of course, since the juror violated an order

12  of the Court, the Judge had to find the juror in contempt.

13  And the penalty was the cost of having to try the case again,

14  which can be pretty expensive.  So I say that not as a threat

15  or to intimidate you, but just so you understand that we have

16  to take this seriously.  And this is not going to be a long

17  trial, and so it really shouldn't be that difficult to just

18  isolate yourself for the next couple of days from those common

19  features of technology that we like to use.

20       Now, a trial follows long-established rules of

21  procedure and evidence and the attorneys are trained in those

22  rules.  Mr. Morgan has some knowledge of that and may consult

23  with Ms. Raben about it.  From time to time, the lawyers,

24  therefore, based on those rules, may make objections to some

25  of the questions that are asked or evidence that's being

1    offered.  Now, I'll rule on those objections and motions and

2    most of the time I will do that in your presence.

3         You should not conclude from any rulings that I have

4    an opinion about the case or that I favor one side or the

5    other.  If I sustain an objection to a question and don't

6    permit a witness to answer, you should not try to guess what

7    the answer might have been or draw any inference from the

8    question itself.

9         Now, sometimes the attorneys and parties are required

10   by law to take up matters of objections outside of your

11   hearing, and if that's the case, I will excuse you from the

12   courtroom, you'll go back to the jury room, we will take that

13   up on the record here, make my rulings, and then we will bring

14   you back in.

15        Now, I'm not able to predict when that might happen,

16   but one thing I'll pledge to you is that we will handle it

17   expeditiously so you can get back into the courtroom, hear the

18   testimony, and conclude the case.

19        Now, this is a criminal case.  The indictment charges

20   the Defendant with a crime, and I will summarize the charge

21   against the Defendant.  You heard it earlier today.

22        It says -- the indictment says that Gemar Morgan,

23   referred to sometimes in this trial as the Defendant,

24   committed a crime involving a firearm that took place in

25   this District, that is, the Eastern District of Michigan, on

1    April 9 of 2019, and that on or about that date Mr. Morgan

2    possessed a firearm when he was prohibited from doing so under

3    law because he previously had been convicted of a felony.

4    Mr. Morgan pleaded not guilty to the indictment.

5         You should clearly understand that the indictment in

6    this case is not evidence, but it serves only to inform

7    Mr. Morgan of the charge against him.  An indictment is

8    presented in every criminal trial.  You must not consider it

9    as any evidence of guilt, nor draw any inference of guilt

10   because Mr. Morgan has been charged.

11        Basic to our system of criminal justice is the

12   principle that a person accused of a crime is presumed to be

13   innocent.  That presumption of innocence starts at the very

14   beginning of the case and continues throughout the trial and

15   during your deliberations.

16        Each and every one of you must be satisfied beyond a

17   reasonable doubt after deliberating that the Defendant is

18   guilty before you can return a verdict of guilty.

19        You must begin the trial with the presumption of

20   innocence foremost in your mind.  The fact that the Defendant

21   was arrested and is on trial is not any evidence against him.

22   There must be evidence introduced in this trial that convinces

23   you beyond a reasonable doubt that the Defendant is guilty

24   before you can convict the Defendant.

25        The law does not require a Defendant to prove his

1    innocence or produce any evidence whatsoever.  The burden of

2    proving guilt is upon the Government throughout the entire

3    course of the trial and at no time does the burden ever shift

4    to the Defendant.

5         The burden of proof means that every element of the

6    offense charged must be proved by evidence beyond a reasonable

7    doubt.  A reasonable doubt is a doubt based on reason and

8    common sense, the kind of the doubt that would make a

9    reasonable person hesitate to act.  Proof beyond a reasonable

10   doubt, therefore, must be proof of such a convincing character

11   that a reasonable person would not hesitate to rely and act on

12   it in the most important of his or her own affairs.

13        Now, I may give you additional instructions during

14   the course of the trial, and as I said, I'll give you

15   detailed instructions at the end of the trial.  All of these

16   instructions are important because together they state the law

17   that you are to apply in deciding this case.

18        During the trial, as I mentioned, we will take

19   certain recesses and sometimes during those recesses you will

20   be permitted to separate, leave the jury room, and go about

21   your personal affairs.  During the recesses you must not

22   discuss the case among yourselves or with anyone else, nor

23   should you allow anyone to say anything to you or in your

24   presence about the case.  If anyone does try to say anything

25   to you or in your presence about the case you should advise

 1    them that you are on the jury hearing the case and ask them to

 2    stop.  If they do not, you must advise me upon your return to

 3    the jury room.

 4         Now, we will begin in a moment.  Let me know

 5    immediately, please, by raising your hand or speaking up if

 6    you cannot hear a witness or if you cannot see or hear what's

 7    being demonstrated and we will try to correct that right away.

 8         We will now begin with the Government's opening

 9    statement.

10         Ms.  Ison, is that your prerogative there?

11         MS. ISON:  It is, your Honor.  Thank you.

12         THE COURT:  Are you prepared to address the jury?

13         MS. ISON:  I am, your Honor.  Thank you.

14         THE COURT:  You may proceed.

15         Actually, before you do, just take a stretch break.

16    Why don't we just all stand for a minute.  I don't mean to say

17    that my instructions are boring, but they are boring.

18       (Pause in the proceedings at 1:35 p.m.)

19         THE COURT:  All right.  You may proceed.

20         MS. ISON:  This is simply a case about the facts;

21    facts about Mr. Morgan's past, uncontested facts about his

22    convictions, and facts about more current events that bring

23    us here that you will hear from all of the law enforcement

24    witnesses in this case.

25         As a matter of fact, Mr. Morgan was convicted of a

1   felony previously; that is, a crime punishable by imprisonment

2   by more than one year, and in fact, he was convicted of two.

3          In 1999 Mr. Morgan was convicted of armed robbery.

4   He pleaded guilty to that offense, and he served approximately

5   four-and-a-half years in prison.

6          In 2006 Mr. Morgan was convicted of the very crime he

7   is charged with here today, and that is felon in possession of

8   a firearm in the Western District of Michigan.  He pleaded

9   guilty to that offense and he served approximately six years

10  for that.

11         As a matter of fact, as it relates to the more

12  current facts in this case, Mr. Morgan, on -- I'm sorry -- on

13  February 20th, 2009 -- 2019, a judge in Allen Park authorized

14  a warrant for Mr. Morgan's arrest.  At some point following

15  the issuance of that warrant, the Allen Park Police contacted

16  the Detroit Fugitive Apprehension Team and asked for their

17  assistance in arresting Mr. Morgan.

18         That is a team of officers who is made up of local,

19  state, and federal officers and that's what they do.  They go

20  out and search for people who have valid outstanding warrants,

21  which is a fact that Mr. Morgan had.

22         Trooper -- Michigan State Trooper Brian Kross will

23  tell you that they searched for Mr. Morgan, and on April 9th,

24  2019, they found him in Warren, Michigan, and they arrested

25  him.

1          And as a matter of fact, he was in possession of

2   a Raven Arms .25 caliber weapon in his front -- and it was

3   concealed in his front pants pocket.  That pistol was

4   functional and had been manufactured in the state of

5   California.  And that is a fact that ATF Officer -- Special

6   Agent -- I'm sorry -- David Salazar will tell you.  In fact,

7   the weapon itself indicates that the gun had been manufactured

8   in the state of California.

9          When you hear all those facts from the witnesses in

10  this case and you combine the facts from Mr. Morgan's past,

11  along with the more current facts of what occurred on April 9

12  of 2019, you will be convinced beyond a reasonable doubt that

13  Mr. Morgan was convicted of a crime punishable by imprisonment

14  for more than one year; that following that conviction

15  Mr. Morgan knowingly carried a firearm, the Raven Arms

16  .25 caliber semi-automatic pistol; that at the time Mr. Morgan

17  possessed that firearm he knew he had been previously

18  convicted of a crime punishable by more than one year; and

19  that the firearm was manufactured outside the state of

20  Michigan, and therefore, crossed a state line before

21  Mr. Morgan possessed it.

22          And after you hear the undisputed facts in this case

23  that satisfy each and every element of the crime charged here,

24  we will ask you to return a verdict of guilty against

25  Mr. Morgan.

1        Thank you, your Honor.

2        THE COURT:  Mr. Morgan, would you like to make an

3   opening statement now or would you like to reserve it until

4   later on?

5        DEFENDANT MORGAN:  I would like to make one now.

6        THE COURT:  Okay.  You can stand right there.  Pull

7   your microphone close.  And you may make your opening

8   statement to the jury.

9        DEFENDANT MORGAN:  The Federal Government alleges

10  that I have committed a violation of 18 U.S.C. 922(g), felon

11  in possession of a firearm.

12        The Defense assert the Fourteenth Amendment of the

13  United States Constitution:  No state shall make any law that

14  will abridge the privileges or immunities of citizens of the

15  United States, nor shall any state deprive any person of life,

16  liberty, or property without due process of law, nor deny any

17  person the equal protection of the laws.

18        The definition of felon is one who has been convicted

19  of a felony and has not yet finished serving time for a

20  conviction.

21        MS. ISON:  Objection, your Honor.

22        DEFENDANT MORGAN:  I was not convicted --

23        THE COURT:  Mr. Morgan, excuse me.  There is an

24  objection.  When there is an objection, you have to stop and

25  let me rule on it.

1              DEFENDANT MORGAN:  Okay.

2              THE COURT:  What's the objection, Ms.  Ison?

3              MS. ISON:  Your Honor, Mr. Morgan is giving a

4    definition of felon that the Court has already ruled is an

5    incorrect definition.

6              THE COURT:  Right.  Mr. Morgan, do you remember when

7    we dealt with this a little bit earlier, I told you that you

8    should not be giving statements of the law, that the law comes

9    from me?

10             DEFENDANT MORGAN:  Yes, your Honor.

11             THE COURT:  All right.

12             DEFENDANT MORGAN:  This is the definition I got out

13   the law library and a dictionary.

14             THE COURT:  I know.  But that's not a definition that

15   you can give the jury.  The jury will be instructed by me

16   as to what the law is and, in fact, your definition is not

17   correct.  So move on with respect to your opening statement on

18   the facts.

19             DEFENDANT MORGAN:  That's the only thing -- that's

20   the only definition the dictionary have for a felon.

21             THE COURT:  Well, I'm not going to argue with you.

22   I'm going to tell you to move on.

23             DEFENDANT MORGAN:  I was not convicted of any crime

24   on April 9, 2019, and was not serving any sentence, which the

25   law state, no state should deprive a person of life, liberty,

Jury Trial - Volume 1 - November 5, 2019                    64

1    or property, as the title, felon, has deprived in this matter.

2            The Tenth Amendment, the power is not delegated to

3    the United States by the Constitution nor prohibited by it to

4    the states or by -- or are reserved to the states respectfully

5    or to the people.

6            This is a form of entrapment etched by Government

7    officials of inducing a crime that has not been committed nor

8    were contemplated without the Government inducement of

9    obstruction of justice as defined in the Michigan Compiled

10   Laws, 750.224f.

11           MS. ISON:  Objection, your Honor.

12           THE COURT:  Mr. Morgan, you're talking about the law

13   again.  That's not your prerogative.

14           DEFENDANT MORGAN:  I'm just giving the definition of

15   the Michigan Compiled Laws, felon in possession.

16           THE COURT:  I'm very aware of what you're doing, and

17   I told you, you can't do it.

18           DEFENDANT MORGAN:  It asserts my right that I wasn't

19   a felon in possession up under the Michigan state law.

20           THE COURT:  Well, the law is the --

21           DEFENDANT MORGAN:  It's the definition of it.

22           THE COURT:  -- enactments of Congress that I will

23   instruct the jury on.  That's not your prerogative.

24           Do you have any arguments -- or rather -- opening

25   statement about what the facts will show or what the evidence

 1    will prove?

 2              DEFENDANT MORGAN:  It's the definition of Michigan

 3    state law.  I was a resident of Michigan.

 4              THE COURT:  You're not hearing me, Mr. Morgan.  You

 5    don't have the right to give the jury a definition of state

 6    law.

 7              DEFENDANT MORGAN:  What's the purpose of the opening

 8    statement?

 9              THE COURT:  The opening statement is to show -- is to

10    tell the jury what the facts -- what you believe the facts

11    will show and what your theory of the case is.

12              DEFENDANT MORGAN:  Well, the Fourteenth Amendment say

13    I have equal protection of the law.  I should be able to

14    assert this.  It defines exactly what a felon in possession in

15    the state of Michigan amounts to.

16              THE COURT:  This is a federal crime, Mr. Morgan --

17              DEFENDANT MORGAN:  I understand.

18              THE COURT:  -- that you're accused of.

19              DEFENDANT MORGAN:  I understand.  I live in the state

20    of Michigan.  I don't live on any tribal or reservation.  I

21    wasn't a federal person.  I was in the state of Michigan.

22              THE COURT:  Do you have any further opening statement

23    for the jury relating to the facts of the case?

24              DEFENDANT MORGAN:  Yes.  Yes.

25              THE COURT:  Go ahead.

1              DEFENDANT MORGAN:  Okay.  So you saying I can't

2    assert Michigan Compiled Law 750?

3              THE COURT:  That's correct.

4              DEFENDANT MORGAN:  Okay.

5              Also, the prosecutor and the police involved in this

6    matter has cleverly, with the intention of fraudulent acts,

7    conspired to defraud Mr. Morgan of the rights that the

8    Constitution was designed to protect the citizens of the state

9    of Michigan, as the Tenth Amendment declared the power to the

10   state and to the people.

11             On April 9, 2019, I was being in recovery of a

12   semi-truck accident that happened in Brazil, Indiana.  As a

13   result of the insurance Company for the trucking Company I

14   worked for, somehow the insurance Company committed a list

15   of fraudulent acts to prevent from rendering the benefits that

16   I was awarded.  As you will see, the insurance Company has

17   successfully created a falsehood whereas I have to prove my

18   innocence that I was not a felon as the term is defined in the

19   dictionary.

20             The prosecutor and polices of various departments are

21   fraudulent trying to force the term, felon, under a character

22   I never represented.  God blessed me to be a provider and a

23   protector, which is the characteristics I will live by and

24   die by.

25             All across the United States I am known as a provider

```
 1      and a protector.  My service as a commercial truck driver has
 2      contributed to the economic boom that Michigan and the
 3      surrounding states has taken into effect.
 4              Due to the fact I have put -- I put being a provider
 5      and a protector first in all elements of life, if I die today
 6      I thank God for allowing me the life to provide and protect.
 7              I do not break laws and I refuse to accept the label
 8      of being something I will never be, which is a felon.  Without
 9      a doubt, God will provide the final answer to the best decision
10      in this matter.  In God we trust.
11              THE COURT:  Thank you, Mr. Morgan.
12              The Government may call its first witness.
13              Mr. Van Wert, is that yours?
14              MR. VAN WERT:  The Government calls Trooper Brian
15      Kross.
16              THE COURT:  Is Mr. Kross in the courtroom?
17              MR. VAN WERT:  No.  He is in the hallway, your Honor.
18              May I move the lectern, your Honor?
19              THE COURT:  No.  My clerk will do that.
20              Are you Brian Kross?
21              THE CLERK:  Yes, your Honor.
22              THE COURT:  Would you step up here, please?  Stand
23      right over there.  Raise your right hand and be sworn.
24          (Witness sworn at 1:46 p.m.)
25              THE COURT:  Would you have a seat right over here in
```

Jury Trial - Volume 1 - November 5, 2019

1    the witness box?

2           Mr. Kross, would you adjust the microphone so you can

3    speak into the tip of it?  The chair is not going to move, but

4    you might be able to pull the microphone closer.

5           THE COURT:  Okay.  Is that better?

6           THE COURT:  I think so.  State your full name and

7    spell your last name for the jury.

8           THE WITNESS:  Brian Kross, K-r-o-s-s.

9           THE COURT:  All right.  Stand by, counsel.

10          MR. VAN WERT:  Yes, your Honor.  Thank you.

11          May I proceed, your Honor?

12          THE COURT:  No.

13          All right, Mr. Van Wert, you may proceed.

14          MR. VAN WERT:  Thank you, your Honor.

15                          *     *     *

16                        BRIAN KROSS

17              was called as a witness, after having

18              been duly sworn to testify to the truth.

19                          *     *     *

20                    DIRECT EXAMINATION

21   BY MR. VAN WERT:

22   Q.   Good afternoon, Trooper Kross.  Can you tell us where

23   you're employed?

24   A.   I'm employed with the Michigan State Police.

25   Q.   In what capacity?

Jury Trial - Volume 1 - November 5, 2019

1   A.   Currently serving as a sergeant.

2   Q.   How long have you been a trooper with the Michigan State

3   Police?

4   A.   Just under seven years.

5   Q.   What is your current assignment?

6   A.   I run the Motorcycle Division for the State Police.

7   Q.   In what area of the state?

8   A.   Metro Detroit.

9   Q.   And what are your current duties in that assignment?

10  A.   My current duties differ from what my assignment was at

11  the time of this incident.

12  Q.   Sure.

13  A.   My current duties, I supervise twelve other motorcyclists

14  in the State of Michigan, general road patrols.  And then we

15  have different duties that fall under escorts, movements of

16  dignitaries, that sort of thing.

17  Q.   So you indicated that you have been with the Michigan

18  State Police for seven years.  Do you have any experience with

19  other law enforcement agencies?

20  A.   I do not.

21  Q.   Take you back to April 9 of this year.  Were you still

22  employed with the Michigan State Police on that day?

23  A.   I was, yes.

24  Q.   What was your assignment in April 2019?

25  A.   During that time I was serving as a task force officer.

 1    It's a multi-jurisdictional task force through the
 2    U.S. Marshals, serving as a Special Deputy U.S. Marshal.  Our
 3    job at that time was just to track, locate, and arrest violent
 4    felony offenders.
 5    Q.   When you say it's a multi-jurisdictional task force, what
 6    does that mean?
 7    A.   Just a fancy word for -- it's law enforcement people from
 8    different jurisdictions, State, DPD, Wayne County, local PDs,
 9    and then also U.S. Marshals.  So just a lot of different police
10    officers from each -- each place.
11    Q.   Was there a name for that task force?
12    A.   Yeah.  It was just short for DFAT, Detroit Fugitive
13    Apprehension Team.
14    Q.   Okay.  Now, in April 2019 how large was the team that you
15    were assigned to?
16    A.   The team that I was assigned to consisted of six people.
17    Q.   And how long were you a task force officer with the
18    fugitive apprehension team?
19    A.   About 13 months.
20    Q.   Now, as a task force officer with that fugitive team, how
21    were you given assignments?
22    A.   Our assignments came from a couple different areas.  We
23    have what's called LEIN, just stands -- an acronym that stands
24    for Law Enforcement Information Network.  In the most simplest
25    terms, it's just how one police agency will talk to a different

Jury Trial - Volume 1 - November 5, 2019

1   police agency nationwide.

2            So we can search for felony warrants within an area

3   that we work, in this case, Detroit, or requests can come in

4   from an outside agency, can come in from State Police.  I can

5   have someone that I work with ask for help to locate someone.

6   It can be a local PD.  Anyone can ask.  If there is a felony

7   warranty out there, they can just say, we need help finding

8   this person, and that was my job.

9   Q.   So in early 2019 were you asked to locate someone named

10  Gemar Kinte Morgan?

11  A.   I was.

12  Q.   And how were you given that request or that assignment?

13  A.   That request came in from a person that I worked with

14  within the department.  At the time I was a trooper, so that

15  name was forwarded to my current supervisor on that team, who

16  basically just says, yes, we have time to go after him, or we

17  have to wait until we free up some time.

18  Q.   Can you tell us why you were instructed to look for Gemar

19  Morgan?

20  A.   I was instructed at that time he had a felony warrant for

21  his arrest.

22  Q.   That was out of Allen Park; correct?

23  A.   Correct.

24  Q.   Is it fair to say that warrant was issued in February of

25  2019?

1    A.   Yes.  It was earlier that year.

2    Q.   Okay.  When you first received the assignment to locate

3    Gemar Morgan, what did you first do?

4    A.   What I would do is just, A, confirm the warrant.  So we

5    would look it up in LEIN.  We would run that person for a

6    warrant.  And it is very simple, they either have a warrant or

7    they don't.  In this case I did validate that there was an

8    active felony warrant for his arrest.

9    Q.   Okay.  And did you also obtain a basic profile of Gemar

10   Morgan?

11   A.   Yeah.  Very basic.  It's just an investigative tool.  We

12   have different law enforcement computer programs that can kind

13   of help generate addresses, possible vehicles, all from prior

14   police contact from where he may have had his license

15   registered or his address or where a vehicle might be

16   registered to.  So we just try to connect the dots in terms

17   of tracking someone.  We read the reports from prior law

18   enforcement contacts just to try to get an understanding of the

19   individual we're searching for.

20   Q.   As part of that did you obtain a photograph of Gemar

21   Morgan?

22   A.   I did.

23   Q.   Did you also obtain his birthday?

24   A.   I did.

25   Q.   Was that July 11 of 1977?

1   A.   I -- honestly, I don't remember.

2   Q.   Would that be indicated in your police report?

3   A.   It would be in my police report, yes.

4   Q.   You did author a police report in this matter; correct?

5   A.   I did, yes.

6   Q.   Would looking at that refresh your memory?

7   A.   It would.

8        MR. VAN WERT:  Your Honor, may I approach the witness

9   briefly?

10       THE COURT:  Why?

11       MR. VAN WERT:  To refresh his memory with his police

12  report.  He indicated that he was made aware of Mr. Morgan's

13  birthday.

14       THE COURT:  What does that have to do with anything

15  in this case?

16       MR. VAN WERT:  Just for identification purposes,

17  your Honor.

18       THE COURT:  Mr. Morgan is in the courtroom.  Maybe he

19  can identify him.

20       MR. VAN WERT:  Absolutely.  I can move on, if the

21  Court wishes.

22       THE COURT:  Please do.

23       MR. VAN WERT:  Thank you, your Honor.

24  BY MR. VAN WERT:

25  Q.   Now, Trooper Kross, did you eventually locate and arrest

1    Mr. Morgan on that warrant?

2    A.   Yes.

3    Q.   How much time approximately passed from the time you

4    received the assignment until when you arrested Mr. Morgan?

5    A.   A month maybe.

6    Q.   Let me take you back to April 9 of 2019.  Again, you were

7    working that day as a task force officer with the fugitive

8    team; correct?

9    A.   That's correct.

10   Q.   And were you also working that day with the other five

11   members of your team?

12   A.   That's correct.

13   Q.   And what did you do to attempt to locate Mr. Morgan that

14   day?  Where did you go?

15   A.   Our investigation led us to a physical therapy place on

16   Hoover near Thirteen Mile.  Our investigation led us there.

17   We established surveillance on the physical therapy building.

18   And at that point, because I was the -- deemed the officer in

19   charge of our team, I established what we call an eye on the

20   building.  That's the person who is kind of directing the

21   traffic within our own team.  I had an eye on the main entrance

22   to this physical therapy place.

23   Q.   Let me take you back one step.

24        So you indicated this building was located on Hoover;

25   correct?

1  A.   That's correct.

2  Q.   Near Thirteen Mile?

3  A.   Yes.

4  Q.   What city was that located in?

5  A.   I think it's Warren there.

6  Q.   Is that located within the Eastern District of Michigan?

7  A.   It is, yes.

8  Q.   So you indicated that you had an eye on one portion of the

9  building.  What part of the building was that?

10 A.   It was actually the rear of the building, but it would be

11 the main door to this -- to this physical therapy place.

12 Q.   Okay.  What type of clothing were you wearing that day?

13 A.   I wear plain clothes.  We move both the city and unmarked

14 vehicles that are equipped with lights.  If we are ever outside

15 of our vehicle we have a vest that we put on that has police

16 identifications and markings.

17 Q.   Okay.  So you indicated that you were at the rear of the

18 building, watching the building.  Where were the other members

19 of your team?

20 A.   At that time we established a perimeter on the building.

21 I had two other people in the parking lot.  It was a large

22 parking lot in the back.  Two other task force officers were

23 with me to my far right and far left.  The other three task

24 force officers were on the other side of the building, which

25 would be facing Hoover Road, just keeping an eye on the front

1    door.

2    Q.   Sure.  So you indicated that at some point in time did

3    you, in fact, observe Gemar Morgan?

4    A.   Yeah.  I was the only one with a clear visual to the glass

5    door that was the physical therapy place.  And at some point I

6    did observe Mr. Morgan come to that door.  He did not exit at

7    that time, but I was able to positively identify him based on

8    that contact and then also pictures that we had pulled up in

9    the past of him.

10   Q.   How long had you been there before you first observed

11   Mr. Morgan?

12   A.   No more than an hour.

13   Q.   Okay.  When you first saw Mr. Morgan through that glass

14   door, what did you do next?

15   A.   I told my team that -- just to suit up, which means we put

16   on our vests that carry those markings, and that I did, in

17   fact, see our suspect.

18   Q.   Okay.  Now, after you were suited up, which means you put

19   your vest on with the police markings on it, what happened

20   next?

21   A.   We waited.  It was very shortly after that Mr. Morgan did

22   exit the physical therapy place.

23   Q.   Okay.  The person you talk about as -- you referred to as

24   Mr. Morgan, do you see him in court today?

25   A.   I do.

```
 1    Q.   Can you please point to him and tell me what color

 2    clothing he is wearing?

 3    A.   The gentleman over here wearing a black button-down shirt.

 4           MR. VAN WERT:   Your Honor, the record reflect the

 5     identification of the Defendant Gemar Morgan.

 6           THE COURT:   Move on.

 7           MR. VAN WERT:   Thank you, your Honor.

 8    BY MR. VAN WERT:

 9    Q.   So you indicated you saw the Defendant exit the building.

10    How did you respond to that?

11    A.   At that point all of our cars are equipped with radios.

12    We talk amongst our team members.  And so I did let the team

13    know that he did exit the building and that we were going to be

14    moving.  That just means that we were in our vehicles.  Myself

15    and the two other task force officers that were in the parking

16    lot, we drove our cars towards that main entrance to the

17    physical therapy building to kind of box in our suspect.

18    Q.   Okay.  Did you then exit your vehicle?

19    A.   We did.

20    Q.   And what happened?

21    A.   All three of us.

22           We approached Mr. Morgan.  Immediately -- because of

23    the active felony warrant, immediately went hands on with him.

24    Q.   When you say you "went hands on with him," what do you

25    mean by that?
```

1    A.   We grab hold of him so he couldn't run away, couldn't get
2    away.
3    Q.   Okay.  Were any restraints placed on Mr. Morgan?
4    A.   A pair of handcuffs were.
5    Q.   And who put the handcuffs on the Defendant?
6    A.   That would be a task force officer who works for the
7    Detroit Police Department, Darren Long.
8    Q.   Okay.  How was Mr. -- how was the Defendant acting when
9    you first went, as you say, hands on with him?
10   A.   You know, I think our initial approach, by the time we --
11   you're talking about a matter of seconds by the time we jumped
12   out of our vehicles.  We all had our own vehicle.  Walked up
13   and grabbed him and put cuffs on him.  I think the initial part
14   was just more shock.  Okay?  So it wouldn't -- I would call it
15   textbook.  There was no issue, really.  Just walked up and
16   grabbed him and put handcuffs on.
17   Q.   Sure.  When you saw the Defendant walk out of the
18   building, did he appear to have any visible ailments as you
19   saw him walk out of the building?
20   A.   None whatsoever.
21   Q.   So what happened after Officer Long put handcuffs on the
22   Defendant?
23   A.   Officer Long did put handcuffs on the suspect.  At that
24   point it's policy that we would search him.  I conducted a
25   search, and where I located a handgun in his front-right pants

1    pocket.

2    Q.   Okay.  You say it's department policy in that situation.

3    Is that because you were arresting the Defendant on the

4    warrant?

5    A.   Yeah.  He has an active felony warrant and he is going to

6    jail, so.

7    Q.   Okay.  You indicated that you found a gun in his pocket.

8    How did you locate that?

9    A.   As Officer Long had the suspect handcuffed, I would just

10   start a search with my hands.  And there was a handgun in his

11   front-right pants pocket.  Just check the pockets, empty his

12   pockets.  We will pat down any area that -- just to, you know,

13   ensure that there is nothing else there.

14   Q.   Okay.  What did you do when you located that gun?

15   A.   Immediately upon locating it, it was a small -- small

16   handgun and it was inside a sock.  So when I grabbed and pulled

17   it out, I just confirmed, hey, it's a gun.  But as soon as it's

18   a gun, I left Mr. Morgan.  I would go make the gun safe.  I

19   believe I walked over to the hood of my vehicle just to make

20   the gun -- render it safe.

21   Q.   When you say you rendered it safe, what did you have to do

22   for that?

23   A.   I would eject the magazine and then you can rack the gun

24   just to eject any caliber -- any round that is in the chamber.

25   I observed a loaded magazine and also one in the chamber.

1    Q.   Okay.  After you made it safe by ejecting the magazine and

2    ejecting that round, was the gun capable of being fired anymore

3    at that point in time?

4    A.   I mean, if you loaded it again, but it was -- it was safe.

5    It was unloaded.

6    Q.   Sure.  If you saw that firearm again, would you recognize

7    it?

8    A.   Absolutely.

9         MR. VAN WERT:  Your Honor, may I approach the witness

10   with Exhibit 1?

11        THE COURT:  Yes.  Proposed Exhibit 1.

12        MR. VAN WERT:  Proposed Exhibit 1.  I apologize, your

13   Honor.  Thank you.

14   BY MR. VAN WERT:

15   Q.   Trooper Kross, I'm showing you what's marked as Proposed

16   Government Exhibit Number 1.

17        Do you recognize this item?

18   A.   That's the firearm.  Yes.

19   Q.   First of all, before you address it, has this firearm

20   currently been rendered safe?

21   A.   Yes.

22   Q.   How so?

23   A.   Well, it's rendered safe because there is a zip tie that's

24   going through the magazine well and the chamber of the gun, so

25   you couldn't put a round in there.

Jury Trial - Volume 1 - November 5, 2019

1    Q.   Okay.  So can you pick up Exhibit 1?

2              And this is the firearm that you recovered from

3    Mr. Morgan on April 9, 2019; correct?

4    A.   That's correct.

5              MR. VAN WERT:  Your Honor, I move to admit Proposed

6     Exhibit 1.

7              THE COURT:  Is the exhibit tag on the firearm or on

8     the box?

9              MR. VAN WERT:  It's on the box, your Honor.

10             THE COURT:  Any objection, Mr. Morgan, to Exhibit 1?

11             DEFENDANT MORGAN:  No.

12             THE COURT:  All right.  Exhibit 1 is received.

13       (Received in Evidence:  Exhibit Number 1.)

14   BY MR. VAN WERT:

15   Q.   Trooper Kross, can you tell us, is there a serial number

16   on that firearm?

17   A.   Yes, there is.

18   Q.   And where is that serial number located?

19   A.   On this particular handgun it's on the back strap of the

20   gun, the rear part of the gun.

21   Q.   And what is that serial number?

22   A.   1096384.

23   Q.   Can you tell us the caliber of that firearm?

24   A.   It's a .25 caliber.

25   Q.   And what's the make of that firearm?

1    A.    Raven.    Raven Arms.

2    Q.    I want to step back briefly.    So when you first -- when

3    the Defendant was placed in handcuffs and you located the

4    firearm in his pocket --

5    A.    Correct.

6    Q.    -- how did he respond?    How did the Defendant respond?

7    A.    As I walked away, I mean, you're talking a matter of

8    seconds, he responded, all of a sudden just flopped, just

9    dropped to the ground complaining of back pain, so.

10   Q.    Okay.    Can you describe how he was acting from that point

11   forward?

12   A.    That, that point forward I think until probably after --

13   this is fast-forwarding until after we left the hospital, just

14   very belligerent, very -- just kind of out of control, very

15   loud, very aggressive.

16   Q.    So you indicated that after you located the firearm you

17   walked away from the Defendant; correct?

18   A.    Correct.    At that point my primary goal, the Defendant was

19   in custody and I wanted to make the firearm safe.

20   Q.    Did other officers remain with him?

21   A.    Always.

22   Q.    Based upon how the Defendant began acting, was a decision

23   made to call for any type of assistance?

24   A.    There was.    He requested -- he demanded an ambulance.    And

25   it's with our policy, too, we won't be able to lodge someone

```
 1    who is complaining of an injury, so it's within policy and
 2    within his request that we called an ambulance to the scene.
 3    Q.   Okay.  How close from your current location was the
 4    nearest hospital?
 5    A.   Literally right across the street.
 6    Q.   Okay.  So did you -- somebody from your team, in fact,
 7    call for an ambulance?
 8    A.   Yes.
 9    Q.   And did it respond?
10    A.   Immediately.
11    Q.   How long did it take?
12    A.   Less than five minutes.
13    Q.   Okay.  When the paramedics responded and the ambulance
14    responded to the scene, did they render some form of aid to
15    Mr. Morgan?
16    A.   They did.  He was transported to the hospital.
17    Q.   Okay.  Did anybody from your team ride with him to the
18    hospital?
19    A.   I did.
20    Q.   Okay.  What happened when you got to the hospital with
21    Mr. Morgan?
22    A.   We got to the hospital with Mr. Morgan.  He was
23    transported by the medics inside.  I may get the term -- to the
24    triage room, I think, to get checked in.
25    Q.   Okay.  And did you remain with him through that process?
```

1    A.   I was with him through the entire process.

2    Q.   Where -- did the Defendant go somewhere else after the

3    triage room?

4    A.   He was admitted to his own -- his own room, his own

5    private room.

6    Q.   And did you go with him there?

7    A.   I did.

8    Q.   How long was the Defendant at the hospital for that day?

9    A.   I would estimate between an hour, hour and a half.

10   Q.   And what happened at the end of that hour and a half?

11   A.   At the end of the hour and a half he was ultimately

12   granted his medical clearance, which gave me permission to

13   transport him to Allen Park PD, where the felony warranty was

14   out of.

15   Q.   How was he transported there to Allen Park?

16   A.   My department carries a policy, you're transported in the

17   front seat, so he was walked to the front of my vehicle and

18   positioned in the front seat to the point that he was

19   comfortable and buckled in and I drove him.

20   Q.   So you drove the Defendant to Allen Park Police

21   Department; correct?

22   A.   That's correct.

23   Q.   And was he then handed over to the custody of Allen Park?

24   A.   Yes.

25   Q.   The firearm, Exhibit Number 1 that you located in the

Jury Trial - Volume 1 - November 5, 2019

1   Defendant's pocket, was that secured as evidence?

2   A.   Yes.

3   Q.   What was done with that firearm that day?

4   A.   Mr. Morgan was -- he was -- he was my case.  He was the

5   person that was assigned to me.  And as I recovered the

6   vehicle -- or the vehicle -- the firearm, it's my

7   responsibility to log that into property under our department.

8   So that property, this firearm was entered into a temporary

9   property locker at our State Police headquarters here in

10  Detroit.

11  Q.   Was the ammunition also secured as evidence as well?

12  A.   It was.

13       MR. VAN WERT:  Nothing further, your Honor.

14       THE COURT:  Mr. Morgan, do you have any questions for

15   the witness?

16       DEFENDANT MORGAN:  Yes.  Yes.

17                      CROSS EXAMINATION

18  BY DEFENDANT MORGAN:

19  Q.   Do you claim to be employed by an entity of the Government

20  that does professional work?

21  A.   I'm sorry, does professional work?

22  Q.   Yes.

23  A.   Yeah.  Yes.

24  Q.   Okay.  Where was the location of the place when you first

25  had physical contact with Mr. Morgan?

 1    A.   I'm sorry, where was the first place I had contact with

 2    you?

 3    Q.   Physical contact.

 4    A.   Physical contact would be the physical therapy place.

 5    Q.   Okay.  Do you allege that the firearm traveled in

 6    interstate commerce?

 7            MR. VAN WERT:  Objection, your Honor.  I don't

 8    believe this witness has the qualifications for that.

 9            THE COURT:  Well, either the witness can answer or

10    he can't.

11            MR. VAN WERT:  Absolutely.

12            THE COURT:  The objection is overruled.

13            Can you answer the question?

14            THE WITNESS:  Can you repeat the question?  Did it

15    travel in interstate commerce?

16            THE COURT:  No.  I think the question was --

17    BY DEFENDANT MORGAN:

18    Q.   No, I said, do you allege --

19            DEFENDANT MORGAN:  Mr. Morgan, excuse me.

20            I think the question was, "Do you allege that the

21    firearm traveled in interstate commerce?"

22            Was that your question?

23            DEFENDANT MORGAN:  Yes.

24            THE COURT:  All right.

25            THE WITNESS:  If I'm understanding that question

 1    correct, yes, it did.

 2    BY DEFENDANT MORGAN:

 3    Q.   Okay.  Is it possible that you have never made a mistake

 4    in life?

 5    A.   Is it possible I never made a mistake?

 6              MR. VAN WERT:  Objection, your Honor, as to

 7     relevance.

 8              THE COURT:  Overruled.

 9              MR. VAN WERT:  Thank you, your Honor.

10              THE WITNESS:  I'm sure I've made a mistake in my life

11     before.

12    BY DEFENDANT MORGAN:

13    Q.   Okay.  Title 49 of the Code of Federal Regulation 373.100

14    and 373.101 require all interstate commerce transactions to

15    have a bill of lading.

16              MR. VAN WERT:  Objection, your Honor.

17              THE COURT:  Finish the question.

18    BY DEFENDANT MORGAN:

19    Q.   Do you understand the purpose of a bill of lading?

20              MR. VAN WERT:  Objection.  First, irrelevant.

21              Second of all, this Defendant is again trying to put

22     forth --

23              THE COURT:  The objection is relevance?

24              MR. VAN WERT:  Yes, your Honor.

25              THE COURT:  The objection is sustained.

```
 1              MR. VAN WERT:  Thank you, your Honor.
 2              THE COURT:  Move on.
 3   BY DEFENDANT MORGAN:
 4   Q.  According to a bill of lading, can you please state the
 5   Company name and US DOT number that traveled in the interstate
 6   commerce transaction that you allege?
 7              MR. VAN WERT:  Objection again as to relevance, your
 8    Honor.
 9              THE COURT:  What's the purpose of the question?
10              DEFENDANT MORGAN:  Oh, because in all interstate --
11    according to the Code of Title 49, Code of Federal Regulation,
12    373.101 and 373.100, in all interstate commerce transactions
13    there must be a bill of lading.
14              THE COURT:  Well, I'm not sure that that's accurate,
15    but whether there is a bill of lading or not with respect to
16    this firearm really has nothing to do with this case,
17    Mr. Morgan.  So that objection is sustained.
18              DEFENDANT MORGAN:  Well, he --
19              THE COURT:  Ask another question.
20              DEFENDANT MORGAN:  He alleged that the firearm
21    traveled --
22              THE COURT:  Don't argue with me, Mr. Morgan.  Ask
23    another question.
24              DEFENDANT MORGAN:  Okay.
25   BY DEFENDANT MORGAN:
```

1   Q.   What was the date of your first time communicating with
2   Mr. Morgan?
3   A.   You called me, I think, on my work phone maybe two weeks
4   prior.
5   Q.   That was March the 8th, 2019?
6   A.   I'm not certain.  You called me.
7   Q.   Did you ever go to Mr. Morgan's grandmother home?
8   A.   There was a house that I went to.  Correct.
9   Q.   Okay.  Do you know the definition of entrapment?
10  A.   I mean, I don't know if I can restate it for you right
11  now.
12  Q.   Excuse me?
13  A.   You want me to give you the definition of entrapment?
14  Q.   Yeah.  If you know it.
15  A.   I don't have a definition to give you right now.
16  Q.   Okay.  Have you ever lied under oath to cover up the
17  truth?
18  A.   No.
19  Q.   According to April the 9th, 2019, where did you take
20  Mr. Morgan?
21  A.   Where -- where did I take you?  I took you to Allen Park
22  Police Department.
23  Q.   Okay.  Are you familiar with Title 49 CFR, subsection
24  373.100 and 373.101, subpart (a), note a carrier receipt of
25  bill of lading for all interstate commerce transactions?

1    A.   I am not familiar with that.

2    Q.   Okay.  On April 9th, 2019, why did you put Mr. Morgan's

3    enhanced CDL in your pocket after you released Mr. Morgan and

4    his property to the Allen Park --

5    A.   I'm sorry, can you restate that question, please?

6    Q.   On April the 9th, 2019, why did you put Mr. Morgan's

7    enhanced CDL in your pocket after you released Mr. Morgan and

8    his property to Allen Park Police Department?

9    A.   Why I put your CDL -- are you talking about a driver's

10   license?

11   Q.   Yeah.  You took my license with you.

12   A.   Okay.

13   Q.   I say, why?

14   A.   Why did I -- I take your license to identify you, and then

15   your property, which is the firearm.

16   Q.   Okay.  Do you still -- hold on.

17          Do you still have Mr. Morgan's CDL and passport in

18   your possession?

19   A.   I do not have your C -- I don't have your driver's license

20   or a passport, no, sir.

21   Q.   What did you do with it?

22   A.   I'm not sure.  Are you alleging I still have your

23   property?

24   Q.   I never received it.

25          THE COURT:  What's your question, Mr. Morgan?

1          DEFENDANT MORGAN:  I asked him, what did he do with

2     my CDL.

3          THE COURT:  Did you confiscate some property at the

4     time of the arrest?

5          THE WITNESS:  The only property that I confiscated

6     was the firearm and a loaded magazine.

7          THE COURT:  Did you confiscate a driver's license?

8          THE WITNESS:  No.  Nothing was booked into property.

9          THE COURT:  All right.  Did you do the booking?

10          THE WITNESS:  I'm sorry?

11          THE COURT:  Did you do the booking after you

12     transported him to Allen Park?

13          THE WITNESS:  Yeah, I dropped him off at Allen Park

14     and then he is out of my --

15          THE COURT:  Listen to the question.

16          Did you conduct the booking?

17          THE WITNESS:  I'm sorry.  No, I did not conduct the

18     booking.

19          THE COURT:  All right.

20     BY DEFENDANT MORGAN:

21     Q.   Did you ever take my license with you when you left

22     Allen Park Police Department?

23     A.   That doesn't sound accurate, no.

24     Q.   Okay.  Do you allege that Mr. Morgan was serving any

25     condition of a sentence on April 9th, 2019?

1    A.   Can you repeat that, please?

2    Q.   Do you allege that Mr. Morgan was serving any condition of

3    a sentence on April the 9th, 2019?

4    A.   I didn't know anything about a sentence.

5    Q.   Okay.  Did the Michigan State Police issue a warrant to go

6    to Mr. Morgan's grandmother home?

7    A.   No.

8    Q.   Okay.  What would you do if you witnessed police

9    entrapment in your department?

10   A.   Well, I would --

11        MR. VAN WERT:  Your Honor, objection.  This witness

12   is a fact witness.  He is asking him hypotheticals.  I don't

13   understand the relevance of that question.

14        THE COURT:  What's the relevance of that?

15        DEFENDANT MORGAN:  To test his credibility.

16        THE COURT:  I don't believe it does.  The objection

17   is sustained.

18   BY DEFENDANT MORGAN:

19   Q.   Did the Michigan -- did the Michigan State Police

20   Department issue a warrant to go to the pharmacy that

21   Mr. Morgan was attending?

22   A.   No.

23   Q.   Did you have a warrant to follow the medical transport

24   vehicle that was responsible for taking Mr. Morgan to all his

25   medical-related appointments?

1    A.   No.  No.  No warrant to follow you.

2    Q.   How did you find out that Mr. Morgan was at a pharmacy on

3    April 9th, 2019?

4    A.   Through our investigation led us to your pharmacy there --

5    or not your pharmacy, your physical therapy place.

6    Q.   That wasn't my physical therapist place.  I was at a

7    pharmacy.

8              THE COURT:  Do you have a question, Mr. Morgan?

9              DEFENDANT MORGAN:  Yes.  I asked it.  I asked him,

10   did he have -- did he have a warrant to follow the medical

11   transport vehicle that was responsible for taking Mr. Morgan

12   to all medical-related appointments.

13             THE COURT:  Yeah.  And he answered that.  He said no.

14   Do you have another question?

15   BY DEFENDANT MORGAN:

16   Q.   How did you obtain the location where Mr. Morgan was at on

17   April the 9th, 2019?

18   A.   That was through our investigation.

19   Q.   I said the location.

20   A.   The location is, we had a possible vehicle that he would

21   be operating under and we had that possible vehicle.

22   Q.   Who was driving that vehicle?

23   A.   I don't know.  By the time we got to the physical therapy

24   place, we observed a possible vehicle for Mr. Morgan and we

25   established a perimeter on the building.  So we were not -- we

1    were not certain.  We can't 100 percent say, and to this day I

2    don't know whose vehicle it was, but we had a probable vehicle

3    that we followed up with and established that perimeter around

4    the building.

5    Q.   Where did you obtain the information to the vehicle from?

6            MR. VAN WERT:  Objection; relevance, your Honor.

7            THE COURT:  What difference does that make?

8            DEFENDANT MORGAN:  If he had probable cause to be

9    following a medical transport vehicle, because it wasn't my

10   vehicle.  It was my first time at that location.  So I'm

11   trying to find out exactly how did he get the legal -- the

12   legal warrant to, you know, be at that place that day, because

13   I have some paperwork that states that he obtained a ping off

14   a signal of my cell phone.

15           THE COURT:  So what?

16           DEFENDANT MORGAN:  That's why I'm asking the question.

17           THE COURT:  I say, what difference does that make

18   with respect to the charge in this case?

19           DEFENDANT MORGAN:  To see if it was a legal warrant

20   issued to that location, being that it was my first day being

21   at that pharmacy.

22           THE COURT:  Well, the -- if you are trying to

23   challenge the legality of the arrest, you should have done

24   that before trial.

25           DEFENDANT MORGAN:  Oh, I did.

1          THE COURT:  So this is not the time to do that.  So

2     do you have another question?

3          DEFENDANT MORGAN:  Yes.

4          THE COURT:  Go ahead.

5     BY DEFENDANT MORGAN:

6     Q.   Was you in charge of the investigation involving the

7     semi-truck accident?

8     A.   I'm not aware of a semi-truck accident, so no.

9     Q.   On March 8th, 2019, do you ever recall telling Gemar, you

10    need to speak to him about a semi-truck accident?

11    A.   I remember that you called me at some point.

12    Q.   Do you remember the nature of that conversation?

13    A.   I remember I tried to get you to turn yourself in, and I

14    believe that you inquired as to why I was at a family member's

15    house asking for you.

16    Q.   Did Mr. Morgan ever provide you with an attorney's

17    information that day?

18    A.   I don't recall.  I think you said, contact your attorney,

19    but never -- no information to contact any attorney was given.

20    Q.   Okay.  Do you have records of your phone?

21    A.   I don't have records of my phone, no.

22    Q.   Okay.  According to your investigation, do you have any

23    records showing that Mr. Morgan was serving a lifetime

24    sentence?

25    A.   No.

Jury Trial - Volume 1 - November 5, 2019

1   Q.   Okay.  If a person successfully complete probation or

2   parole, what gives the criminal justice system the right to

3   treat the person as if they are a criminal for life?

4          MR. VAN WERT:  Objection, your Honor, as to

5    relevance.

6          THE COURT:  The objection is sustained.

7          MR. VAN WERT:  Thank you, your Honor.

8   BY DEFENDANT MORGAN:

9   Q.   Do you have any records of Mr. Morgan committing any crime

10  as a semi-truck driver?

11  A.   No.  I acted under a valid felony warrant for your arrest

12  out of Allen Park Police Department.

13  Q.   Can you please present that warrant?

14  A.   The issue was in LEIN.  There is a copy of the system ID

15  number, which is the unique multi-digit number that's assigned

16  when it's entered into LEIN, which is Law Enforcement

17  Information Network.  It would -- a copy of the warrant or a

18  copy of the system ID number would be in my report, showing

19  that it was active at the time of the arrest.

20  Q.   Do you know the definition of discharge?

21  A.   I think it can be used in a lot of different contexts.

22  Q.   From a prior -- do you know the definition of a discharge

23  from a prior conviction?

24          MR. VAN WERT:  Objection as to relevance, your Honor.

25          THE COURT:  How is this relevant?

1        DEFENDANT MORGAN:  Excuse me?

2        THE COURT:  How is this relevant, Mr. Morgan?  What

3   does it have to do with the issues in the case?

4        DEFENDANT MORGAN:  Because they -- the title, they

5   say I was a prohibited person on April the 9th, 2019, which I

6   wasn't.  I wasn't a prohibited person.

7        THE COURT:  Okay.

8        DEFENDANT MORGAN:  I did everything up under the

9   Constitution and the laws that required for me to restore my

10  rights as a commercial truck driver to get certain enhancement

11  for my CDL, and I completed them, the requirements for

12  restoring them rights.  So as of April the 9th, 2019, I had

13  rights restored.

14        THE COURT:  Well, that's an argument that you are

15  making, but what does it have to do with this witness?

16        DEFENDANT MORGAN:  Because he arrested me upon felon

17  in possession.

18        THE COURT:  No, he arrested you on a warrant out of

19  another court.

20        DEFENDANT MORGAN:  Okay.

21        THE COURT:  At least that's what his testimony is.

22        DEFENDANT MORGAN:  Okay.

23  BY DEFENDANT MORGAN:

24  Q.   Okay.  Do you know the definition of malicious arrest?

25  A.   Not an exact definition.  I understand what the term

1    means.

2    Q.   Could you elaborate?

3    A.   Malicious arrest?

4    Q.   Yes.

5    A.   I'm telling you that I would probably understand what a

6    malicious arrest was.  In this case, it was, I want to say, as

7    routine as possible.  There was no physical harm.  There was no

8    foul play.  No -- it was a valid warrant and we fulfilled that

9    warrant for Allen Park Police Department.

10   Q.   Okay.  Due to the -- who issued the warrant; Allen Park

11   Police Department or Michigan State Police?

12   A.   Nothing -- really, nothing other than the fact that I'm

13   employed by Michigan State Police.  The warrant was through

14   Allen Park Police Department and their -- I believe it's

15   24th District Court.

16   Q.   And could you please state for the record exactly what

17   that warrant indicated, the addresses, the peoples, the

18   commodity, the property, that was in that warrant?

19   A.   I'm sorry, you're asking for what now?

20   Q.   The addresses, the commodity of the property, and the

21   peoples that was stated in that warrant.

22   A.   So my job as a task force officer is just to fulfill these

23   warrants and find people with felony warrants.  I had nothing

24   to do with the original complaint that generated this warrant

25   with Allen Park.  I just know at the time there was a valid

1    warrant, which was again my job.

2              So in terms of talking about the commodities, I know

3    it was a weapons -- felony for weapons offense, and there was

4    subsequent charges along with that, multiple counts, was like

5    the more common thing.  I know there was multiple counts for a

6    felony warrant.  That's what I acted on.

7    Q.   Did it have an address in that warrant?

8    A.   I believe one --

9              MR. VAN WERT:  Your Honor, I'm going to object as to

10   relevance, your Honor.

11             THE COURT:  I don't see how this is relevant to the

12   charge, Mr. Morgan.  Do you?

13             DEFENDANT MORGAN:  To see if it was a legal arrest

14   warrant.  Up under the Fourth Amendment, it's a stipulation

15   for a seize warrant and an arrest warrant.

16             THE COURT:   This is not the time to challenge

17   the validity of the arrest.  If you had a challenge to the

18   validity of the arrest, you were required under Rule 12 to

19   file a pretrial motion in that regard, which you didn't do.

20   So trying -- addressing that issue at trial is too late.  The

21   question is whether or not the Government can prove that you

22   possessed a firearm as a prohibited person and the firearm

23   traveled in interstate commerce.  The fact that the firearm

24   was discovered in the course of an arrest is really irrelevant

25   at this point.

1          DEFENDANT MORGAN:  Well, when I just tried to assert

2    the law in regards to interstate commerce transactions, I'm a

3    truck driver, up under every interstate commerce transaction

4    you must present a bill of lading.  And I -- you told me I

5    couldn't ask him if he got a bill of lading.  He alleged that

6    the firearm traveled in interstate commerce.  As a requirement

7    of that law, you must have a bill of lading or you can't

8    transport anything in interstate commerce.

9          THE COURT:  I understand that that's your position,

10   but that's not correct, and I have told you that before.

11         DEFENDANT MORGAN:  I have this in my truck.  That is

12   correct.  I cannot pick up a load without --

13         THE COURT:  Mr. Morgan, quiet.  I'm not going to

14   argue with you about the law.  I'm going to tell you what the

15   law is.  If you disagree with it, you have your remedies.

16         Do you have any further questions for this witness?

17         DEFENDANT MORGAN:  No.

18         THE COURT:  All right.  Does the Government have any

19   redirect?

20         MR. VAN WERT:  No, your Honor.  Thank you.

21         THE COURT:  Thank you, Mr. Kross.  You are excused.

22         THE WITNESS:  Thank you, your Honor.

23         THE COURT:  Would you mind taking that exhibit back

24   to the Government, though?

25         MR. VAN WERT:  May I approach the witness?

 1                THE COURT:  I'll tell you what, go ahead and get

 2      that, Mr. Van Wert.

 3                MR. VAN WERT:  Thank you.

 4                THE COURT:  Mr. Van Wert, are you taking the next

 5      witness?

 6                MR. VAN WERT:  Yes, your Honor.

 7                THE COURT:  You may call your next witness.

 8                MR. VAN WERT:  Thank you, Judge.  The Government

 9      calls Officer Darren Long.

10                THE COURT:  Is Mr. Long in the courtroom?

11                MR. VAN WERT:  I believe he is in the hallway, your

12      Honor.

13                THE COURT:  All right.  You may retrieve him.

14                Are you Darren Long?

15                THE WITNESS:  Yes.

16                THE COURT:  Would you come forward, please?

17                Would you pause right there?  Raise your right hand

18      and be sworn.

19         (Witness sworn at 2:24 p.m.)

20                THE COURT:  Thank you.  Would you have a seat right

21      over here in the witness box?

22                Mr. Long, try to adjust the microphone so you can

23      speak into the tip of it.  And state your full name and spell

24      your last name for the jury.

25                THE WITNESS:  Darren Long.  Last name is L-o-n-g.

```
 1              THE COURT:  Keep your voice at that level when you

 2    testify, please.

 3              THE WITNESS:  Yes.

 4              THE COURT:  You may proceed.

 5              MR. VAN WERT:  Thank you, your Honor.

 6                        *      *      *

 7                         DARREN LONG

 8              was called as a witness, after having

 9              been duly sworn to testify to the truth.

10                        *      *      *

11                      DIRECT EXAMINATION

12    BY MR. VAN WERT:

13    Q.  Officer Long, can you tell us where you're employed?

14    A.  With the Detroit Police Department.

15    Q.  How long have you been an officer with the Detroit Police

16    Department?

17    A.  It will be eleven years.

18    Q.  What is your current assignment?

19    A.  Right now I'm with the FAST unit.  It's a fugitive team in

20    Wayne County.

21              THE COURT:  Mr. Long, you're going to have to speak

22    up, I guess.  I'm having trouble hearing you myself.  I don't

23    know if the jurors are having trouble.

24    BY MR. VAN WERT:

25    Q.  So you indicated your current assignment is with the FAST
```

 1    team; correct?

 2    A.   Yes.  It's a multi fugitive team in Wayne County.

 3    Q.   Okay.  Take you back to April 9 of 2019.  What was your

 4    assignment back in April of 2019?

 5    A.   I was with DFAT, which is the Detroit Fugitive

 6    Apprehension Team headed by the Marshals and other local

 7    agencies.

 8    Q.   Okay.  What were your duties as a member of the DFAT team?

 9    A.   I was a task force officer.

10    Q.   What did that task force do?

11    A.   Fugitive apprehension.  I was assigned cases.

12    Q.   Okay.  Now, back in April 2019 were you assigned to the

13    DFAT team with Trooper Brian Kross?

14    A.   Yes.

15    Q.   Okay.  Were you made aware that Trooper Kross had received

16    an assignment to locate someone named Gemar Kinte Morgan?

17    A.   Yes.

18    Q.   Okay.  And were you assisting Trooper Kross in locating

19    Mr. Morgan?

20    A.   Yes.

21    Q.   Okay.  Specifically, let's go back to April 9 of 2019.

22    Were you working that day as a task force officer with the

23    DFAT team?

24    A.   Yes.

25    Q.   Were you working that day with Trooper Kross?

1    A.   Yes.

2    Q.   Did you make any attempts that day to locate someone named

3    Gemar Morgan?

4    A.   Yes.

5    Q.   What attempts were made?

6    A.   We went to a -- it was a physical therapy building in

7    Warren, Michigan.

8    Q.   Was that at 28671 Hoover Street?

9    A.   Yes, I believe so.

10   Q.   Okay.  That's located within the Eastern District of

11   Michigan; correct?

12   A.   Yes.

13        DEFENDANT MORGAN:  Objection, your Honor.

14        THE COURT:  What's the objection, Mr. Morgan?

15        DEFENDANT MORGAN:  He is basically, you know,

16   coercing him on what to say and I feel that's

17   unconstitutional.

18        THE COURT:  Well, it's not unconstitutional.  I'll

19   construe the objection as suggesting that you're leading the

20   witness.  So try to refrain from that.

21        MR. VAN WERT:  I'll rephrase, your Honor.  Thank you.

22        THE COURT:  Yeah.

23   BY MR. VAN WERT:

24   Q.   When you first responded to that location in Warren, what

25   did you do?

1    A.   I took visual in the back of the building.

2    Q.   Did any other officers with your team also locate in the

3    back of the building?

4    A.   Yes.  Kross was back there with me also.

5    Q.   Okay.  Can you tell us what type of vehicle you were

6    driving that day?

7    A.   A gray 2008 Ford F150.

8    Q.   What type of clothing were you wearing?

9    A.   Plain clothes, but I had -- I have a vest carrier with

10   markings, police markings on it.

11   Q.   Okay.  So the vest identifies you as a police officer?

12   A.   Correct.

13   Q.   Okay.  Now, prior to arriving at that location did you

14   have a profile of Gemar Morgan?

15   A.   Yes.  From the photos that Kross had showed me, yes.

16   Q.   So you had a photograph of him?

17   A.   Correct.

18   Q.   Now, while you were there at that location in Warren did

19   you, in fact, observe Gemar Morgan?

20   A.   Yes.  Not at that moment, but yes, I did.

21   Q.   Eventually you did?

22   A.   Yes.

23   Q.   How long had you been there before you first saw

24   Mr. Morgan?

25   A.   Probably been there an hour, I would say.

1    Q.   Where was Mr. Morgan when you first saw him?

2    A.   Brian Kross had alerted me that Moore -- he had confirmed

3    that it was Moore coming out the back of the building, and

4    that's when my eyes was drawn to the door and I seen Mr. Moore

5    exit the back of the building.

6    Q.   Okay.  And the person you refer to as Mr. Morgan, do you

7    see him here in court today?

8    A.   Yes.

9    Q.   Can you point to him and tell me what color shirt he is

10   wearing?

11   A.   The red button up -- I mean, I'm sorry, black button up

12   with white dots.

13        MR. VAN WERT:  Ask the record reflect the

14   identification of the Defendant Gemar Morgan.  Thank you,

15   your Honor.

16   BY MR. VAN WERT:

17   Q.   So how did you respond when you saw the Defendant walk out

18   of that building?

19   A.   Brian let us know that was him.  We confirmed it.  We

20   suited up.  We approached kind of in our vehicles and then

21   hurried up and got out and approached him on foot.

22   Q.   That point in time, were you wearing your vest with police

23   markings on it?

24   A.   Yes.

25   Q.   Did you identify yourself in any way?

1    A.   Yes.

2    Q.   How did you identify yourself?

3    A.   Told him, "Police.  Stop."

4    Q.   Okay.  How did the Defendant react?

5    A.   He threw -- I think he was in shock.  He threw a whole

6    bunch of cookies on the floor and that's when I was able to

7    gain control of him.

8    Q.   Okay.  Where did those cookies come from?

9    A.   I don't know.  He either had them in his hand or to the

10   side of his body, but he threw a whole bunch of cookies.  It

11   was a lot of them.

12   Q.   You said at that point in time you were able to gain

13   control of him.  How exactly did you do that?

14   A.   Gained control, I think I maybe grabbed his arm or

15   shoulder and started handcuffing him.

16   Q.   Okay.  Why was the Defendant being arrested at that point

17   in time?

18   A.   He had a felony warrant, I remember that, out of Allen

19   Park.

20   Q.   Okay.  So you said that he dropped some items on the

21   floor.  Were you inside the building or outside the building?

22   A.   We were outside the building in the parking lot.  I'm

23   sorry.

24   Q.   So when you began putting handcuffs on the Defendant were

25   you, in fact, able to fully handcuff him?

1   A.   Yes.

2   Q.   How was he acting before that moment in time?

3   A.   He kind of tensed up on me, but at that point, at that

4   moment, just tensing up on me.

5   Q.   All right.  When you first saw him, how was he acting?

6   How was he acting when he walked out of the building?

7   A.   He walked out of there.  He didn't see us.  So kind of

8   just strolled out of there.  Was minding his own business, I

9   would say.

10  Q.   When you handcuffed the Defendant, what were the other

11  officers in your team doing?

12  A.   So Brian was in front of me.  I was behind the Defendant

13  cuffing him.  And that's when Brian alerted me that he found a

14  handgun on the subject.

15  Q.   What did you see?  Did you see the gun?

16  A.   Yes.  I seen the gun.  It was a silver, small -- as I call

17  it, pocket -- pocket pistol, as I refer to it.

18  Q.   Okay.  Did you see where Trooper Kross located that gun?

19  A.   No.  No.

20  Q.   Okay.  How did the Defendant react when Trooper Kross

21  found that gun?

22  A.   Once Trooper Kross alerted me that he found the handgun,

23  Mr. Morgan, I still had him by the handcuffs, went to a dead

24  weight going towards the ground.  So I kind of just helped him,

25  assist him going to the ground.  He was screaming that his --

1    that he was in pain.

2    Q.   Okay.  Do you know what Trooper Kross did with that

3    firearm after he found it?

4    A.   No.  I was focused on Mr. Morgan.

5    Q.   Sure.

6    A.   But I --

7    Q.   Based on how the Defendant was acting, was any type of

8    assistance called?

9    A.   Yes.  We called for EMS.

10   Q.   Okay.  That ambulance actually arrived; correct?

11   A.   Yes.

12   Q.   And took the Defendant?

13   A.   Yes.

14   Q.   After that happened did you have any further role in this

15   investigation?

16   A.   No.

17            MR. VAN WERT:  Nothing further, your Honor.  Thank

18    you.

19            THE COURT:  Mr. Morgan, do you have any questions

20    for Mr. Long?

21            DEFENDANT MORGAN:  Yes.

22            THE COURT:  You may proceed.

23                        CROSS EXAMINATION

24   BY DEFENDANT MORGAN:

25   Q.   Do you allege that the firearm traveled in interstate

1    commerce?

2    A.   I'm sorry?

3    Q.   Do you allege that the firearm traveled in interstate

4    commerce?

5    A.   I don't -- I don't even know what you mean by that, sir.

6    Q.   Okay.  Do you have -- did you all conduct a forensic lab

7    report of the firearm?

8    A.   I didn't, no.

9    Q.   Was it ever -- was it ever any fingerprints taken of the

10   firearm?

11   A.   I don't know that.

12   Q.   Okay.  Is it possible for a police officer to make a

13   mistake?

14   A.   Pretty sure, yes.

15   Q.   Okay.  Do you allege that Mr. Morgan traveled across state

16   lines?

17   A.   No.  Not at that point.  I'm just there for a felony

18   warrant and warrant.

19   Q.   Okay.  According to April 9, 2019, where did you take

20   Mr. Morgan?

21   A.   I did not take Mr. Morgan anywhere.

22   Q.   Okay.  Have you ever lied under oath to cover up the

23   truth?

24   A.   No.

25   Q.   Okay.  Could you state your job title and ID for the

1  entity that you work for?

2  A.   I'm sorry?

3  Q.   Could you state your job title and ID for the entity --

4  A.   I'm a police officer with Detroit Police and my badge is

5  4539.

6  Q.   Okay.  Do you remember the documentation that's in that

7  warrant that you all retrieved?

8  A.   Negative.

9  Q.   You say what?

10 A.   Negative.  No.

11 Q.   Did you all have a legal warrant?

12 A.   Yes.

13 Q.   And who issued that warrant?

14 A.   Allen Park.

15 Q.   How do you know?

16 A.   I read the LEIN message.

17 Q.   Excuse me?

18 A.   The LEIN message.

19 Q.   And you never looked at it?

20 A.   Yes, I read it.  I just told you I read the LEIN message.

21 Q.   What was the -- what was the address in that warrant?

22 A.   I don't recall that.

23 Q.   Did it have any property in that warrant?

24 A.   Don't recall that, sir.

25 Q.   Okay.  Have you ever communicated with a trucking Company

1   that Mr. Morgan worked for?

2   A.   No.

3   Q.   Okay.  Did you ever go to Mr. Morgan's grandmother house?

4   A.   No.

5   Q.   Okay.  According to the investigation, do you have any

6   records showing that Mr. Morgan was serving a lifetime

7   sentence?

8   A.   No.

9   Q.   Okay.  According to your records, do it state that

10  Mr. Morgan was serving any sentence during April the 9th, 2019?

11  A.   Negative.  I don't know.  No.  I wasn't in charge of the

12  case, sir.

13  Q.   Okay.  Do you have any records of Mr. Morgan committing

14  any crimes as a semi-truck driver?

15  A.   No.

16           DEFENDANT MORGAN:  That's all, your Honor.

17           THE COURT:  Thank you.  Any redirect?

18           MR. VAN WERT:  No, your Honor.  Thank you.

19           THE COURT:  Mr. Long, thank you.  You are excused.

20           THE WITNESS:  Thank you.

21           THE COURT:  The Government may call its next witness.

22           MR. VAN WERT:  Thank you, your Honor.  The Government

23   calls Trooper John Comer.

24           THE COURT:  And who is getting Mr. Comer?

25           MR. VAN WERT:  I'll retrieve him, if the Court allows.

1          THE COURT:  Are you John Comer?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Would you step up here, please?  Just

4   pause right there for a moment.  Raise your right hand and be

5   sworn.

6     (Witness sworn at 2:36 p.m.)

7          THE COURT:  Would you have a seat right over here in

8   the witness box, please?

9          THE WITNESS:  Thank you.

10         THE COURT:  Please adjust the microphone so you can

11  speak into the tip of it.  And would you state your full name

12  and spell your last name for the jury?

13         THE WITNESS:  My name is Jonathan Comer, C-o-m-e-r.

14         THE COURT:  Thank you.

15         Counsel, you may proceed.

16         MR. VAN WERT:  Thank you, your Honor.

17                         *     *     *

18                      JONATHAN COMER

19              was called as a witness, after having

20              been duly sworn to testify to the truth.

21                         *     *     *

22                    DIRECT EXAMINATION

23  BY MR. VAN WERT:

24  Q.   Trooper Comer, can you tell us where you're employed?

25  A.   I'm employed with the Michigan State Police.

1    Q.   How long have you been a Trooper with the Michigan State
2    Police?
3    A.   Approximately eleven years.
4    Q.   Do you have any other law enforcement experience?
5    A.   I do not.
6    Q.   What's your current assignment?
7    A.   My current assignment is, I'm a sergeant at the training
8    academy.  I coordinate and conduct training in Lansing.
9    Q.   What was your assignment back in April of 2019?
10   A.   I was a member of DFAT, the Detroit Fugitive Apprehension
11   Team, which is a multi-jurisdictional task force involved in
12   locating and arresting fugitives.
13   Q.   Were you assigned to the same team as Trooper Brian Kross?
14   A.   Yes.
15   Q.   Let me take you back to early 2019.  Was your team
16   requested to locate someone named Gemar Kinte Morgan?
17   A.   Yes.
18   Q.   Okay.  Why were you instructed to locate that person?
19   A.   He had a current felony warrant out of Allen Park.
20   Q.   Were you the lead on that assignment or was that Trooper
21   Kross?
22   A.   It was not me.  It was Trooper Kross.
23   Q.   Take you back to April 9, 2019.  Were you working that day
24   with Trooper Kross?
25   A.   Yes, I was.

1    Q.   As a member of DFAT?

2    A.   Yes, I was.

3    Q.   Did you make any attempts to locate and arrest Gemar

4    Morgan that day?

5    A.   On that date, yes.

6    Q.   What did you do?

7    A.   I provided backup and extra bodies for surveillance in the

8    area which we ended up locating him.

9    Q.   Where was he located?

10   A.   It was at a physical therapy center off of Hoover, I

11   believe.

12   Q.   What city was that in?

13   A.   Warren.

14   Q.   Okay.  When you first responded to that location, exactly

15   where did you go?

16   A.   I went to the rear of the building, which I believe would

17   be the west side of the building.  There was a back parking lot

18   and I set up in that back parking lot in my vehicle.

19   Q.   So the same area that Trooper Kross was located?

20   A.   Yes.

21   Q.   Prior to that date did you have a basic profile of Gemar

22   Morgan?

23   A.   Yes.

24   Q.   As part of that did you have his photograph?

25   A.   Yes.

1  Q.   And that day did you, in fact, observe Gemar Morgan?

2  A.   Yes.

3  Q.   Where did you first see him?

4  A.   I saw him when he came out of the physical therapy door

5  into the parking lot.  That's where I first observed him.

6  Q.   How did you respond at that point in time?

7  A.   The -- typically what happens is the officer in charge, in

8  this case it would have been Trooper Kross, would have eyes on

9  the front door.  And the suspect, or in this case Mr. Morgan,

10  would -- came out of the door.  He said, "Suit up," which we

11  would put our vests on, and then approached Mr. Morgan.

12  Q.   Did you have any markings on that vest that day?

13  A.   Yes.  I have an external carrier vest that has "State

14  Police," and I wear my badge as well.

15  Q.   The person who you refer to as Mr. Morgan, do you see him

16  here in court today?

17  A.   Yes, I do.

18  Q.   Can you point to him and tell me what color shirt he is

19  wearing?

20  A.   It's a -- he's right over here.  It's dark, possibly

21  maroon color.

22        MR. VAN WERT:  Record reflect the identification of

23  Defendant Gemar Morgan.

24  BY MR. VAN WERT:

25  Q.   So when you first saw the Defendant exit the building and

 1    you approached him, what did you do?

 2    A.   I just provided backup for Trooper Kross and Officer Long.

 3    We just basically conducted an arrest at that time.

 4    Q.   Okay.  Do you recall what Officer Long did during the

 5    arrest?

 6    A.   Yes.  He was the one that put the handcuffs on Mr. Morgan.

 7    Q.   Okay.  And as Officer Long was handcuffing the Defendant,

 8    what did Trooper Kross do?

 9    A.   Trooper Kross conducted a search of Mr. Morgan.

10    Q.   Did you observe that?

11    A.   I did.

12    Q.   Did Trooper Kross locate anything during that search?

13    A.   Yes.

14    Q.   What did he find?

15    A.   He first found a handful of cookies in one of his pockets,

16    but then the second pocket, I believe the right front, is when

17    he located the firearm.

18    Q.   Okay.  How did the Defendant respond when Trooper Kross

19    found that firearm?

20    A.   After he found the firearm he kind of became out of

21    control, belligerent, flopped on the ground.  Stated he was in

22    pain, his back hurt.

23    Q.   Was an ambulance called for the Defendant at that point in

24    time?

25    A.   They were.

1    Q.   Did they take over treatment of the Defendant?

2    A.   Yes.

3    Q.   Okay.  Did you make any efforts to locate any type of

4    surveillance video that day?

5    A.   I did.

6    Q.   What efforts did you make?

7    A.   The physical therapy location was in a strip mall and I

8    went to each one of the other businesses in the strip mall

9    looking for surveillance.

10   Q.   Okay.  Did any of those -- any of those businesses have

11   video surveillance?

12   A.   No, they did not.

13   Q.   Did you have any role in this investigation going forward

14   from that point in time?

15   A.   As far as the investigation, no, but I did go to the

16   hospital with Trooper Kross.

17         MR. VAN WERT:  Okay.  Nothing further, your Honor.

18   Thank you.

19         THE COURT:  Mr. Morgan, do you have any questions for

20   Mr. Comer?

21         DEFENDANT MORGAN:  Yes.

22                    CROSS EXAMINATION

23   BY DEFENDANT MORGAN:

24   Q.   Do you allege that the firearm traveled in interstate

25   commerce?

1    A.   I'm sorry, I don't understand the question.

2    Q.   Do you allege that the firearm traveled across state line?

3    A.   I -- I don't know if it traveled across state lines, no.

4    Q.   Do you allege that Mr. Morgan traveled across state line?

5    A.   I don't know.

6    Q.   Was it ever a forensic lab report done on the firearm?

7    A.   I -- I had nothing to do with the investigation as far as

8    after you were under arrest.  Typically what happens is any

9    firearm is submitted to a lab, but I -- again, I don't know

10   personally, no.

11   Q.   Was there any fingerprints done to that firearm?

12   A.   I don't know.

13   Q.   Okay.  Have you ever lied under oath to cover up the

14   truth?

15   A.   No.

16   Q.   Now, you said you obtained a -- what was it, a search

17   warrant, a seize warrant, or an arrest warrant?

18   A.   I did not obtain any warrant at all.

19   Q.   What was your purpose being at that location?

20   A.   My purpose would be backup for the officer in charge,

21   which would have been Trooper Kross.

22   Q.   Who dispatched you all for that location?

23   A.   We did not get dispatched to that location.

24   Q.   Now, you say your job was to back up officer who?

25   A.   Trooper Kross, who was the officer in charge.

1    Q.   Did he ever present a warrant to you all?

2    A.   Yes.  An arrest warrant.

3    Q.   Did it state addresses in it?

4    A.   I believe it did.

5    Q.   What was the address in that warrant?

6    A.   I don't know what the address was.

7    Q.   What about the -- did it state any property in that

8    warrant?

9    A.   No.  It does not say any property in the arrest warrant.

10   Q.   Did it have any other specific location in that warrant?

11   A.   A specific location, no, I don't believe so.

12   Q.   Did it have any license plates in that warrant or vehicle?

13   A.   Not that I recall.

14           DEFENDANT MORGAN:  That's it, your Honor.

15           THE COURT:  No further questions, Mr. Morgan.

16           DEFENDANT MORGAN:  No.

17           THE COURT:  Thank you.

18           Any further questions?

19           MR. VAN WERT:  Just very briefly, your Honor.

20                       REDIRECT EXAMINATION

21   BY MR. VAN WERT:

22   Q.   Trooper Comer, based upon those last few questions, when

23   you're notified of an arrest warrant for a person, what

24   information are you given?

25   A.   It's the name, the full name, first, middle, last, date of

```
 1    birth, height and weight, color hair, color eyes, what the
 2    warrant is, what the -- where the warrant is out of, what
 3    police department, and what court and the jurisdiction.
 4    Q.   Is it fair to say that warrant authorizes you to arrest
 5    somebody; correct?
 6    A.   Yes.
 7    Q.   And you weren't part of the underlying investigation into
 8    that Allen Park case; correct?
 9    A.   I was not, no.
10              MR. VAN WERT:  Nothing further, your Honor.
11              THE COURT:  Any further questions?
12              DEFENDANT MORGAN:  Yes.
13              THE COURT:  Okay.  Go ahead.
14                            RECROSS EXAMINATION
15    BY DEFENDANT MORGAN:
16    Q.   At the address that you all located Mr. Morgan at, was
17    that -- was that his home?
18    A.   No.  It was a physical therapy center.
19    Q.   What date did you all receive that address?
20    A.   I don't know the date that we received it.
21    Q.   So you never really seen the warrant yourself?
22    A.   Yes, I would have seen the arrest warrant, yes.
23    Q.   Do you remember anything about that warrant?
24    A.   Just how I explained.  Your name, first, middle, last,
25    date of birth, where the warrant was out of, what the warrant
```

1    was for.

2    Q.   You don't remember the address that was in it?

3    A.   I don't.

4    Q.   Okay.  Trying to figure out, how did you all obtain the --

5    come to a location at a pharmacy?  I know you keep on saying

6    physical therapy, but it's a pharmacy.  That was my first time

7    being at that place.  How did you all come about that address

8    or the location?

9    A.   That would have been -- that would have been part of our

10   investigation in this case.  It would have been part of Trooper

11   Kross's investigation, since he was the officer in charge.

12   Q.   Did you all have a warrant to follow the medical transport

13   vehicle around?

14   A.   I'm not -- I'm not aware of any medical transport vehicle.

15   Q.   Was you all -- did you all have any warrant to go to any

16   other facilities?

17   A.   I guess I'm --

18   Q.   Doctor's office.  My physical therapist place was in

19   Farmington, that's why I'm kind of concerned.

20   A.   Okay.  I guess your arrest warrant, is that what you're

21   asking?  I'm confused at what the question is.

22   Q.   I'm just trying to -- I'm trying to get an understanding

23   of what was involved in that legal -- if it was a legal arrest

24   warrant.

25   A.   Well, the arrest warrant was issued out of Allen Park.

1    I had no part of the investigation for the warrant.  My

2    specific job duties would be to obtain or locate and arrest

3    the fugitive.  In this case would be you, Mr. Morgan.

4    Q.  So how did you know it was Mr. Morgan in that warrant

5    then?

6    A.  I'm sorry?

7    Q.  How did you all know it was Mr. Morgan in that warrant?

8            What specifics that the warrant indicated to

9    positively identify that it was Mr. Morgan?

10   A.  Like we just stated a little bit ago, your full name, your

11   date of birth, your height and weight, eye color, hair color.

12   Q.  Now, before this date did you all ever have, like,

13   pictures of Mr. Morgan?

14   A.  Yes.

15   Q.  And where did them pictures come from?

16   A.  Came from LEIN or Secretary of State.

17   Q.  Okay.  Did you all ever communicate with an insurance

18   Company?

19   A.  I did not, no.

20           DEFENDANT MORGAN:  Okay.  No further questions, your

21   Honor.

22           THE COURT:  Mr. Van Wert, do you have any further

23   questions?

24           MR. VAN WERT:  No, your Honor.  Thank you.

25           THE COURT:  Mr. Comer, when you observed Mr. Morgan

1      in April in Warren in the parking lot, was he wearing a

2      cervical collar at the time?

3               THE WITNESS:  I don't believe so, but I'm not

4      100 percent.  I don't think he was.

5               THE COURT:  You know what I mean by that?

6               THE WITNESS:  Yes.  Yes.

7               THE COURT:  You see that he is wearing one now?

8               THE WITNESS:  I do.

9               THE COURT:  So you don't remember whether he was or

10     not?

11              THE WITNESS:  I don't believe he was, no.

12              THE COURT:  Okay.  Thank you.

13              Anything else?

14              MR. VAN WERT:  No, your Honor.  Thank you.

15              THE COURT:  Mr. Morgan, anything further?

16              DEFENDANT MORGAN:  Excuse me?

17              THE COURT:  Any further questions?

18              DEFENDANT MORGAN:  No.

19              THE COURT:  All right.  Thank you.

20              Mr. Comer, you are excused.

21              THE WITNESS:  Thank you, sir.

22              THE COURT:  You may call your next witness.

23              MR. VAN WERT:  Thank you, your Honor.  Government

24     calls Special Agent David Salazar.

25              THE COURT:  And he is not in the courtroom either?

1        MR. VAN WERT:  He is in the hallway, your Honor.

2        THE COURT:  Okay.  Are you David Salazar?

3        THE WITNESS:  Yes, I am, sir.

4        THE COURT:  Would you step forward, please?  Just

5   pause right there for a moment.  Raise your right hand and be

6   sworn.

7      (Witness sworn at 2:50 p.m.)

8        THE COURT:  Would you have a seat right over here in

9   the witness box, please?

10       THE WITNESS:  Yes, sir.

11       THE COURT:  Mr. Salazar, pull the microphone -- well,

12   adjust it just like that so you can speak right into the tip

13   of it.

14       State your full name and spell your last name for the

15   jury.

16       THE WITNESS:  David Salazar, S-a-l-a-z-a-r.

17       THE COURT:  Counsel, you may proceed.

18       MR. VAN WERT:  Thank you, your Honor.

19

20                     *     *     *

21                   DAVID SALAZAR

22        was called as a witness, after having

23          been duly sworn to testify to the truth.

24                     *     *     *

25

1          DIRECT EXAMINATION

2    BY MR. VAN WERT:

3    Q.   Agent Salazar, can you tell us where you're employed?

4    A.   Yes.  I'm a Special Agent with the Bureau of Alcohol,

5    Tobacco, Firearms, and Explosives.

6    Q.   How long have you been an agent with the Bureau or ATF?

7    A.   Over five years.

8    Q.   What are your current duties as a special agent with ATF?

9    A.   I investigate crimes mostly concerning firearms and

10   narcotics and I am also an interstate nexus expert.

11   Q.   Do you have any other law enforcement experience?

12   A.   Yes.  Prior to working for ATF I was a Detroit police

13   officer for over 17 years.

14   Q.   Throughout your law enforcement career have you received

15   training in the use of firearms?

16   A.   Yes, I have.

17   Q.   Can you tell us what type of training you have received?

18   A.   Handling of firearms and firearms qualification.

19   Q.   Is that both with Detroit Police Department and now with

20   ATF?

21   A.   Yes, it is.

22   Q.   How many times throughout your career in law enforcement

23   have you fired a weapon in training?

24   A.   Well over 10,000, I would say.

25   Q.   What types of weapons were you trained in the use of?

1    A.   Handguns, shotguns, rifles.

2    Q.   As a Special Agent with ATF have you been trained in

3    making interstate nexus determinations of firearms?

4    A.   Yes, I am.

5    Q.   Can you tell us, what -- what is interstate nexus

6    determination?

7    A.   The determination is first identifying the firearm, and

8    then from there you locate where the firearm was manufactured,

9    and then whether or not it crossed state lines.

10   Q.   Okay.  In order to make that -- in order to make those

11   determinations did you have to receive or go to or attend any

12   type of training?

13   A.   Yes, I did.

14   Q.   Can you tell us about the training in that area that you

15   have received?

16   A.   Yes.  I can -- I attended a week-long training that was

17   conducted by ATF in Huntsville, Alabama.  And also during that

18   training I toured Remington Manufacturing Company.

19   Q.   And during that week-long training what type of topics

20   were you trained on?

21   A.   How to identify -- properly identify a firearm and just

22   different ways to determine where a firearm is manufactured.

23   Q.   Are there other resources that you use when you make an

24   interstate nexus determination of a firearm?

25   A.   Yes.  There's different publications I use, internet

 1   searches, anything -- any way I can get additional information

 2   of the manufacturer.

 3   Q.   All right.  When you talk about making an interstate nexus

 4   determination of a firearm, are you referring to firearms that

 5   were collected or received by ATF as evidence in ongoing

 6   criminal investigations?

 7   A.   Yes, I am.

 8   Q.   So if ATF has recovered or they have received a firearm,

 9   based on your training and experience, how do you go -- how do

10   you determine whether that weapon is, in fact, a firearm?

11   A.   Basically, sometimes we will test fire it or I'll just do

12   a test at my desk with the firearm unloaded to make sure it

13   functions as it is manufactured to.

14   Q.   Do you also examine the weapon itself, the markings on the

15   weapon?

16   A.   Yes, I do.

17   Q.   Then do you take that information and compare it with your

18   reference guides?

19   A.   Yes, I do.

20        DEFENDANT MORGAN:  Objection, your Honor.

21        THE COURT:  Yes, what's your objection?

22        DEFENDANT MORGAN:  The prosecutor is coercing this

23   witness to basically answer exactly how he want him to answer.

24        THE COURT:  Well, I'm not sure that's the case, but

25   I'll take it as an objection that the questions are leading,

1    and I will sustain that objection.

2              MR. VAN WERT:  I'll rephrase going forward, your

3    Honor.  Thank you.

4    BY MR. VAN WERT:

5    Q.   Now, Agent, you indicated that another part of your

6    determination is determining whether a firearm has traveled in

7    interstate commerce; correct?

8    A.   Yes, it is.

9    Q.   How do you make that determination?

10   A.   I will find the markings on the firearm to determine the

11   manufacturer of the firearm, and then I will look up where that

12   manufacturer actually manufactures their firearms.

13   Q.   How many times in your career after you attended that

14   training have you looked at a firearm and made a determination

15   as to whether it traveled in interstate or foreign commerce?

16   A.   I have done anywhere, 50, 75 interstate nexus

17   determinations.

18   Q.   In those cases do you prepare reports of your findings?

19   A.   Yes, I do.

20   Q.   Have you previously testified in court regarding an

21   interstate nexus determination that you have made on a firearm?

22   A.   Yes, I have.

23   Q.   Or about ammunition?

24   A.   Yes, I have.

25   Q.   Approximately how many times?

1    A.    Twice in Federal Court.

2    Q.    Do you recall when?  When you testified?

3    A.    Yes.  February of 2018 and November of 2018.

4    Q.    And both times that was in Federal Court; correct?

5    A.    Yes, it was.

6    Q.    Throughout your career have you also conducted test

7    firings of firearms to determine whether a firearm is

8    functional?

9    A.    Yes.

10   Q.    Approximately how many times have you test fired a firearm

11   to see whether it was functional?

12   A.    I have conducted probably 20, 25, somewhere around there,

13   maybe more.

14   Q.    When you test fire a weapon in that capacity, what are you

15   trying to determine?

16   A.    To makes sure it functions as it is designed.  So

17   basically loading the firearm with ammunition and pulling the

18   trigger and seeing if it expels the projectile.

19   Q.    In this case did you examine the firearm?

20   A.    Yes, I did.

21          MR. VAN WERT:  Your Honor, may I approach the witness

22    with Government Exhibit Number 1?

23          THE COURT:  You may.

24          MR. VAN WERT:  Thank you, your Honor.

25   BY MR. VAN WERT:

Jury Trial - Volume 1 - November 5, 2019

1    Q.   Agent Salazar, I'm showing you what's been already

2    admitted as Government Exhibit Number 1.

3            Do you recognize that item?

4    A.   Yes.  This is the firearm I conducted a determination on.

5    Q.   Did you examine that exact firearm for this case?

6    A.   Yes, I did.

7    Q.   Why did you examine that firearm?

8    A.   To complete a determination on the firearm, whether or not

9    it traveled in interstate nexus or interstate commerce.

10   Q.   Can you tell us what type of weapon that is?

11   A.   Yes.  This is a Raven Arms Model MP25, .25 caliber

12   semi-automatic pistol.

13   Q.   Before giving us your interstate nexus determination, was

14   that determination that you made based upon facts and data that

15   you learned through your training and experience?

16   A.   Yes, it was.

17   Q.   Is that the product of specialized training that you

18   received in making those type of determinations?

19   A.   Yes, it is.

20   Q.   After examining that Government Exhibit Number 1, that

21   firearm, that weapon, did you make a determination about

22   whether it is, in fact, a firearm?

23   A.   Yes, it is.

24   Q.   And what determination is that?

25   A.   That this is, indeed, a firearm based upon the definition

1   of a firearm.

2   Q.   And what did you use to form that opinion?

3   A.   The firearm was test fired and it functioned as a firearm.

4   Q.   Now, after examining that firearm did you determine

5   whether or not it traveled in interstate or foreign commerce?

6   A.   Yes, I did.

7   Q.   And how did you form that opinion?

8   A.   I researched Raven Arms.  Raven Arms was a manufacturer.

9   They are no longer in existence.  But when they were, they

10  manufactured all their firearms in California.

11  Q.   Okay.  And is there, in fact, a stamp on that firearm --

12  A.   Yes, there is.

13  Q.   -- where it was made?

14  A.   Yes, there is.

15  Q.   Where is that stamp located?

16  A.   It is located on the left side when holding the firearm.

17  Q.   Okay.  What part of the firearm?

18  A.   It's on the slide.

19  Q.   Okay.  And what does that indicate?

20  A.   That the firearm was manufactured by Raven Arms in

21  Industry, California.

22  Q.   And just for the record, when you're holding the firearm

23  in your right hand, that's -- when you're holding the firearm

24  in your right hand, the firearm is pointed forward, what side

25  is that marking on?

```
1    A.   It is on the left side.
2    Q.   And you indicated regarding that firearm, you're aware
3    that it was test fired; correct?
4    A.   Yes.
5    Q.   Were you present when it was test fired?
6    A.   Yes, I was.
7    Q.   Can you explain that process of how that was done?
8    A.   Yes.  The firearm was loaded and the trigger was pulled,
9    at which time it expelled the projectile and it ejected the
10   casing.
11   Q.   What was -- what was loaded into that firearm?
12   A.   .25 caliber ammunition.
13   Q.   Do you recall how many rounds were loaded?
14   A.   Two.
15   Q.   How were those loaded into the firearm?
16   A.   They were loaded right into the magazine and then
17   loaded -- or it was loaded and then the magazine -- the slide
18   went forward to put it in the chamber.
19   Q.   Okay.  Then what happened next in that process?
20   A.   It was -- the trigger was pulled.
21   Q.   And what happened when the trigger was pulled?
22   A.   The projectile was ejected or the projectile fired through
23   and the spent casing was ejected.
24   Q.   Okay.  Based upon that, did that firearm function as it
25   was intended?
```

1  A.   Yes, it did.

2  Q.   What was done with that firearm after it was test fired?

3  A.   It was placed back into evidence.

4  Q.   Do you recall who was with you when that firearm was test

5  fired?

6  A.   Yes.  Special Agent Kenton Weston.

7  Q.   Okay.  Who is the one that actually physically pulled that

8  trigger?

9  A.   Special Agent Weston.

10  Q.   But you were there with him when it happened?

11  A.   Yes, I was.

12          MR. VAN WERT:  Okay.  Nothing further, your Honor.

13          THE COURT:  Any questions, Mr. Morgan?

14          DEFENDANT MORGAN:  Yes.

15          THE COURT:  You may ask.

16                    CROSS EXAMINATION

17  BY DEFENDANT MORGAN:

18  Q.   You claim you did a special report on that firearm?

19  A.   I did a nexus report, correct.

20  Q.   Who did it register to?

21  A.   I do not conduct a registration check on the firearm.

22  Q.   What about a forensic lab report?

23  A.   I do not conduct a forensic -- I do not prepare a

24  forensics lab report.

25  Q.   Was it ever any fingerprints taken?

1   A.   I do not know, sir.

2   Q.   Okay.  Now, you say you are a nexus expert?

3   A.   Yes, sir.

4   Q.   Do you allege that the firearm traveled in interstate

5   commerce?

6   A.   Yes, it did.

7   Q.   Do you allege that Mr. Morgan traveled across state line?

8   A.   I do not know that, sir.  That is not what I do.

9   Q.   When was it traveled across state lines, the firearm?

10  A.   Sometime after it was manufactured.

11  Q.   And what year was it manufactured?

12  A.   The Company was active between 1971 and 19- -- 1970 and

13  1991.

14  Q.   Okay.  Are you aware of the bill of ladings that is

15  required in all interstate commerce transactions?

16  A.   No, sir.

17  Q.   Okay.  Is it possible that a police officer can make a

18  mistake?

19  A.   Yeah, I guess it's possible, sir.

20  Q.   Okay.  Did you participate in the arrest of Mr. Morgan?

21  A.   No, I did not.

22  Q.   Okay.  Well, without no forensic lab report, it's really

23  hard to say if it was ever any -- well, was it ever any

24  fingerprints taken on that?

25  A.   I do not know, sir.

 1           DEFENDANT MORGAN:  Okay.  Thanks a lot.

 2           No other questions.

 3           THE COURT:  No further questions?

 4           DEFENDANT MORGAN:  No.

 5           THE COURT:  Any further questions?

 6           MR. VAN WERT:  No, your Honor.  Thank you.

 7           THE COURT:  Thank you, Mr. Salazar.  You are excused.

 8           THE WITNESS:  Thank you, sir.

 9           THE COURT:  You may call your next witness.

10           MR. VAN WERT:  Your Honor, we have one additional

11   witness.  Is it possible to take a five-minute break at this

12   point in time or no?

13           THE COURT:  It is possible.  Are you asking for one?

14           MR. VAN WERT:  I am, your Honor.

15           THE COURT:  All right.  We will take a five-minute

16   recess.

17           Members of the jury, please don't discuss the case

18   among yourselves.  Please remain in the jury room during the

19   break.

20           Would you escort the jury out, please?

21           THE CLERK:  All rise for the jury.

22      (Jury left courtroom at 3:03 p.m.)

23           THE COURT:  Five minutes enough?

24           MR. VAN WERT:  Absolutely.

25           THE COURT:  We will reconvene at 3:10 and Court is in

Jury Trial - Volume 1 - November 5, 2019

1    recess.

2       (Recess taken from 3:04 p.m. to 3:15 p.m.)

3             THE CLERK:  All rise.  Court is back in recess -- or

4    back in session.

5             THE COURT:  Yes.  You may be seated.

6             Is the Government ready for the jury?

7             MS. ISON:  Yes, your Honor.  I'm just wondering, we

8    have digital exhibits for purposes of this witness, your

9    Honor.

10            THE COURT:  Oh, can you see that?

11            Off the record.

12       (Discussion held off the record at 3:15 p.m.)

13            THE COURT:  I'm sorry.  Are you ready for the jury?

14            MS. ISON:  I am, your Honor.  Thank you.

15            THE COURT:  Mr. Morgan, are you ready for the jury?

16            DEFENDANT MORGAN:  Yes.

17            THE COURT:  Would you bring the jury in, please?

18            Is your witness in the courtroom?

19            MS. ISON:  Yes, he is, your Honor.  He is right here.

20            THE COURT:  All right.

21            THE CLERK:  All rise for the jury.

22       (Jury entered courtroom at 3:16 p.m.)

23            THE COURT:  You may be seated.

24            When we took our recess, members of the jury, the

25    Government was going to call another witness.

1        And Ms.  Ison, you may proceed.

2        MS. ISON:  Thank you, your Honor.  The Government

3   calls Special Agent Kenton Weston.

4        THE COURT:  Mr. Weston, would you step around, raise

5   your right hand and be sworn?

6        THE WITNESS:  Yes, your Honor.

7     (Witness sworn at 3:17 p.m.)

8        THE COURT:  Please have a seat in the witness box.

9        THE WITNESS:  Thank you, your Honor.

10        THE COURT:  Would you state your full name and spell

11   your last name for the jury?

12        THE WITNESS:  My name is Kenton, K-e-n-t-o-n; Weston,

13   W-e-s-t-o-n.

14        THE COURT:  Would you pull that microphone a little

15   closer to you?

16        You may proceed, Ms.  Ison.

17                    *      *      *

18                       KENTON WESTON

19              was called as a witness, after having

20              been duly sworn to testify to the truth.

21                    *      *      *

22                    DIRECT EXAMINATION

23   BY MS. ISON:

24   Q.  Agent Weston, how are you employed?

25   A.   I'm a Special Agent with the Bureau of Alcohol, Tobacco,

1    Firearms, and Explosives.

2    Q.   And how long have you been employed in that capacity?

3    A.   Since January 2018.

4    Q.   Before that how were you employed?

5    A.   I have ten years working as a financial statement auditor,

6    working primarily with the Big Three auto industry.

7    Q.   Are you the agent in charge of this case?

8    A.   I am.

9    Q.   How did you become involved in this case?

10   A.   I was contacted by a task force officer we have with the

11   ATF who was originally a trooper from Michigan State Police,

12   and I was contacted about the facts of the case involving

13   Mr. Morgan.

14   Q.   And what are your duties as an ATF officer?

15   A.   We investigate federal firearm laws focusing primarily on

16   violent crimes involving those firearms.  They can go anywhere

17   from gun trafficking and also firearms that are utilized to

18   protect narcotics.

19   Q.   You said that you were notified by a task force officer

20   about a particular individual.  Who was that?

21   A.   Gemar Morgan.

22   Q.   And what is it that you learned about Mr. Morgan?

23   A.   I learned that there was an arrest warrant that was

24   executed, and Gemar Morgan was arrested with a loaded firearm

25   in his front pocket.

1    Q.   And do you know what type of firearm that was?

2    A.   It was a Raven Arms MP25 semi-automatic pistol.

3    Q.   And is that the pistol that is in Government's Exhibit

4    Number 1?

5    A.   It is.

6    Q.   And have you had custody of that particular exhibit --

7    A.   I have.

8    Q.   -- as the agent in charge of this case?

9    A.   I have.

10   Q.   After you learned of that information about Mr. Morgan

11   from the task force officer, what, if anything, did you

12   determine?

13   A.   I determined that Mr. Morgan was a prohibited person, that

14   the firearm traveled through interstate nexus, and that -- I

15   think this was the main two parts of it.

16   Q.   Let's start with the first part.

17            How did you determine that Mr. Morgan was a

18   prohibited person?

19   A.   Utilizing certified court documents, the Law Enforcement

20   Information Network, also known as LEIN, I confirmed that there

21   was previously felony convictions associated with Mr. Morgan.

22   Q.   And what felony convictions did you determine that

23   Mr. Morgan had?

24   A.   He was sentenced in 1999 for felony armed robbery, and

25   then also in 2006 for -- he pled to felon in possession in the

1    Western District of Michigan.  In both cases, the first one

2    being a sentence in '99, he spent about four years in prison.

3    And then the following case in 2006, spent a little -- almost

4    six -- or over six.  I'm sorry.

5    Q.  Let's start with the 1999 case.  You said that you

6    obtained certified records; is that correct?

7    A.  Yes, ma'am.

8    Q.  And did you obtain certified records for the 1999 -- for

9    the 1998 case in which Mr. Morgan was sentenced in 1999;

10   correct?

11   A.  Correct.

12   Q.  From the court?

13   A.  I put a request in through the Third Circuit Court here

14   in Wayne County and received certified court documents.

15   Q.  So that was Third Circuit in Wayne County where that --

16   Mr. Morgan was convicted of that offense?

17   A.  Yes.

18   Q.  And did you acquire those records?  Were those records

19   provided for you?

20   A.  Yes, they were.

21   Q.  And were those the records on which you relied to

22   determine that Mr. -- one record on which you relied to

23   determine that Mr. Morgan was a prohibited person?

24   A.  It was.

25            MS. ISON:  Will you pull up Number 5?

1   BY MS. ISON:

2   Q.   I'm showing you what has been marked -- if you will, go to

3   Number 5.  You have an exhibit book up there.

4          Government's Proposed Exhibit Number 5, do you

5   recognize that?

6   A.   Yes, ma'am.

7          THE COURT:  That should be up on your screen.  Is it

8   there?

9          THE WITNESS:  It is, sir.

10          THE COURT:  All right.

11   BY MS. ISON:

12   Q.   Okay.  And what is it?

13   A.   That's a State of Michigan, Third Judicial Court Criminal

14   Division.  It is a certified document of conviction.

15   Q.   Of whose conviction?

16   A.   Gemar Morgan.

17   Q.   And what is the conviction?

18   A.   That is for two different things.  Felony armed robbery

19   and felony firearm.

20   Q.   And what was the -- is there a sentence indicated on

21   there?

22   A.   A sentence on July the 19th of 1999.

23   Q.     And does it indicate what the sentence of imprisonment

24   was imposed by this court?

25   A.   It does.  Between -- let's see -- four to fifteen years.

1    Q.   And did you independently determine whether or not

2    Mr. Morgan had -- actually was imprisoned on this case?

3    A.   Yes.

4    Q.   And what did you do?  What did you determine with regards

5    to his term of imprisonment?

6    A.   That he was imprisoned for over a year, making him by

7    definition a felon.

8    Q.   And going to the conviction you mentioned in 2006 from --

9    you mentioned -- you indicated that it was from the Western

10   District?

11   A.   Yes, ma'am.

12   Q.   Is that the Federal Court in the Western District?

13   A.   It is.

14   Q.   And what did you learn about that particular conviction?

15   A.   In that conviction there was a plea that was obtained

16   between the United States and Mr. Morgan concerning a felon in

17   possession.  In that plea agreement it stated that he was, in

18   fact, a felon from a -- previously a felon in 2006, and that

19   was in possession of a firearm at that time.

20           MS. ISON:  Your Honor -- I'm sorry.

21   BY MS. ISON:

22   Q.   Agent Weston, going back to Proposed Government's Exhibit

23   Number 5, there are two pages to that.  Can you go to the

24   second page of that exhibit, please?

25           THE COURT:  Well, he can't.  Your technician is going

 1    to have to flip it.

 2              MS. ISON:  Pardon me?

 3              Oh, can you pull that up, please?

 4              THE COURT:  Are you asking for him to look at it on

 5     the screen?

 6              MS. ISON:  Yes.  She pulled it up, your Honor.

 7              THE WITNESS:  Your Honor, I have a hard copy as well.

 8              MS. ISON:  I'm sorry about that.

 9    BY MS. ISON:

10    Q.  And what is that?  Is that another -- is that part of the

11    record that you received from the Third Circuit Court about

12    Mr. Morgan's 1999 or 1998 conviction?

13    A.  It is.

14    Q.  And what does it reflect?

15    A.  It reflects that there is a conviction for -- there

16    is a conviction; that a restitution payment was had; and that

17    320 days was awarded time served.

18    Q.  And does it also indicate that he was sentenced to four

19    years to fifteen years for Count 2 for the armed robbery and

20    two years for Count 3, the felony firearm?

21    A.  It does.

22              MS. ISON:  In addition to that, if you would please

23     pull up Government's Exhibit 6, please.

24    BY MS. ISON:

25    Q.  Draw your attention to Government's Exhibit 6, Proposed

 1   Exhibit 6, please.

 2              THE COURT:  I don't have an Exhibit 6 on your list.

 3              MS. ISON:  Oh, we don't?  We provided that, I

 4   believe, to the Court, your Honor.

 5              I believe it was provided to Defense Counsel and we

 6   neglected to provide a copy to the Court.

 7              Would the Court allow us to tender one to the Court

 8   now?

 9              THE COURT:  Well, actually, you have tendered one to

10   me, but I don't have it on your exhibit list.  So you're

11   adding that?

12              MS. ISON:  Yes.  Would the Court allow us to amend

13   the exhibit list to include Government's Proposed Exhibit 6?

14   And I can provide the Court with a copy that includes it

15   already.

16              THE COURT:  Yes.  That's part of the same conviction

17   that is covered by Exhibit 5?

18              MS. ISON:  That is correct, your Honor.

19              THE COURT:  All right.

20              MS. ISON:  It is.

21              THE COURT:  Go ahead.

22   BY MS. ISON:

23   Q.  And what is that in Government's Proposed Exhibit 6,

24   Agent?

25   A.  This is the pretrial settlement offer between the

1    Third Circuit Judicial Court and Mr. Morgan.

2    Q.   Is this signed by Mr. Morgan?

3    A.   It appears to be.

4    Q.   And on what date was it signed?

5    A.   It would be May 26 of 1999.

6    Q.   And what is your understanding of the pretrial settlement

7    offer?

8    A.   To my understanding, that means that there has been a plea

9    agreement or someone has pled guilty to the charges against

10   them.

11   Q.   And based on the records you received from the Third

12   Judicial Circuit Court about this case, the 1998 case in which

13   Mr. Morgan pleaded guilty in 1999 and sentence was in '99, it

14   indicated that he had, in fact, pleaded guilty in that case; is

15   that right?

16   A.   Correct.

17            MS. ISON:  Your Honor, I move to admit Government's

18   Exhibit 5 and 6, please.

19            THE COURT:  Mr. Morgan, do you have any objections to

20   Exhibits 5 or 6?

21            DEFENDANT MORGAN:  Yes, your Honor.  If you didn't

22   have it in, if the Court didn't have it as an exhibit, I think

23   it's unconstitutional for it to, you know, be amended in

24   court.

25            THE COURT:  Well, that's Number 6.  Let's start with

1     Number 5.  Do you have any objection to Number 5?

2                 DEFENDANT MORGAN:  Oh, yes.  According to that

3     conviction, that conviction was discharged back in 2003, so

4     it's been over 16 years that that's been off my record.

5                 THE COURT:  What do you mean, it's been discharged?

6                 DEFENDANT MORGAN:  I successfully completed and got a

7     certificate of rehabilitation.

8                 THE COURT:  All right.  So what's the objection?

9                 DEFENDANT MORGAN:  That that was 20 years ago.

10                THE COURT:  All right.  I don't find that that's

11    a valid basis to object, so the objection is overruled.

12    Exhibit 5 is received.

13       (Received in Evidence:  Exhibit Number 5.)

14                THE COURT:  What about Number 6?

15                DEFENDANT MORGAN:  Oh, same scenario.  In 2011 I

16    received a certificate of rehabilitation, whereas, that

17    conviction was discharged.  I wasn't sentenced to life for

18    either -- neither one of them crimes to where the Government

19    is still, you know, punishing me for, you know, prior

20    convictions where I done changed my life and don't partake

21    in them conducts anymore.  So I think it's unconstitutional

22    for it to be produced into the court.

23                THE COURT:  All right.  I appreciate your objection,

24    but it does not state a valid legal ground.  The objection is

25    overruled and Exhibit 6 is received.

```
 1         (Received in Evidence:  Exhibit Number 6.)
 2              THE COURT:  Proceed, counsel.
 3    BY MS. ISON:
 4    Q.   Agent Weston, with regard to Mr. Morgan's 1999 conviction
 5    for armed robbery, did your research reveal in any way that
 6    Mr. Morgan's rights to possess a firearm had been restored?
 7    A.   In all my investigation, no.  There was no rights restored
 8    in any way that I saw, especially in getting your -- your
 9    non-prohibited status reversed.  So if he was -- there was
10    nothing.
11    Q.   Did you see any orders or were you able to locate any
12    orders in this record for the 1999 conviction for armed robbery
13    from a court, from a judge in that court that revealed that
14    Mr. Morgan's rights had been restored?
15    A.   I saw nothing.
16    Q.   Drawing your attention to Government's Exhibit Number 3,
17    you indicated that you also received or acquired certified --
18              THE COURT:  That's a proposed exhibit?
19              MS. ISON:  Proposed exhibit.  Thank you, your Honor.
20              THE COURT:  Okay.
21    BY MS. ISON:
22    Q.   Proposed Exhibit Number 3, that you also acquired
23    information from the Western District of Michigan, the United
24    States District Court for the Western District of Michigan with
25    regards to Mr. Morgan's conviction for felon in possession; is
```

1     that correct?

2     A.   Correct.

3     Q.   And I'm showing you Government's Proposed Exhibit 3.  Is

4     that what you acquired from that Court with regards to that

5     record or have you had an opportunity to review a certified

6     record that reflects that?

7     A.   I have had a chance to review a certified record.  On the

8     screen is the record that -- the certified record that I

9     examined.

10    Q.   And have you confirmed that with the information and

11    research that you learned about this particular conviction for

12    Mr. Morgan based on your research, your investigation, and any

13    law enforcement databases that you utilized to determine

14    Mr. Morgan's criminal record?

15    A.   Correct.  Yes.  This is --

16    Q.   And what is the date of the -- what is that?  What is

17    Government's Proposed Exhibit 3?

18    A.   It is a judgment in a criminal case out of the Western

19    District of Michigan, United States versus Gemar Morgan, for

20    a 922(g)(1), which is felon in possession.  And it was an

21    agreement that was -- this is the front page of a plea

22    agreement.

23    Q.   Read that again, Government's Proposed Exhibit --

24    A.   I'm sorry, judgment in a criminal case.  My apologies.

25    Q.   Did you learn, however, that Mr. Morgan had, in fact,

1    pleaded guilty to this particular offense?

2    A.   I did.

3    Q.   In addition to that, did you also learn that Mr. -- any

4    sentence that Mr. Morgan received for this particular offense,

5    the 2006 felon in possession conviction out of the Western

6    District?

7    A.   I'm sorry, can you repeat the question?

8    Q.   I'm sorry.

9         Did you determine whether or not Mr. Morgan had, in

10   fact, pleaded guilty to this particular offense?

11   A.   Yes.  He pled guilty to this offense.

12   Q.   Okay.  And do you know what he -- what, if any, sentence

13   he received as a result?

14   A.   He was sentenced to prison for and served about six and a

15   half years.

16   Q.   And you said he served six and a half years for this

17   particular offense as well?

18   A.   Yes, ma'am.

19        MS. ISON:  Your Honor the Government moves to admit

20   Proposed Exhibit Number 3, please.  Government Proposed

21   Exhibit Number 3.

22        THE COURT:  Mr. Morgan, do you have an objection to

23   Exhibit Number 3?

24        DEFENDANT MORGAN:  No.  But I have questions.

25        THE COURT:  I'm sorry?

```
 1               DEFENDANT MORGAN:  I have questions for the witness.
 2               THE COURT:  Do you want to wait until your turn or do
 3     you want to ask about the exhibit?
 4               DEFENDANT MORGAN:  No.
 5               THE COURT:  All right.  So you have no objection?
 6               DEFENDANT MORGAN:  No.
 7               THE COURT:  All right.  Thank you.  Exhibit Number 3
 8      is received.
 9          (Received in Evidence:  Exhibit Number 3.)
10     BY MS. ISON:
11     Q.  Did you have an opportunity --
12               THE COURT:  Ms.  Ison, what do you want to do about
13      publishing this to the jury?
14               MS. ISON:  Pardon me.  We have -- we can make copies,
15      your Honor.
16               THE COURT:  Well, they have their screens.  You
17      haven't asked to --
18               MS. ISON:  We will have it available in the event
19      that they need to see a hard copy of it.
20               THE COURT:  All right.  You may proceed, then.
21               MS. ISON:  Oh, the -- I'm sorry.  Oh, it's not
22      published to the jury?  I'm sorry.
23               Yes, your Honor.  We just ask that now that the
24      exhibits are admitted they be published to the jury.
25               THE COURT:  Which ones?
```

1          MS. ISON:  Government's Exhibit 3, 5, and 6.

2          THE COURT:  Well, you can only do them one at a time.

3          Members of the jury, jurors in the front row, grab

4   the screen with both hands, one on each side, and pull it up,

5   just like that.

6          And this is Exhibit Number 3.  Are you able to see

7   that?

8          MS. ISON:  Your Honor, I do have a hard copy that I

9   can furnish to the jury.

10          THE COURT:  I think this is sufficient.

11          MS. ISON:  This is Number 3, your Honor, with regard

12   to Mr. Morgan's prior conviction out of the Western District

13   of Michigan for felon in possession of a firearm.

14          THE COURT:  Right.  Do you wanted to publish 5 or 6?

15          MS. ISON:  Yes, your Honor.  5 and then 6 as well,

16   please.

17          THE COURT:  All right.  You can put up 5.

18          MS. ISON:  Is that 5?  Okay.  And then 6, please.

19          Then, your Honor, for purposes of completeness, your

20   Honor, we would ask that Government's Exhibit 3 be published

21   again, page 2, please.

22          THE COURT:  Oh, all right.

23   BY MS. ISON:

24   Q.  And if you would, Agent, turn to page 2 of the judgment.

25   And does it indicate there the term of imprisonment that

1    Mr. Morgan received out of the Western District for being a

2    felon in possession of a firearm?

3    A.   It does.

4    Q.   What does it indicate there?

5    A.   The Defendant is remanded to the custody of the United

6    States Marshals.

7    Q.   Do you see under the term, imprisonment?  Are you looking

8    at --

9    A.   Oh, I'm sorry.  I was too far.  "Imprisonment.  The

10   Defendant is hereby committed to the custody of the United

11   States Bureau of Prisons to be imprisoned for a total term of

12   78 months."

13   Q.   And did you independently determine, approximately how

14   much time did Mr. Morgan spend in prison on this particular

15   offense?

16   A.   Yes.

17   Q.   And how much?  How long was that?

18   A.   About six years.

19   Q.   Did your research or investigation reveal in any way

20   whether Mr. Morgan's rights with regards to this particular

21   conviction, that is, the 2006 conviction out of the Western

22   District for being a felon in possession of a firearm, that his

23   rights had been restored in that case?

24   A.   His rights had not been restored.

25   Q.   Based on your investigation were you able to determine

1    whether or not Mr. Morgan is a prohibited person?

2    A.   Mr. Morgan has been a prohibited person for quite a while

3    as exemplified by the sentencing in 1999, the sentencing in

4    2006.

5    Q.   Did you also participate -- did you also -- you have had

6    custody of the weapon, you indicated.  Did you in any way

7    determine whether or not the weapon was functional?

8    A.   I have.

9    Q.   And do you have any experience with that?

10   A.   I do.

11   Q.   Have you fired several weapons?

12   A.   I have.

13   Q.   Did you also participate in any way to determine that from

14   a more legal perspective, if you will, determine that the gun

15   actually functioned, the weapon functioned?

16   A.   Yes.  Utilizing my training and experience as an ATF agent

17   I took Exhibit 1 to the ATF test firing range and conducted two

18   function tests on that firearm and the firearm functioned as

19   designed.  I did so in the presence of Special Agent Salazar.

20            MS. ISON:  No further questions of this witness, your

21   Honor.

22            THE COURT:  All right.  Thank you.

23            Mr. Morgan, you may ask questions now if you like,

24   sir.

25            DEFENDANT MORGAN:  Yes.

1                       CROSS EXAMINATION

2   BY DEFENDANT MORGAN:

3   Q.   Do you allege that the firearm traveled in interstate

4   commerce?

5   A.   Through the investigation conducted by Special Agent

6   Salazar, who is a nexus expert, he informed me through his

7   report that the firearm has, in fact, traveled through

8   interstate nexus.

9   Q.   And do you have an exact date when that transaction

10  occurred?

11  A.   I do not.

12  Q.   Do you allege that Mr. Morgan traveled across state line?

13  A.   I do not know the travel history of Mr. Morgan.

14  Q.   Okay.  According to your testimony, is it true that you

15  say my rights wasn't restored?

16  A.   Correct.

17  Q.   Are you familiar with the TSA and the Department of

18  Homeland Security?

19  A.   I'm familiar with both of those agencies.

20  Q.   Okay.  When they provide you with a background clearance,

21  what do that specify?

22  A.   I do not know what you're referencing.

23  Q.   Oh.  Well, I received a background clearance from being a

24  felon in 2013 from the TSA, which is the Transportation Safety

25  Administration and Department of Homeland Security.  So my

1   rights was restored.

2   A.   I don't know what rights were restored in this particular

3   case between TSA and Homeland Security, but when it comes to

4   terms of being a prohibited person in the eyes of federal law

5   enforcement, being a prohibited person, there is a number of

6   items.  One of those, one of those items is being a felon.

7   During our investigation at no time did we see anything that

8   would state that any rights were restored in the sense of being

9   able to possess a firearm.

10  Q.   The Probation Department at this location, Ms. Trevino,

11  she have records of my rights being restored, restored by TSA

12  and Department of Homeland Security.  So --

13  A.   I'm sorry, I don't understand the question.

14  Q.   No, I say, she have records of it, and you said you

15  didn't.  You said you did an investigation on it.  What

16  investigation did you do on it?

17  A.   The investigation I conducted was going through to verify

18  that there are court-certified documents stating that the

19  Defendant is a convicted felon.

20  Q.   And stating that the Defendant is a convicted felon,

21  that's a lifetime condition?

22  A.   As far as I -- I don't know if it's a lifetime condition,

23  but there has been no evidence of any sort of rights pertaining

24  to ownership of a -- I'm sorry -- the possession of a firearm

25  that were uncovered during the investigation.

1    Q.   So up under your expertise if a person is discharged from

2    a prior sentence what would you define as discharged from a

3    prior sentence?

4    A.   Could you please repeat the question?

5    Q.   What would you define as discharged from a prior sentence?

6    A.   I don't -- I don't understand how to answer that.

7    Q.   Well, I can help you out a little bit.

8             MS. ISON:  Objection, your Honor.

9             THE COURT:  Well, let me hear the question.

10   BY DEFENDANT MORGAN:

11   Q.   Actually, discharge from a prior sentence means to set

12   free of all obligations and I met that criteria.  I received

13   certificates of rehabilitation.  So I'm trying to understand,

14   why would you label Mr. Morgan as a convicted felon when at

15   the time of April 9, 19 -- 2019, Mr. Morgan wasn't serving no

16   sentence, no probation, no parole, or owed no fines or

17   restitutions?

18   A.   I'm sorry, can you -- so what's the question?

19   Q.   What give you the legal grounds to claim Mr. Morgan as a

20   convicted felon when at the time of April the 9th, 2019,

21   Mr. Morgan wasn't serving no -- no sentence of imprisonment,

22   probation or parole, fine or restitution, which defines felon?

23   A.   Based off of certified court documents indicated, as I

24   have mentioned before, that Mr. Morgan is a convicted felon.

25   Q.   Once again, did any of them court documents state that

1    Mr. Morgan was serving a lifetime sentence?

2    A.   From my evaluation of the documents, a lifetime sentence

3    of imprisonment was not included as part of the -- any plea

4    agreement or any sentencing.

5    Q.   Okay.  Did you partake in the arrest of Mr. Morgan?

6    A.   Did I partake -- I executed the felony arrest of

7    Mr. Morgan.

8    Q.   And what location that was at?

9    A.   I obtained custody of Mr. Morgan at the Wayne County Jail.

10   Q.   On April 9th, 2019, did you have a legal -- did you

11   partake in that arrest?

12   A.   No.

13   Q.   Okay.  Now, did you ever do a forensic lab report on that

14   firearm?

15   A.   I did not conduct a forensic lab report on this firearm.

16   Q.   Okay.  Do you claim to be employed by an entity of the

17   Government that does professional work?

18   A.   Could you please rephrase that question?

19   Q.   Do you claim to be employed by an entity of the Government

20   that does professional work?

21   A.   I am a special agent with the Bureau of Alcohol, Tobacco,

22   Firearms, and Explosives.

23   Q.   Okay.  Did you retrieve any fingerprints from that

24   firearm?

25   A.   I did not retrieve any fingerprints from that firearm.

```
 1    Q.   Have you ever lied under oath to cover up the truth?
 2    A.   No.
 3    Q.   Okay.  Do you have knowledge of the interstate commerce?
 4    A.   I do not have -- I know of it.
 5    Q.   Are you familiar with the bill of lading that is required
 6    in all interstate commerce transactions?
 7    A.   I don't know -- I do not know the policy that you're
 8    referencing.
 9    Q.   It's Title 49 from the Code of Federal Regulations.
10         MS. ISON:  Objection, your Honor.  The Court has
11    already ruled on this.  It is irrelevant.
12         DEFENDANT MORGAN:  "Are you familiar."  He answered
13    the question, are you familiar with the --
14         THE COURT:  Mr. Morgan, do you have a response to the
15    objection?
16         DEFENDANT MORGAN:  Yes.  He was answering the
17    question.
18         THE COURT:  The objection is sustained.  It's
19    irrelevant.  You may proceed.
20    BY DEFENDANT MORGAN:
21    Q.   Okay.  Back to that.  Do you allege that the firearm
22    traveled in interstate commerce?
23    A.   Based on the report of Special Agent Salazar, the nexus
24    expert, that firearm traveled through -- had interstate nexus.
25    Q.   Who traveled with that firearm?
```

1    A.   I do not know the history of the firearm.  I only know

2    that based off of the report from Special Agent Salazar, the

3    firearm was a part of an interstate nexus or has an interstate

4    nexus.

5    Q.   What date was that firearm traveled?

6    A.   As I have mentioned before, I do not know the history

7    of -- the manufacturing history or the travel history of that

8    firearm.

9    Q.   How could you claim that the firearm traveled in

10   interstate commerce when you don't have no specific details?

11   A.   As I mentioned earlier, based on the report of Special

12   Agent Salazar, nexus expert with the ATF, the firearm traveled

13   through interstate nexus or has an interstate nexus.

14   Q.   What's your definition of that, interstate nexus?

15        MS. ISON:  Objection, your Honor.

16        THE COURT:  What's the objection?

17        MS. ISON:  That is not for the witness to decide the

18   law.  The law is clear that the law comes from the Judge as to

19   the definition of interstate nexus.

20        THE COURT:  No, I agree with that, and interstate

21   nexus really is not part of the statute.  The question is

22   whether the firearm was in or affecting commerce, which is

23   what the statute says.

24        But I think Mr. Morgan is trying to ask you what your

25   understanding of that term is.

```
 1                THE WITNESS:  Understood.
 2                THE COURT:  Can you answer that?
 3                THE WITNESS:  Yes, I can.
 4                THE COURT:  Go ahead.
 5                THE WITNESS:  Interstate nexus means, is that if a
 6      firearm was -- or any item was made in one state and traveled
 7      to another state, that there is a nexus of interstate
 8      commerce.
 9      BY DEFENDANT MORGAN:
10      Q.   So my question to that:  You basically saying interstate
11      commerce is going from one state to another state?
12      A.   A product that is made in one state that travels to
13      another state has a nexus of interstate commerce.
14      Q.   Are you familiar with the constitutional -- give me one
15      second, please.
16                Are you familiar with Article I of the Constitution,
17      Section 8, Clause 3, Congress's power to regulate commerce
18      with foreign nations and among several states with the Indian
19      tribes?
20      A.   I'm not familiar with what -- what you -- I don't know.
21      Q.   Well, my question to you is, did Congress grant the power,
22      grant Article I, Section 8, Clause 3, to regulate manufacturing
23      or did it give Congress -- did it give the power to regulate
24      commerce?
25                MS. ISON:  Objection as to relevance.  And this
```

1    witness is not equipped to answer that question, your Honor.

2              THE COURT:  The objection is sustained.

3              Do you have any further questions?

4              DEFENDANT MORGAN:  Yes.

5    BY DEFENDANT MORGAN:

6    Q.   Is it possible for a police officer to make a mistake?

7    A.   Yes.

8    Q.   Is it possible that you have never made a mistake in life?

9    A.   Unfortunately, yes, I have made mistakes in my life.

10   Q.   Okay.  Okay.  Did you ever conversate with Mr. Morgan

11   about a semi-truck accident?

12   A.   Not that I recollect.

13   Q.   Okay.  According to April 9, 2019, where did you take

14   Mr. Morgan?

15   A.   My relationship with Mr. Morgan did not begin on April 9

16   of this year.

17   Q.   When did it begin?

18   A.   I believe on the 12th.

19             THE COURT:  Of April?

20             THE WITNESS:  Of April.  I'm sorry, your Honor.

21   BY DEFENDANT MORGAN:

22   Q.   And when you retrieved Mr. Morgan, did you receive

23   property?

24   A.   There was property.

25   Q.   Was Mr. Morgan enhanced CDL included in that property?

1    A.   I don't recollect what property was with Mr. Morgan when

2    I picked him up from Wayne County Jail.

3    Q.   Is it safe to say that you don't remember what property

4    you had retained?

5    A.   I do not remember what was in -- what property was with

6    Mr. Morgan at the time that I was first -- we first met.

7    Q.   Okay.  What would you do if you witnessed police

8    entrapment in your department?

9            MS. ISON:  Objection, your Honor.  Relevance.  And

10   it's a hypothetical, your Honor.

11           THE COURT:  The objection is sustained.

12   BY DEFENDANT MORGAN:

13   Q.   Do you have any records of Mr. Morgan committing any

14   crimes as a semi-truck driver?

15   A.   No, I do not have any records of any crimes.

16           Actually, there was a police report that was made in

17   Illinois involving Mr. Morgan making threatening phone calls

18   to a call center that initially got the interest of law

19   enforcement.

20   Q.   You say that initially got the attention of what?

21   A.   I could -- I'm sorry, I can clarify.

22           So a part of the investigation that I conducted

23   pertaining to the Defendant included a police report that

24   explained that someone that was identified as the Defendant was

25   making threatening phone calls to an insurance call center and

1    that that call center/insurance Company made police reports

2    with that local PD.  That local PD contacted MSP to find out

3    what was going on.  They realized at that time that there was

4    an open arrest warrant for Mr. Morgan, and at that time, DFAT

5    was contacted.

6    Q.   Are you testifying that the initial issue was from the

7    insurance Company?

8    A.   No.

9    Q.   What was the initial warrant?

10   A.   There was an arrest warrant out of Allen Park, Michigan,

11   concerning -- I don't recollect the facts of that case.  I just

12   know there was a valid warrant out of Allen Park, Michigan.

13   Q.   And according to the MSP, could you detail exactly what

14   that stands for?

15          MS. ISON:  Objection.  That calls for speculation,

16    your Honor, when he says "according to MSP."

17          THE COURT:  What does "MSP" stand for?

18          THE WITNESS:  Michigan State Police.

19          THE COURT:  I think that was the question.

20          DEFENDANT MORGAN:  Yes.

21   BY DEFENDANT MORGAN:

22   Q.   According to that, was Michigan State Police in charge of

23   the investigation of the insurance Company?

24   A.   I don't know what Michigan State Police -- their scope of

25   their investigation entailed.

```
 1    Q.   Was you -- did you have any -- partake in the
 2    investigation of that insurance Company?
 3    A.   I had no -- my investigation was solely to the facts of
 4    the case that was, the Defendant had a loaded firearm in his
 5    front pocket and he was a felon at the time of that possession.
 6    Q.   And did you ever witness the -- Mr. Morgan traveling
 7    across state line with a firearm?
 8    A.   The -- could you repeat the question?
 9    Q.   Did you ever witness Mr. Morgan traveling across state
10    line with a firearm?
11    A.   No.
12             DEFENDANT MORGAN:   I rest my case.   No further
13     questions, your Honor.
14             THE COURT:   Do you have any further questions?
15             MS. ISON:   Just a couple of follow-up.
16                         REDIRECT EXAMINATION
17    BY MS. ISON:
18    Q.   You indicated that you were made aware that there was an
19    outstanding warrant out of Allen Park for Mr. Morgan's arrest;
20    correct?
21    A.   Correct.
22    Q.   In what county is Allen Park located?
23    A.   Boy, I want to say it's Wayne County.
24    Q.   Okay.  And because you already testified that you picked
25    Mr. Morgan up at the Wayne County Jail.
```

1    A.   I did.

2    Q.   And why was he at the Wayne County Jail?

3    A.   He was at the Wayne County Jail pending the -- how he got

4    there, I do not know, but he was waiting for federal charges,

5    so there was a hold on his state arrest warrant that pending

6    federal charges were coming.

7    Q.   So did you look -- determine whether or not he was there

8    after having been arrested on the arrest warrant out of

9    Allen Park?

10   A.   Correct.

11   Q.   In addition to that you talked about interstate nexus and

12   you said that when a gun or a product travels from one state to

13   another there is an interstate nexus.

14        When you say nexus, what do you mean by that?

15   A.   I'm sorry, that there is a -- I'll use the term,

16   correlation or relationship between traveling from one state,

17   being manufactured in one state and then traveling to another,

18   that there is a history of or there is a connection to

19   traveling between states.

20   Q.   And does that also mean that it crossed state lines then?

21   A.   It did.

22        MS. ISON:  Your Honor, may I approach the witness?

23        THE COURT:  Yes.

24   BY MS. ISON:

25   ///

1    Q.   Agent Kenton, you have already testified that you are

2    familiar with Government's Exhibit 1.

3    A.   I am.

4    Q.   What is that again?

5    A.   This is a -- Exhibit 1 is a Raven Arms MP25 .25 caliber

6    semi-automatic pistol.

7    Q.   Based on your investigation in that case, is that the gun,

8    the weapon that was recovered from Mr. Morgan?

9    A.   Yes.

10   Q.   Have you had an opportunity to observe that weapon

11   personally yourself?

12   A.   I have.

13   Q.   Have you noticed anything on that weapon that indicates to

14   you that that weapon traveled in interstate commerce, in that

15   it crossed state lines?

16   A.   I do.

17   Q.   And what is that?

18   A.   There is a marking on the slide of the pistol indicating

19   that it was manufactured in the state of California.

20   Q.   And to your knowledge, do you know whether or not Raven

21   Arms, which you have already testified, the manufacturer of

22   that weapon, if Raven Arms ever had a manufacturing Company in

23   the state of Michigan?

24   A.   Never.

25   Q.   Based on your training and experience; is that correct?

 1  A.   Based on my training and experience and the information

 2  provided to me by other ATF agents.

 3  Q.   Are you aware, after a person is convicted of a crime and

 4  they serve a sentence, if they are -- if there are any other

 5  conditions imposed on them after --

 6  A.   There are.

 7  Q.   -- after being released from prison?

 8  A.   Correct.

 9  Q.   And did you determine whether or not Mr. Morgan had served

10  on any supervisory probation or anything as a -- or parole

11  after serving his time in prison for both of the 1998

12  conviction and the 2006?

13          DEFENDANT MORGAN:   Objection, your Honor.   That's a

14  form of coercion.   I mean, that's not a direct question.

15  That's basically asking him a question and giving him an

16  answer in the same phrase.

17          THE COURT:   Yeah, that would be a leading question.

18  But that form is not leading, and so the objection is

19  overruled.

20          THE WITNESS:   Could you please repeat the question?

21  BY MS. ISON:

22  Q.   Are you aware of whether or not Mr. Morgan served on

23  parole or any other -- in any other -- under any other

24  supervision following his term of imprisonment for the 1999

25  armed robbery?

1    A.   Yes.

2    Q.   And what do you know about that?

3    A.   That he was paroled and then violated parole and was sent

4    back to prison.

5    Q.   And at some point was he discharged from that parole?

6    A.   He was.

7    Q.   And was that -- discharged from that sentence; is that

8    correct?

9    A.   Correct.

10   Q.   Based on your training and experience, is that the same as

11   having your rights restored to possess a firearm?

12   A.   It is not.

13   Q.   What is the difference?

14   A.   The difference is that there is a process that needs to --

15   that needs to happen in order for you to have your rights

16   restored.  Completing your imprisonment is not one of them.

17   Q.   Well, it might be one of them.

18   A.   I'm sorry, it's not the only one.  I apologize.

19   Q.   In addition to that, the same thing with regard to the

20   2006 conviction for felon in possession of a firearm, do you

21   know whether or not Mr. Morgan was on any supervisory -- under

22   any supervisory conditions following his term of imprisonment

23   in that case?

24   A.   According to the court-certified document, yes.

25   Q.   And do you know whether or not -- you have already

1   testified that you see no evidence that his rights had been

2   restored from that conviction as well; is that correct?

3   A.   Correct.

4          MS. ISON:  I have no further questions, your Honor.

5          THE COURT:  Mr. Morgan, do you have further

6    questions?

7          DEFENDANT MORGAN:  Yes.

8          THE COURT:  Go ahead.

9                    RECROSS EXAMINATION

10  BY DEFENDANT MORGAN:

11  Q.   You just testified that the nexus is crossing state lines?

12  A.   Yes.

13  Q.   Who do you allege -- who do you allege crossed state

14  lines?

15  A.   I'm -- I can't give a hypothetical answer.  I don't know.

16  Q.   Do you allege Mr. Morgan crossed state line?

17  A.   I do not know the travel history of Mr. Morgan.

18  Q.   Did you witness Mr. Morgan traveling across state line?

19  A.   I do not know the travel history of Mr. Morgan.

20  Q.   You also said that my rights wasn't restored.  The police

21  department, the law enforcement agents, they have my CDL, and

22  on my CDL you can see the hazmat endorsement on it which

23  requires you, in order to get a hazmat endorsement on a CDL,

24  you have to have your rights restored.

25          MS. ISON:  Objection, your Honor.  Defendant, first

1    of all, is testifying and hasn't asked a question.  And it's

2    not relevant.

3              THE COURT:  It really isn't relevant, Mr. Morgan.

4    BY DEFENDANT MORGAN:

5    Q.  Well, do you -- do you know what happened to my CDL --

6    enhanced CDL license?

7    A.  No.

8    Q.  And what factual basis do you have to present to the Court

9    to show that my rights wasn't restored?

10   A.  I have no documents to say that his rights were restored.

11   I have -- in order to have your rights restored in order to

12   possess a firearm after being a convicted felon, that there

13   needs to be some sort of documentation.  No documentation

14   showing that that right was restored was located.

15             THE COURT:  Did you look for it?

16             THE WITNESS:  Yes.

17             THE COURT:  All right.

18   BY DEFENDANT MORGAN:

19   Q.  According to the CDL, enhanced CDL license, that can

20   easily be proven, but law enforcements has that in they

21   possession.

22             MS. ISON:  Same objection.

23   BY DEFENDANT MORGAN:

24   Q.  Do you have my CDLs in your possession?

25             THE COURT:  Do you have an objection?

1           MS. ISON:  Objection as to relevance.  And it's been

2    asked and answered, and the Court has already ruled on the

3    same question.

4           DEFENDANT MORGAN:  Your Honor --

5           THE COURT:  You keep asking -- go ahead.

6           DEFENDANT MORGAN:  It's only one way that we can

7    prove that my rights been restored.  Law enforcement took my

8    property.  They got my CDL, enhanced CDL license.  It can be

9    proven that -- based on my CDL license that my rights was

10   restored.

11          THE COURT:  I don't think that that's an accurate

12   statement of the law, Mr. Morgan.

13          DEFENDANT MORGAN:  The requirements to get a hazmat --

14          THE COURT:  Mr. Morgan, I'm not going to argue with

15   you about it.  We have been over this already, and I have

16   already sustained objections.

17          Now, do you have any additional questions for this

18   witness?

19          DEFENDANT MORGAN:  Yes.

20   BY DEFENDANT MORGAN:

21   Q.  You go back to where you testified that the gun, you know,

22   crossed state lines.

23          Do you have any documentations showing when that gun

24   crossed state line?

25   A.  As I have noted earlier, that the manufacturer was in the

1    state of Nevada and that for this gun to come to the state of

2    Michigan indicates that it has crossed state lines.

3    Q.   Do you have any documentation, I asked.

4    A.   The only -- the documentation that I'm relying upon is

5    the report provided by nexus expert, ATF Special Agent David

6    Salazar.

7    Q.   Okay.  What date did that gun cross state line?

8    A.   I do not know the travel history of this firearm or the

9    manufacturing history of this firearm.

10   Q.   Do you know who crossed state line with the firearm?

11   A.   I do not know the travel history of this firearm.

12   Q.   So your testimony, what are you testifying to, based on

13   the gun crossing state line, if you don't know the travel

14   history?

15   A.   This firearm was manufactured by Raven Arms in the state

16   of California.  In order for it to arrive to the state of

17   Michigan, it has to cross multiple states.  I do not know the

18   history of the travel of that firearm, other than the fact that

19   it was made in one state and traveled to this state, and it was

20   located in the front pants pocket of the Defendant.

21   Q.   Did you retrieve that?

22   A.   No.

23   Q.   How do you know it was retrieved from the front pocket of

24   the accused?

25   A.   Based off the report -- the MSP -- I'm sorry -- Michigan

1  State Police report provided by --

2          THE COURT:  Mr. Weston, you understand here you're

3  supposed to testify on the basis of personal knowledge; right?

4          THE WITNESS:  I apologize, your Honor.

5          THE COURT:  Okay.

6          THE WITNESS:  I don't know.  I wasn't there.

7  BY DEFENDANT MORGAN:

8  Q.  Well, based on your knowledge and your expertise as a

9  professional entity of the Government, do you have fingerprints

10  of that firearm?

11  A.  Can you please repeat the question?

12  Q.  Did you ever retrieve fingerprints of that firearm based

13  on your professional expertise?

14  A.  No.  I did not conduct any sort of fingerprint analysis.

15  Q.  What about a forensic lab report?

16  A.  No.  No forensic lab report was created.  Due to policy,

17  if a firearm is located on a person no DNA swabs are done

18  because it's been found on that person.

19  Q.  Okay.  What is the method of proving that -- what is the

20  method of proving fingerprints in a matter that a person

21  possessed a firearm?

22          MS. ISON:  Objection, your Honor.  It's beyond the

23  scope of redirect.

24          THE COURT:  It is.  Mr. --

25          DEFENDANT MORGAN:  I object, your Honor.

1          THE COURT:  No, you don't object.  The Government

2     objected.  The objection is that it's beyond the scope of the

3     questions that Ms.  Ison asked this witness.  And this witness

4     really had nothing to do with fingerprints and he never

5     testified to that.  So if you cross examine him on that, it

6     really has nothing to do with his testimony.

7          DEFENDANT MORGAN:  He testified that it came out of

8     my front pocket.

9          THE COURT:  Right.  And he then retracted that by

10    saying he didn't know that for sure.

11         DEFENDANT MORGAN:  No further questions, your Honor.

12         THE COURT:  All right.  Thank you.  Anything else?

13         MS. ISON:  Just a couple.

14                   FURTHER REDIRECT EXAMINATION

15    BY MS. ISON:

16    Q.  Based upon your position as the agent in charge of this

17    case, did you have an opportunity to discuss this case with the

18    other people involved in Mr. Morgan's arrest?

19    A.  Yes.

20    Q.  And did you review reports with that regard?

21    A.  Yes.

22    Q.  And did you learn information about the circumstances of

23    Mr. Morgan's arrest on April 9 of 2019?

24    A.  Yes.

25    Q.  Okay.  Based on your training and experience does

1   obtaining a commercial driver's license have anything to do

2   with the restoration of a person's rights after having been

3   convicted of a felony?

4   A.  It does not.

5          DEFENDANT MORGAN:  Objection, your Honor.

6          THE COURT:  What's the objection?

7          DEFENDANT MORGAN:  It wasn't anything about obtaining

8   a CDL.  The restoration is the enhanced -- I mean, the hazmat,

9   because with the hazmat endorsement you got to -- I had to

10   have my rights restored, because I did have --

11          THE COURT:  I understand your position, but that

12   doesn't mean the question is improper, so the objection is

13   overruled.

14          Any further questions?

15   BY MS. ISON:

16   Q.  Based on your training and experience, anything with

17   regards of receiving an enhanced or a commercial driver's

18   license that has the hazmat that has anything to do with the

19   restoration of a person's rights after they have been

20   committed -- I'm sorry -- convicted of a felony?

21   A.  No.  A restoration in terms of a driver's license, pilot's

22   license, or boating license has nothing to do with the

23   restorations of your rights or reversal of being a prohibited

24   person.

25          MS. ISON:  Nothing further, your Honor.  Thank you.

1          THE COURT:  Do you have questions?

2                    FURTHER RECROSS EXAMINATION

3     BY DEFENDANT MORGAN:

4     Q.   Do the restoration of your rights have anything to do with

5     receiving a background clearance from TSA and Department of

6     Homeland Security?

7     A.   I don't know what the terms of TSA and Homeland Security

8     are for the restoration of that.  But when it pertains to a

9     prohibited person in terms of possessing a firearm, they are

10    not mutually exclusive.

11    Q.   Once again, in order to receive a background clearance

12    from TSA or Department of Homeland Security, do it have

13    anything to do with restoring your rights?

14    A.   I don't know.

15              DEFENDANT MORGAN:  No further questions, your Honor.

16                    FURTHER REDIRECT EXAMINATION

17    BY MS. ISON:

18    Q.   Which agency is responsible for or governs prohibited

19    persons possessing firearms?

20    A.   I believe the ATF.

21    Q.   And that's your agency; right?

22    A.   Yes, ma'am.

23    Q.   And you know what is required in order to determine

24    whether or not someone's rights have been restored after having

25    been convicted of a felony; is that correct?

1    A.   I'm familiar with the process.

2    Q.   Does clearing a background check for purposes of getting a

3    job or a CDL license or anything else have anything to do with

4    the restoration of a prohibited person's right to possess a

5    firearm, based on your training and experience?

6    A.   Based on my training and experience, that is not a factor.

7            MS. ISON:  Thank you.  Nothing further, your Honor.

8            THE COURT:  Anything else, Mr. Morgan?

9            DEFENDANT MORGAN:  Yes.

10                   FURTHER RECROSS EXAMINATION

11   BY DEFENDANT MORGAN:

12   Q.   Based on a person receiving they -- restoring they rights,

13   is a firearm considered an explosive?

14   A.   I don't understand the question.

15           MS. ISON  objection as to relevance, your Honor.

16   BY DEFENDANT MORGAN:

17   Q.   I'm asking you, is a firearm considered an explosive?

18           THE COURT:  The objection is that it's irrelevant.

19    Do you have a response?

20           DEFENDANT MORGAN:  Yes.

21           THE COURT:  What's the response?

22           DEFENDANT MORGAN:  I have a direct question to the

23   restoration of my rights, because in order to haul explosives,

24   which is a placard as firearms, that's what the -- if you

25   hauling firearms, ammunition, you going to have to placard

1    your semi truck with an explosive.  So in order to get your

2    rights restored is that's part of -- is that's part of getting

3    your rights restored to be able to haul explosives, which is

4    firearms and ammunition, bombs, fireworks.

5              THE WITNESS:  I don't understand your question.

6    BY DEFENDANT MORGAN:

7    Q.  Based on a prohibited person, can a prohibited person

8    transport firearms, explosives, bombs, fireworks, ammunitions,

9    and firearms?

10   A.  No.

11             DEFENDANT MORGAN:  Thank you, your Honor.

12             MS. ISON:  Nothing further, your Honor.  Thank you.

13             THE COURT:  Thank you.  You may stand down.

14             Members of the jury, we're going to conclude our

15   session today.  We have -- there are some legal matters that

16   we have to take up on this case tomorrow morning before we get

17   you back into the courtroom, so rather than 8:30, I suggest

18   you come back in at 9:30.

19             So why don't you try to get here about 9:15, check in

20   on the fifth floor, wait there until Ms. Pinkowski comes to

21   get you to bring you up to the jury room, and then we will

22   hopefully conclude the case and get it to you for your

23   determination sometime during the day tomorrow.

24             In the meantime, though, please do not discuss the

25   case among yourselves.  Do not try to gather any information

 1    about the case or anything that we have discussed in court or

 2    any of the individuals on your own.  Remember, you have to

 3    decide the case based solely on what you have seen and heard

 4    here in the courtroom.

 5              You may retire to the jury room right now and just

 6    wait there for a few minutes before we discharge you for the

 7    day.

 8              Would you escort the jury out, please?

 9              THE CLERK:  All rise for the jury.

10       (Jury left courtroom at 4:09 p.m.)

11              THE COURT:  You may be seated.

12              Will the Government have any additional evidence?

13              MS. ISON:  No, your Honor.

14              THE COURT:  You will want to rest, then, tomorrow

15    morning before the jury?

16              MS. ISON:  Yes, your Honor.

17              THE COURT:  All right.  Mr. Morgan, do you intend to

18    testify on your own behalf tomorrow?

19              DEFENDANT MORGAN:  It's a possibility, your Honor.

20              THE COURT:  All right.  You understand that the

21    choice is yours?

22              DEFENDANT MORGAN:  Yes.

23              THE COURT:  You have a right to testify, but you also

24    have the right to remain silent.  Do you understand that?

25              DEFENDANT MORGAN:  Yes.

```
 1              THE COURT:  All right.  So would you let me know in
 2   the morning what your choice is?
 3              DEFENDANT MORGAN:  I got a quick question.
 4              THE COURT:  All right.
 5              DEFENDANT MORGAN:  If the testimony is to assert
 6   various laws and case laws, would that be accepted?
 7              THE COURT:  No.  You would not be able to testify
 8   about what you think the law is.  The law is what I will
 9   instruct the jury on.
10              DEFENDANT MORGAN:  Okay.
11              THE COURT:  And if you wish to consult with
12   Ms. Raben, maybe she can give you some advice.  You don't have
13   to take it if you don't want to, but she is available.
14              I will want him back here by 8:15 tomorrow morning
15   because I want to make sure Ms. Raben has some draft jury
16   instructions, and you can present them to him.
17              MS. RABEN:  Your Honor, are you aware that he --
18   transport did not arrive until almost 9:00?
19              THE COURT:  Yeah, I am aware of that, and that's not
20   the way it should have gone.  And I'm not sure why that is,
21   but I intend to look into it.
22              MS. RABEN:  Has the Court ever seen inbound 96 or 275
23   in the morning?
24              THE COURT:  Unfortunately, yes, I have.  So that
25   means to arrive at a particular time, and if there is some
```

1    difficulties, that means you have to start out earlier.

2              MS. RABEN:  Your Honor, if I were transporting, I

3    would be happy to drive out to Livingston County and get him

4    here by 8:15.

5              THE COURT:  I don't accept that you would be happy to

6    do that, although you might be willing.

7              MS. RABEN:  Yes.

8              THE COURT:  In any event, make sure you get him

9    transported here so he arrives at 8:15.

10             Ms. Raben, if you will stop by chambers I'll get you

11   a draft of some jury instructions.  I'll make those available

12   to the Government at the same time.  And then I hope to have a

13   charge conference in the courtroom tomorrow so that we can go

14   over that.

15             MS. RABEN:  Okay.

16             THE COURT:  And then by then, Mr. Morgan, maybe you

17   can tell me whether you would like to testify or not.  All

18   right?

19             DEFENDANT MORGAN:  Okay.  Could I just ask her one

20   question?

21             THE COURT:  Sure.  Of course.

22       (Discussion held off the record at 4:12 p.m.)

23             MS. RABEN:  Your Honor, Mr. Morgan has a question and

24   I think it's in relation to a jury instruction.

25             THE COURT:  What's the question?

1     DEFENDANT MORGAN: Just so the jury won't be

2 confused, is it possible that you can actually citate the

3 actual statute for Title 18 U.S.C. 922(g)? Is it possible

4 that you can include that as a jury instruction?

5     THE COURT: You want the actual text of the statute

6 you're charged with?

7     DEFENDANT MORGAN: Yes.

8     THE COURT: I usually don't do that, but I don't

9 think the Government has an objection to that.

10     MS. ISON: We don't. No objection, your Honor.

11     THE COURT: All right. I'll include that.

12     DEFENDANT MORGAN: Thanks, your Honor.

13     THE COURT: All right. If there is nothing further,

14 then, this matter will stand in recess. We will see you all

15 tomorrow morning.

16     MS. ISON: Thank you, your Honor.

17     (Proceedings adjourned at 4:13 p.m.)

18       *   *   *

19

20      **CERTIFICATE OF COURT REPORTER**

21    I certify that the foregoing is a correct transcript

22  from the record of proceedings in the above-entitled matter.

23

24     s/ Rene L. Twedt      June 26, 2020
   RENE L. TWEDT, CSR-2907, RDR, CRR, CRC  Date

25    Federal Official Court Reporter